**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM NO. 21–cr–00107-RDM |
| | ) | |
| BRUNO JOSEPH CUA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## EMERGENCY MOTION FOR REVOCATION OF DETENTION

Defendant Bruno Joseph Cua, by and through his attorneys, and pursuant to 18 U.S.C. §§ 3145(b) and 3142(e), respectfully moves this Court for an order releasing him to the third-party custody of his parents with location monitoring, as well as other conditions set forth herein. Such conditions are more than sufficient to reasonably assure Mr. Cua's future appearances before this Court and the safety of all persons and the community under the heightened standards of the Bail Reform Act. Given his age (18), the time he has been incarcerated to date, and the circumstances discussed below, Mr. Cua respectfully requests that the Court set an accelerated briefing schedule and hold a hearing at the soonest possible date that is convenient for the Court.

Counsel understands that Mr. Cua is currently in transit to D.C. After being held for nearly three weeks in Georgia, he was moved yesterday to the Grady County Jail in Chickasha, Oklahoma, and is being held in a cell with approximately thirty other inmates. Counsel has no further information as to when he will be moved to D.C. Counsel notes, however, that another Capitol defendant, Gina Bisignano, was arraigned and released today by video conference by Judge Nichols while being held at the Grady County Jail. *See United States v. Bisignano*, 1:21-cr-00036-CJN. Given that the Grady County Jail appears to have video conference capability,

Mr. Cua respectfully requests an arraignment and detention hearing by video conference from Oklahoma if the Court is amenable, especially if he is not transported to D.C. promptly.

## I.      PROCEDURAL HISTORY

Mr. Cua was arrested in Georgia on February 5, 2021, pursuant to a criminal complaint charging him with several offenses in relation to the breach of the Capitol that took place on January 6, 2021. Mr. Cua is charged based on allegations that he entered the Capitol without authorization, participated with others in a shoving match with a plain-clothes law enforcement officer inside the Capitol, and carried a baton on his person (but did not use it) while doing so. Pretrial Services in Georgia recommended release to his parents as third-party custodians and a $15,000 unsecured bond with other special conditions. On February 10 and 12, 2021, Magistrate Judge Alan Baverman held a detention hearing in the Northern District of Georgia at which Mr. Cua's father, Joseph Cua, testified in support of Mr. Cua's request that he be released to the third-party custodianship of his parents. At the end of the hearing on February 12, Judge Baverman found that Mr. Cua is a danger to the community based primarily on certain direct messages sent to other individuals. *United States v. Cua*, 1:21-mj-00129, ECF No. 9 (Feb. 12, 2021). Judge Baverman also found that Mr. Cua's parents are not suitable third-party custodians. *Id.* Judge Baverman stated at the hearing that he did not believe Mr. Cua was a flight risk.

## II.      INTRODUCTION

Bruno Cua is an impressionable eighteen-year-old kid who was in the middle of finishing his online coursework to graduate from high school when he was arrested. In many ways, he is less of an "adult" than many other teenagers. He has never lived away from his parents. He has lived his entire life in the area immediately surrounding Atlanta, Georgia. His favorite things to do are to work on his truck, go fishing, spend time with his family, and design and build

elaborate tree houses, much of the time accompanied by his little brother and his little brother's friends. He does not smoke, vape, or drink alcohol. He does not run around at night partying with other teenagers. He has never been arrested or jailed before his arrest in this case.

Right now, Bruno is very scared and very remorseful. In the strongest terms, he wholly regrets his actions on January 6 and fully recognizes the utmost seriousness of the charges and allegations against him. His arrest and these charges will unavoidably change the course of this young man's life. His parents are heartbroken. His younger sister and brother just want Bruno home. The impact of this experience will forever alter their entire family. But while the charges are serious, Mr. Cua is prepared to face them through the legal system. He should not, however, be forced to do so from a jail cell hundreds of miles away from his family, especially during the current pandemic, while he remains innocent until proven guilty.

In the months and days leading up to January 6, 2021, former President Trump and his surrogates repeatedly sowed the seeds of distrust in the democratic institutions of this country, claiming that the presidential election had been stolen from him. He engaged in violent rhetoric and fomented a growing outrage among his supporters. Other politicians, prominent persons, and members of the media amplified and radicalized the message further—the Democrats had stolen the election and Trump's supporters must "stop the steal." The message echoed across social media, as unsubstantiated allegations were hurled back and forth and the rhetoric grew more and more violent. True or not, Trump and many of his supporters espoused the belief that our democratic institutions had failed, that Trump had won the election, and that Biden was an illegitimate President. As January 6 grew closer, Trump called his supporters to Washington to "fight." From the Office of the President of the United States, he tasked them with an illegal and impossible task—to stop Congress from certifying the election results. Indeed, President Trump

was impeached for inciting an insurrection based on his role in the violence at the Capitol and fifty-seven senators voted to convict him.

At the detention hearing in Georgia, the government presented a number of direct messages Mr. Cua sent to other individuals to support their allegations that he is such a danger that no conditions of release could reasonably assure the safety of the community. But those messages are the idle chatter of an extremely passionate, but very naïve, teenager who was parroting what he heard and saw on social media. Mr. Cua did not come up with these ideas on his own; he was fed them. As one press report describes, "talk of civil war, traitors and revolution mirrored fighting words echoed by right-wing social media personalities and websites for months."[1]

As reported in USA Today, before the Capitol Riots "[v]iolent rhetoric including threats against elected officials and police officers flooded all social media platforms including Facebook, Twitter and Google's YouTube, not just online forums popular with extremists," which was "fueled by President Trump's voter fraud claims."[2] On one popular message board called TheDonald, eighty percent of the top posts called for violence in the top five responses, including comments such as "WE WANT BLOOD" and calls to murder House Speaker Nancy Pelosi. *Id.* One account urged Trump's followers to "[s]tart shooting[,] patriots. Kill these (expletive) traitors." *Id.* The Boogaloos, a far-right extremist group, called for Trump supporters to "Burn down DC." *Id.* Members of the extremist groups the Proud Boys and Oath Keepers conspired to disrupt Congress. One person online asked "Whos running arms and ammo to dc for

---

[1] M. Kunzelman & A. Seitz, "Dozens Charged in Capitol Riots Spewed Extremist Rhetoric,"
[2] J. Guyyn, "'Burn down DC': Violent that Erupted at Capitol Was Incited by Pro-Trump Mob on Social Media," USA Today (Feb. 12, 2021), *available at* https://www.usatoday.com/story/tech/2021/01/06/trump-riot-twitter-parler-proud-boys-boogaloos-antifa-qanon/6570794002/.

when the fun starts." *Id.* A TikTok video with hundreds of thousands of views encouraged supporters to arm themselves, while thousands of posts on Parler "talked of a second civil war." *Id.* According to the research organization Advance Democracy, there were 128,395 engagements with posts on social media with calls for violence. *Id.* The false narrative and violent rhetoric of former President Trump and other leaders is the central fact that links all of the Capitol cases.

As a sheltered and vulnerable teenager whose view of the outside world largely revolved around social media, Mr. Cua echoed what many others were saying. And as the government has recognized, there were "scores of individuals inside the Capitol building without authority to be there." *United States v. Barnett*, 1:21-cr-00038-CRC, ECF No. 12, at 5 (D.D.C. Jan. 27, 2021). Mr. Cua did not lead the charge. He did not break windows or damage property to gain access. Mr. Cua did not plan out an attack or conspire with others. He did not plan to meet up with other people in D.C. It was a mob of people, many of whom unfortunately believed the very same things expressed in the direct messages on which the government relies so heavily. Unfortunately, Bruno was swept up in this mistaken world view, a view that told him that democracy was not working and the only option was to fight. But in the end, he never even acted on any violent rhetoric. He could have, but he did not.

## III.   ARGUMENT

"Our system of criminal justice embraces a strong presumption against detention." *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 113 (2013) (quoting *United States v. Hanson*, 613 F. Supp. 85, 87 (D.D.C. 2009)). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). This Court must release a defendant prior to trial unless it determines "that

such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. §1342(b).

### A. Mr. Cua's parents are appropriate third-party custodians.

The defense proposes that Mr. Cua be released to the third-party custody of his parents, Joe and Alise Cua. The suitability of Mr. and Dr. Cua as third-party custodians may be a less important issue given that most of the Capitol defendants released to date whose cases have been reviewed by counsel have been released without a third-party custodian. Thus, release to the custodianship of his parents is, in essence, an extra assurance of compliance with release conditions. Nevertheless, the defense addresses his parents' suitability, given the magistrate judge's finding in Georgia.

The Cuas have been married for twenty-one years. They, along with their three children, reside in Milton, Georgia, in a single-family home on farmland. Up until last year, Joe Cua had worked for an international hotel chain for twenty years, serving as a Vice President in the development area for the past seven years. He now works for a construction restoration company. His wife Alise is a veterinarian who gave up her practice to be at home to raise her children. She now works as a freelance photographer. Bruno has two younger siblings: a 17-year-old sister a 13-year-old brother. Bruno and his siblings are home-schooled. They are a close family of Christian faith who enjoy the support of their church community, their neighbors, and their wider community. A letter from Bruno's parents is included at Exhibit 1.

In its efforts to keep Mr. Cua jailed pending trial, the government has attempted to impugn the character of Mr. Cua's parents, largely based on their political beliefs, attacking them as unsuitable custodians. The government's argument centers on two points: (1) that his parents brought him to D.C. to participate in what they believed would be a First Amendment demonstration; and (2) Bruno Cua's youthful brushes with law enforcement that, in the

6

government's view, were not properly curtailed or prevented by his parents. The government's attempt to sully the outstanding reputations of Mr. Cua's parents fails. Moreover, even to the extent that his parents were motivated to go to D.C. on January 6th based on President Trump's false allegations of voter fraud (something that by itself would be no reason to find them unsuitable), their eyes are wide open now.

Mr. Cua's father, Joseph Cua, testified extensively at the Georgia hearing about the reason he, his wife, and their son traveled to Washington, D.C. They had no expectation that there would be a riot and certainly had no intention to participate in one (nor did they). They went as a family to exercise their First Amendment rights. In Joe Cua's testimony in Georgia, and in the letter at Exhibit 1, the Cuas have expressed regret and embarrassment that they ever believed the statements of the President and other leaders that there was widespread fraud that caused Trump to lose the election. While Mr. and Dr. Cua, along with Bruno, stood a distance away from the Capitol and noticed a fracas developing nearer to the Capitol, Bruno said he wanted to take a closer look, suggesting he would climb up a nearby scaffolding to get a better view and take a picture of the National Mall. His parents deeply regret ever letting him go closer. And while Mr. Cua's father was aware that Bruno was carrying a baton for self-defense,[3] they did not think that there was any chance he would get involved in the increasingly chaotic scene closer to the Capitol. As events unfolded, and not knowing the location of their son, they tried to reach him on their cell phones, but the calls would not go through as the cellular network was apparently jammed.

---

[3] Carrying the baton for self-defense was largely motivated by reports of prior incidents of violence in D.C. at prior rallies, as well as rhetoric on social media suspecting that counter-protestors would engage in violence at the rally on January 6. To be clear, Bruno was not involved in any violence at prior rallies, but he and his parents had read and heard about incidents in the media.

Mr. Cua's parents also had no idea that their son was sending direct private messages through Instagram like the ones highlighted by the government. If they had known, they would have stopped it, including by taking away his social media or his phone. Indeed, although there is little to no chance that Mr. Cua would continue to engage in such rhetoric if he is released (or that his parents would allow him on social media), precluding social media is one condition the Court may impose on Mr. Cua to ensure that such language is not used going forward. Indeed, shortly after January 6, the Cuas made Bruno spend most of his time in his room working on his studies, allowing him out of the house for chores and errands. In the time between January 6 and his arrest on February 4, Bruno completed three courses: College Algebra (completed January 13, 2021), Intro to Government (completed January 18, 2021), and Intro to Marketing (January 26, 2021). *See* Ex. 2. If he is released and permitted to be online for this singular purpose, he will spend his time completing the three classes he has remaining to graduate from high school.

As for Bruno's interactions with law enforcement cited by the government, these were minor incidents that have no bearing on whether Bruno is an actual danger to the community, whether he will fail to follow the Court's conditions of release, or whether his parents are suitable custodians. None of the interactions involved violence. Only one incident resulted in any citation, and that was for blowing his airhorn in a school parking lot when school was not in session after a teacher complained. Bruno's father was present at that incident, as were Bruno's younger brother and some of his friends (all kept a safe distance away), to see Bruno fly a new flag from his truck. Permitting one's eighteen-year-old child to do something so minor (that rarely would be subject to a citation) cannot possibly be grounds for finding a custodian unfit, even assuming a custodian is needed here.

Most of the other interactions with law enforcement relate to Bruno riding his ATV on the gravel road in front of their house, something that Bruno and others in the neighborhood had done for years before a neighbor began to complain.[4] About a year ago, Bruno sold the ATV. Another incident where Bruno allegedly disobeyed a security guard's instruction not to enter a private subdivision—a path he had taken previously numerous times to get to a fishing spot—is a youthful indiscretion that markedly differs in character and kind from the conduct at issue here. As a neighbor and former FBI agent explains in his letter of support for Bruno:

> [T]he community . . . carried what I would deem to be petty running feuds amongst each other. . . . In my opinion, [Bruno's] interactions with law enforcement have been overblown. As a teenager, he was overly targeted by a few neighbors with complaints about his youthful behavior in the neighborhood. I have interacted in the past with community law enforcement officers regarding Bruno's and other neighborhood children's "run-ins" with law enforcement and find these instances to be over-hyped in relation to their portrayal that this behavior is symptomatic to these recent actions.

Ex. 3 at 2. In any event, the shock of arrest and incarceration, and the potential for returning to jail, are certain to keep Bruno out of any further trouble while he awaits trial.

As they make clear in their letter to the Court attached hereto, Bruno's parents are committed to supervising Bruno closely and ensuring that he abides by all conditions imposed by the Court. They state that they "will strictly enforce the Court's conditions" and "immediately call law enforcement should he violate any part of the bail conditions. Ex. 1 at 2. In fact, they intend to impose limitations on Bruno beyond conditions typically imposed for pretrial release, including no smart phone, no access to internet other than for his classes, and no social media. *Id.* at 1-2. They explain that they "want to provide solid guardrails and ensure his success." *Id.*

---

[4] The Cuas' home is on three acres of farmland within an agricultural zone. It is not a typical suburban subdivision. Joe Cua testified at the detention hearing in Georgia that his former neighbor, a retired FBI agent, had also been pulled over for driving his ATV on the road. Feb. 12, 2021 Tr. at 12:23-13:1.

**B. The future court appearances of Mr. Cua and the safety of the community can be reasonably assured through his release to the custody of his parents and other appropriate conditions of release.**

Based on the four factors enumerated in section 3142(g), the government cannot make a sufficient showing that no conditions can reasonably assure the safety of the community and Mr. Cua's future appearances.

### a. Nature and Circumstance of the Offense

Although the charges against Mr. Cua are undoubtedly serious, it is important to focus on the specific factual allegations against Mr. Cua, including in comparison to other persons involved in the incidents at the Capitol on January 6, 2021. In essence, the government alleges that Mr. Cua entered the Capitol without authorization, participated alongside others in a shoving match with a plain-clothes federal officer, where no injuries have been reported, and possessed a baton while he was doing those things. He is not alleged to have participated in the violent breach of police lines, breaking windows, or otherwise forcefully entering the Capitol. He is not accused of using the baton or engaging in any other physical violence, property damage, or theft. While he entered the Senate Chamber, he did not sit in the Vice President's chair or rummage through papers in the chamber like others. And although the maximum sentences available for his charges, if he is convicted, are significant, there are no minimum sentences.

In the detention hearing in Georgia, however, the government attempted to lump Mr. Cua in with the collective mob and the worst of the worst. In attempting to exaggerate the seriousness of the charges, the government cited the then-ongoing Senate impeachment trial against the former President for his role in the Capitol riots and stated that "Mr. Cua and several hundred other people *charged* the United States Capitol . . . ." Feb. 10, 2021 Tr. at 6:23-7:4 (emphasis added). The government also described that people died as a result of the riots at the Capitol and that 140 members of law enforcement were injured. *Id.* at 7:5-7. The government, however, has

provided no evidence that Mr. Cua himself "charged" the Capitol or engaged in any violence whatsoever to gain entrance. There were many people who made it inside the Capitol that day who walked right in after security had been breached and who have not been charged. And there is no allegation that Mr. Cua engaged in any actions that contributed to the injury or death of anyone. As the government admitted elsewhere, based on the images captured by Capitol surveillance, it appears as if Mr. Cua was on a tour of the Capitol. *Id.* at 8:23-24.

Looking at the specific actions of Mr. Cua is important because of how his case compares to other persons the government has charged who have been released. In some cases, defendants with more serious conduct—or even who engaged in actual violence—have either been released over the government's objections or the government *did not even seek their detention*. Releasing Mr. Cua under special conditions is fully consistent with what Courts have ordered in these other Capitol cases. The following are a few examples of defendants who have been released with cases often involving closer involvement in the breach of the Capitol, violent acts, advanced planning, and extremist viewpoints, illustrating that they pose a far greater danger to the community than Mr. Cua could ever pose.

*1. United States v. Chad Jones*, 1:21-mj-00076-ZMF – Whereas Mr. Cua was charged with assault on a federal officer under 18 U.S.C. § 111(a) (essentially simple assault), Mr. Jones was charged under section 111(b), which requires the additional element of either use of a deadly or dangerous weapon or infliction of bodily injury. Mr. Jones was also filmed using a flagpole to repeatedly and forcefully strike and break the glass of the now infamous doorway where Ashley Babbitt was shot and killed as she climbed through a broken pane. Just before Mr. Jones started breaking down the glass, lawmakers and staff were seen on the other side of the doors from the

angry mob, being evacuated. Below is a still shot from the complaint against Mr. Jones in a red

jacket in which he is shown breaking the glass with the pole moments before Babbitt is shot.[5]



As described in the complaint, "[a]n officer inside the Speaker's Lobby, facing the door with a

gun raised, can be seen at the [left] side of the video in the close vicinity of the doorway," as

shown below.



---

[5] It is difficult to grasp the violent and reckless conduct undertaken by Mr. Jones without
watching the full video, which can be viewed at
https://www.washingtonpost.com/investigations/2021/01/08/ashli-babbitt-shooting-video-
capitol/.

As the officer points the gun and fires at Ms. Babbitt, Jones could still be seen next to the door with the pole, just to the left of where Ms. Babbitt was shot. The government did not request Mr. Jones's detention and Magistrate Judge Harvey released him on special conditions.

    *2. United States v Vitali Gossjankowski*, 1:21-cr-00123-PLF – According to the Indictment, Mr. Gossjankdowski (pictured in a royal blue jacket below) has been charged under 18 U.S.C. § 111(b) for assaulting a federal officer with a dangerous weapon (a Taser) after being videotaped trying to forcefully and violently enter a restricted area of the Capitol and activating the Taser multiple times, in contrast to Mr. Cua, who is not accused of using the baton.[6]



The complaint describes that an officer near Mr. Gossjankowski suffered a heart attack and was hospitalized after being Tased multiple times on the back of his neck. While Mr. Gossjankowski said he recognized the officer during an interview, he denied using the Taser on him. He is also charged with section 1752 offenses for being in restricted areas of the Capitol while carrying or using a dangerous weapon. The government did not object to his release.

---

[6] The full video is available at https://www.youtube.com/watch?v=cJOgGsC0G9U. Mr. Gossjankowski can be seen entering the scene at the 2:25 mark as he pushes his way to the front of the crowd and discharges the Taser multiple times before reaching the front and the line of the officers attempting to stop the crowd, eventually passing a police shield taken from an officer back over the crowd.

*3. United States v. Matthew Miller*, 1:21-cr-00075-RDM – Your Honor ordered Mr. Miller to be released subject to special conditions. As the Court knows, Mr. Miller was charged with ten offenses, including assault on a federal officer under section 111(b), a more severe charge than Mr. Cua received, based on his assault by discharging a fire extinguisher, as captured in the image below. He is also accused of using a crowd barrier fence as a makeshift ladder to scale the walls of the Capitol. Mr. Miller was also charged with offenses under section 1752 involving use or carrying of a dangerous weapon.



*4. United States v. Rachel Powell*, 1:21-mj-00197-GMH – Ms. Powell, known in the press as the "bullhorn pink hat lady" in the press, was filmed using a battering ram to break a large window of the Capitol valued at approximately $1,000 so that she and the rioting crowd could force their way into the Capitol, as shown in the image below from her complaint.

14



Ms. Powell was also filmed using a bullhorn to direct rioters inside the Capitol toward lawmakers, seeming to have detailed knowledge of the floor plan, as shown below.



Among other charges, Ms. Powell is accused of entering or remaining in a restricted area with a dangerous weapon, the same charge as Mr. Cua. Ms. Powell was released by a magistrate judge in the Western District of Pennsylvania. The government appealed the release order, but Chief Judge Howell denied the appeal.

    5. *United States v. Robert Packer*, 1:21-cr-00103-CJN – Mr. Packer was infamously photographed inside the Capitol wearing a "Camp Auschwitz" t-shirt, suggesting anti-semitic beliefs and endorsement of the Holocaust, an obviously horrific and violent event, as shown in the image below from his complaint.



Mr. Packer was charged with entering or remaining in a restricted building and violent entry and disorderly conduct on Capitol grounds. He was previously convicted of forging public records, driving under the influence, driving without a license, and had a warrant for failing to appear in court. The government did not request pretrial detention of Mr. Packer.

6. *United States v. Mark Leffingwell*, 1:21-cr-00005-ABJ – Like Mr. Cua, Mr. Leffingwell was charged with assault on a federal officer under section 111, as well as several counts under 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). Unlike Mr. Cua, however, Mr. Leffingwell allegedly pushed past a wall of law enforcement officers who were attempting to keep people out of the Capitol and then repeatedly punched an officer with a closed fist. In other words, he was part of the mob who actually breached the Capitol. The government did not object to Mr. Leffingwell's release on conditions.

7. *United States v. Joseph Biggs*, 1:21-mj-00126-RMM – Mr. Biggs is an admitted member of the Proud Boys, an extremist group described in Mr. Biggs's by the government as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western chauvinists." Mr. Biggs posted a plan on social media for the Proud Boys to go to D.C. on January 6, 2021, but not to wear their distinctive black and yellow, saying "we are

going to blend in like you" (referencing Antifa). He is alleged to have been at the front of the crowd who breached the Capitol and to have entered the Capitol within 20 seconds of its breach. He appeared to have been wearing an earpiece and carrying a walkie-talkie for communication purposes (and presumably coordination with other Proud Boys) during the riot. He was released in the Middle District of Florida and it does not appear that the government appealed his release.

8. *United States v. Matthew Capsel*, 1:21-mj-00122-RMM – Like Mr. Cua, Mr. Capsel was charged with assaulting a federal officer. Mr. Capsel was captured on video fighting against National Guardsmen attempting to hold a boundary with riot shields, as shown below in an image from his complaint. Mr. Capsel persisted in fighting until he was pepper sprayed.



The government's oral motion to detain Mr. Capsel was denied in the Southern District of Illinois. It appears that the government did not appeal Mr. Capsel's release.

   *9. United States v. Josiah Colt*, 1:21-cr-00074-TFH – Mr. Colt went to the rally on January 6 wearing tactical assault gear, including a helmet.[7] He was infamously photographed scaling down the wall of the gallery in the Senate chamber, as shown below in an image from his complaint.



According to the complaint, Mr. Colt claimed in a Facebook video that he was the first person to sit in Speaker Pelosi's chair (which was actually Vice President Pence's chair) and calls her a traitor. The government did not seek Mr. Colt's detention.

   *10. United States v. Christopher Alberts*, 1:21-cr-00026-CRC – Mr. Alberts was stopped on Capitol grounds on January 6, 2021, after the emergency curfew, when a law enforcement officer noticed a bulge on his hip that turned out to be a handgun fully loaded with 13 bullets. He

---

[7] Coincidentally, Magistrate Judge Baverman asked Joe Cua if he saw people in tactical gear at the rally before the riot, presumably to support an inference that Mr. Cua should have been aware that violence may break out. But *actually wearing* tactical gear was insufficient to justify holding Mr. Colt.

also carried a spare magazine in a holster on his other hip and was wearing a bullet-proof vest. In his backpack, he was carrying a gas mask, a military-style meal-ready-to-eat (MRE), and a first aid kit. The government's oral motion to detain Mr. Alberts was denied and he was released by Magistrate Judge Harvey.

    11. *United States v. Nicholas DeCarlo and Nicholas Ochs*, 1:21-cr-00073-BAH – Messrs. DeCarlo and Ochs are charged with conspiring with each other and other persons to stop Congress's certification of the election results. Mr. Ochs is a founding member of the Proud Boys Hawaii chapter with the group's name tattooed on his arm. They engaged in planning, fundraising, and forcibly stormed past barricades. In a video on social media, DeCarlo stated that he came to DC to stop the vote counting. Another video of the two of them is titled "Twas the Night Before REVOLUTION!!!" They are alleged to have defaced the Memorial Door of the Capitol with the words "Murder the Media," as shown below in an image from Mr. DeCarlo's complaint.



Ochs is charged with stealing flex cuffs from a Capitol police officer. Ochs posted a picture of them on social media showing them smoking cigarettes in the Capitol. The government did not seek their pretrial detention.

12. *United States v. Matthew Council*, 1:21-mj-00008-GMH – Mr. Council is alleged to have forced his way through a police line inside the Capitol during which process he pushed a female uniformed Capitol police officer and had to be pepper sprayed. The government did not seek Mr. Council's detention. Among his conditions of release, Mr. Council was ordered to participate in mental health treatment, including medication compliance.

13. *United States v. Gina Bisignano*, 21-cr-00036-CJN – As the government emphasized in its appeal of a release order entered in the jurisdiction of arrest, Ms. Bisignano is accused of being an "instigator, a director, and an active participant in the violence, destruction and obstruction at the Capitol" on January 6. ECF No. 12 at 1. On the front lines of the crowd pushing against the police line, as pictured below, she allegedly shouted through a bullhorn things like: "Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our boys!"



Among her eight charges, she is charged in her Indictment with destruction of government property. After she was released in her home district, Judge Nichols denied the appeal and ordered Ms. Bisignano to be released.

*14. United States v. Jenny Cudd*, 21-mj-00068-TNM – Ms. Cudd is alleged to have been inside the Capitol without authorization. According to the Complaint, after leaving the Capitol, Ms. Cudd livestreamed a video in which she stated, "I was here today on January 6th when the new revolution started in the Capitol." In describing her entrance, she further stated, "we just pushed, pushed, and pushed, and yelled go and yelled charge." Showing no regret after the fact, she also said, "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions." She later told a local news station during an interview, "Yes, I would absolutely do it again." The government did not seek Ms. Cudd's detention. Moreover, on February 4, 2021, the Court granted Ms. Cudd's motion to travel to Mexico to participate in a work-related retreat, which neither the government nor Pretrial Services opposed.

### b.  Weight of the Evidence Against the Person

Given the nature of the charges against Mr. Cua as compared with other cases, the weight of the evidence supporting such charges is of less significance here. He is not a flight risk or a danger based on the weight of the evidence, as Magistrate Baverman agreed. It is worth noting, however, that the only evidence the government has presented regarding Mr. Cua allegedly pushing a federal officer is a still shot of Mr. Cua next to a person alleged to be a federal officer outside the Senate Chamber and another still shot in which Mr. Cua is completely obscured except for his head and appears to be behind other persons who are closer to the officer. ECF No. 1-1 at 8-9. Thus, the government has thus far not provided any photographic or video evidence of Mr. Cua pushing the officer.  Even if it had, however, many defendants who engaged in far more serious contact have been released, and some without any objection from the government.

### c. History and Characteristics of Mr. Cua

Among the types of information the Court must consider as part of Mr. Cua's history and characteristics are his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."[8] 18 U.S.C. § 3142(g)(3)(A). The government's complaint and the press reports, while leveling serious allegations against Mr. Cua, fail to address these important factors. All of these factors weigh heavily in favor of Mr. Cua's release pending trial.

Much of these factors have been addressed above. The community support for Mr. Cua is overwhelming. Almost immediately after Mr. Cua's arrest, he received dozens of letters of support. *See* Ex. 4. Those letters repeat the same refrain about Mr. Cua's character—he is a respectful, kind, courteous, and compassionate young man. He has no history of drinking alcohol or using drugs. One neighbor, a former FBI agent, writes, "Bruno is a good kid, one whose recent actions, I don't believe, truly speak to his character. He is also a passionate young man, who cares deeply about this country, and whose intentions may have been misguided but [sic] the various personalities he perceives to be leaders." Ex. 3 at 2. After his arrest, his parents found a display outside their home supporting them and Bruno. *See* Ex. 5. His parents will continue to financially support him, including by financing his legal defense. Mr. Cua has lived his entire life in or near his current home in Milton, Georgia. He has no close ties to anyone outside that community. In short, Milton is his world.

---

[8] In addition, among the history and characteristics of the defendant that the Court must consider is "whether, at the time of the current offense or arrest, the person on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3)(B). Mr. Cua was not under such conditions at the time of the current offense or arrest.

Mr. Cua also has no criminal history. Media reports and the government have discussed the fact that Mr. Cua was issued a $300 citation for disturbing the peace from blowing an airhorn.[9] The government has also made much of minor run-ins Mr. Cua has had with police, such as a warning for trespassing in a private neighborhood and driving an ATV on the road in front of his house, which had been done for years by him and others without incident until new neighbors complained. None of these incidents resulted in any charge or citation. None of them endangered the community. More importantly, none of this information raises an inference sufficient to show that *no conditions* of release can reasonably assure the safety of the community.

Perhaps the most important factor for the Court to consider is Mr. Cua's age. At eighteen, he is just barely an adult in the eyes of the law, but mentally and emotionally he is far from being a mature adult. It is now well accepted that the prefrontal cortex of the brain, the part that controls judgment and impulsivity, does not fully develop until a person's twenties. A. Ortiz, *Cruel and Unusual Punishment: The Juvenile Death Penalty, Adolescence, Brain Development and Legal Culpability*, 1-2 (2004) (published by the American Bar Association).[10] One scientific report in 2013 states that development of the prefrontal cortex is not complete until age twenty-five. M. Arain, et al., "Maturation of the Adolescent Brain," *Neuropsychiatric Disease and Treatment*, 459 (2013).[11] As a result, "[a]dolescents often rely on emotional parts of the brain, rather than the frontal lobe." Ortiz, at 2. "Mass media, community, and adult role models can [also] influence adolescent risk-taking behaviors." In addition, male adolescent bodies are

---

[9] Mr. Cua was arrested when he went to the courthouse with his father to pay the fine. After sitting by himself for some time after his son was led away, Joe Cua got up and paid the ticket.
[10] Available at https://www.publiccounsel.net/ya/wp-content/uploads/sites/6/2014/08/ABA-Article.pdf.
[11] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/pdf/ndt-9-449.pdf.

flooded with testosterone, which further increases emotional volatility and impulsivity. Arain, at 455. As a result, Mr. Cua is less morally culpable than an older adult who commits the same offenses or engages in type of rhetoric in the direct messages presented by the government. Given his ongoing development, he is also more capable of change and rehabilitation, including as a result of experiences like his arrest and incarceration to date.

### d.  Nature and Seriousness of the Danger to the Community

For the final factor, the government relies heavily upon certain private direct messages Mr. Cua is alleged to have sent to other individuals that contain violent rhetoric. As already mentioned, those private text messages, while understandably disturbing, are the idle bluster of a teenager who was mimicking what many, many others were saying openly on social media. Although one message in December mentions storming the Capitol, there is no evidence that Mr. Cua engaged in any substantive planning regarding an insurrection or overthrow of the government. Mr. Cua parroted that idea from others on social media. Although there are messages talking about a gun, Mr. Cua never took any material step toward obtaining a firearm or bringing any gun to Washington, D.C., like a number of other Capitol cases. This was all bluster. Mr. Cua is alleged to have entered the Capitol building and participating with other older adults in a shoving match with an officer. Those older adults showed a terrible example to Mr. Cua, who appears to have gotten carried away in the moment.

The government also attempts to paint Mr. Cua as unrepentant by highlighting messages Mr. Cua sent in the few days after January 6. Again, this is all idle talk. Mr. Cua never made any plans to participate in additional protests, much less any violence. Neither he nor his parents made any further plans to visit Washington or participate in other protests. Indeed, Mr. Cua testified that after their trip to Washington on January 6, he was done with supporting Trump's bid to overturn the election, telling the Court that he was expecting that the President would

present evidence of fraud at the rally, but he did not. Moreover, the last message government has provided is dated January 10, weeks before his arrest. That is at least in part because his parents told him that they were done with protesting the election and told him to stay off social media. As mentioned, in the couple of weeks before his arrest, Mr. Cua's parents kept him largely confined to his room to focus on finishing his high school studies.

### C.  Proposed Release Plan

Mr. Cua should be released to the third-party custody of his parents under the supervision of Pretrial Services. Mr. Cua agrees to refrain from all use of all social media, including but not limited to Facebook, Instagram, Twitter, and Parler. He is even willing to forego all internet use except for his online classes if the Court believes that such a measure will reasonably ensure the safety of the community. Mr. Cua's parents also plan to seek professional counseling for their son and their family to help address the emotions Bruno was experiencing after the election. Mr. Cua's parents have already removed all firearms and other weapons from the home and will open their home to inspection by Pretrial Services, as needed. Mr. Cua also agrees to stay away from Washington, D.C., except for court appearances, visits with his D.C.-based attorneys, and interactions with Pretrial Services, as needed, as had been done for many of the other Capitol defendants. He will surrender his passport and agrees to report to Pretrial Services in advance any travel outside the Norther District of Georgia. Mr. Cua's parents are willing to agree to an appearance bond, including collateralizing their home, if necessary, although the defense submits that Mr. Cua is not a flight risk.

### IV.   CONCLUSION

For the foregoing reasons, Mr. Cua respectfully requests that he be released pending trial in this matter.

Respectfully submitted,

DATED:  February 26, 2021

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.C. Bar No. 479074)
William E. Zapf (D.C. Bar No. 987213)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jjeffress@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Bruno Joseph Cua*