**Exhibit 2**

1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA, )
                              )
5                             )
     -VS-                     ) DOCKET NO. 1:21-MJ-129-AJB
6                             ) VOLUME 2
    BRUNO JOSEPH CUA,         )
7                             )
         DEFENDANT.           )
8

9       **TRANSCRIPT OF THE CONTINUATION OF DETENTION PROCEEDINGS**
            **BEFORE THE HONORABLE ALAN J. BAVERMAN**
10             **UNITED STATES MAGISTRATE JUDGE**
                    **FEBRUARY 12, 2021**
11

12

13

14  <u>APPEARANCES</u>:

15  ON BEHALF OF THE GOVERNMENT:
          RYAN BUCHANAN, ESQ.
16        ASSISTANT UNITED STATES ATTORNEY

17

18  ON BEHALF OF THE DEFENDANT:
          JOHN THOMAS MORGAN, ESQ.
          MOLLY PARMER, ESQ.
19

20  ON BEHALF OF MR. AND DR. CUE:
          DONALD SAMUEL
21

22

23

24                    PENNY PRITTY COUDRIET, RMR, CRR
                         OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
25                         ATLANTA, GEORGIA

2

```
1                    I N D E X

2

3   WITNESS:                                    PAGE:

4   Joseph Cua
```
```
5           Cross-Examination (Cont'd) .....................17

6           Redirect Examination..........................23

7           Further Recross-Examination...................29
```
```
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (PROCEEDINGS HELD IN OPEN COURT AT 3:28 P.M.)
 2         THE COURT:  Good afternoon, everyone.  Please be seated.
 3         This is the continuation of the case of The United
 4  States of America v. Bruno Joseph Cua, case number 1:21-MJ-129 in
 5  this district.  As far as I know it's still 1:21-mj-187 in the
 6  District of Columbia.  Either the indictment hasn't been returned
 7  or I don't have a number for it.
 8         MR. BUCHANAN:  It looks like it has the same magistrate
 9  number on the front of the indictment, your Honor.
10         THE COURT:  And Mr. Buchanan is here representing the
11  United States.  And Ms. Parmer and Mr. Morgan are here
12  representing Mr. Cua.  And Mr. Samuel is here for Mr. Cua and
13  Dr. Cua as well?
14         MR. SAMUEL:  Yes.
15         THE COURT:  So where we were the other day -- first of
16  all, I know that there are people on the phone.  I'm going to
17  request that all except for my pretrial services officer mute
18  their microphones.  Nobody is allowed to say anything other than
19  my pretrial services officer.  And everybody please mute their
20  phones here in the courtroom as well.
21         All right.  So where we were the other day was that
22  Mr. Cua, Sr., was testifying and on cross-examination he invoked.
23  And then we took a break and he thought to uninvoke.  And I told
24  him you need to consult with counsel first.  Learned counsel is
25  here now.
```

1          Mr. Samuel, I don't know if you have an announcement.

2          MR. SAMUEL:  Sure.  I met with him yesterday for several

3   hours and met with him today for several hours, and he would like

4   to continue with his testimony and uninvoke.

5          THE COURT:  All right.  Very well.

6          Mr. Cua.

7          COURTROOM DEPUTY CLERK:  Can you please raise your right

8   hand.

9          (The witness was resworn)

10          COURTROOM DEPUTY CLERK:  You can have a seat.  Can you

11   please state your name for the record.

12          THE WITNESS:  Joseph Cua.

13          THE COURT:  Mr. Buchanan, you may continue.

14          MR. BUCHANAN:  So I'm clear, your Honor, because I've

15   reviewed the transcript, when we concluded his testimony Wednesday

16   your Honor struck his testimony.  With his uninvocation has your

17   Honor also unstruck his testimony, or do I need to start over,

18   that's my only question?

19          THE COURT:  I will consider his testimony as long as he

20   doesn't invoke.  But he's got counsel here and we will be governed

21   by his counsel.

22          MR. BUCHANAN:  Sure.  So I can pick up where I left off

23   as opposed to starting from scratch?

24          THE COURT:  You may.

25          MR. BUCHANAN:  Thank you.

```
 1                        JOSEPH CUA
 2              a witness herein, being first duly sworn,
 3                was examined and testified as follows:
 4                   CROSS-EXAMINATION (CONT'D)
 5  BY MR. BUCHANAN:
 6  Q.  Mr. Cua, Wednesday when we talked, I believe towards the end
 7  of your testimony you testified that your son left you and your
 8  wife, y'all were outside of the Capitol and he said that he wanted
 9  to get a closer look, is that correct?
10  A.  That's correct.
11  Q.  And after he said that he wanted to get a closer look, he then
12  walked towards the Capitol, correct?
13  A.  Correct.
14  Q.  I believe it was also your testimony that prior to your son
15  walking towards the Capitol, you were aware that he had brought
16  that baton from Georgia, correct?
17  A.  Correct.
18  Q.  And so he walked toward the Capitol and you and your wife
19  remained outside, correct?
20  A.  Correct.
21  Q.  And approximately, sir, how much time passed before you saw
22  your son again?
23  A.  It's hard to tell.  I'm not sure if it was an hour or it could
24  have been an hour-and-a-half, I'm not really sure, sometime around
25  that.
```

1 **Q.**  Physically approximately how far away from the Capitol were

2 you when you last saw your son?

3 **A.**  We were on the grounds, you know, before all the stairs and

4 all the scaffolding like out on the grounds area.

5 **Q.**  Concrete or grass?

6 **A.**  I think it was right at the concrete and grass, right where

7 those -- the grass ended and concrete started.

8 **Q.**  And you testified Wednesday that you saw people climbing the

9 scaffolding, correct?

10 **A.**  Correct.

11 **Q.**  And you saw people pushing and shoving with law enforcement,

12 correct?

13 **A.**  Correct.

14 **Q.**  And so after some time your son came out, correct?

15 **A.**  Correct.

16 **Q.**  That is, away from the Capitol, correct?

17 **A.**  Correct.

18 **Q.**  And then I believe where we left, you said that you, your son

19 and your wife went back to the truck and then returned to Georgia?

20 **A.**  Correct.

21 **Q.**  And my question then when we stopped was:  What did your son

22 say to you on the way back?

23 **A.**  He said that he had gone in and they had walked around and he

24 had taken some pictures and, you know, that was it.  Like, again,

25 there was some pushing and shoving, but he said it was largely

1  without incident, per se.

2  **Q.**  Did he mention the pushing and shoving with the Capitol police

3  officer?

4  **A.**  He said there was a bunch of guys and there was a -- he said

5  there was a guy, it wasn't an armed -- or, I mean, a uniformed

6  officer, it was like a guy in a suit jacket or something.

7  **Q.**  So he -- he talked about a plain-clothed officer?

8  **A.**  I guess, yeah.

9  **Q.**  And did he say anything else about what happened on this trip?

10  **A.**  On that, no, that was about it.

11  **Q.**  And what was your response?

12  **A.**  I was -- my heart sank, my wife and I's heart sank.  We were

13  shocked that he had -- that he had gone.  We lost track of him, we

14  were trying to call and text him, both of us were, many times, but

15  there was no signal.  And, again, everyone was on their phone so I

16  couldn't reach him, but we were trying to reach him to find out

17  where he was to get him out of there.  So it was a shock that he

18  had gone in there.

19  **Q.**  Okay.  And then y'all drove back to Georgia?

20  **A.**  Yes.

21  **Q.**  And to pick up on a little bit of what we talked about

22  Wednesday night, you and I, but myself and the Court (sic), are

23  you aware your son has social media?

24  **A.**  Yes.

25  **Q.**  Do you review some of his social media?

**A.**  Not really.  I mean, I'll see an occasional Instagram post,

but I don't really review and monitor his social media.

**Q.**  And you're aware that I read several of his Instagram posts in

court Wednesday, correct?

        MS. PARMER:  Objection, your Honor.  I think that that

is a fact not in evidence.  My understanding is that those are

private messages, direct messages and not posts.

        THE COURT:  I'll let you redirect on that, and I

overrule the objection.

        MS. PARMER:  Okay.

BY MR. BUCHANAN:

**Q.**  So you were seated in the courtroom when I read some Instagram

messages in court Wednesday, correct?

**A.**  I was here, and that's my understanding as well, that they

were direct messages, though, and not necessarily public posts.

**Q.**  Have you ever seen any public posts of similar rhetoric?

**A.**  No.

**Q.**  Do you follow your son on Instagram?

**A.**  Not -- I'm not really on social media, on LinkedIn mostly, and

like once in awhile I'll check Instagram.  But I'm not really a

social media person, and I do not regularly monitor his.

**Q.**  What about Parler?

**A.**  I do have a Parler account, a couple months ago I started it.

**Q.**  And are you aware that your son uses Parler as well?

**A.**  Yes.

1  **Q.**  Do you use Parler to communicate with your son?

2  **A.**  No.

3  **Q.**  What about Twitter?

4  **A.**  I think he's on Twitter as well.  I -- yeah, I believe -- I

5  think he's got a lot of social media accounts.  I don't know all

6  of the ones he has.

7  **Q.**  Have you ever seen a Parler post of your son related to

8  dragging Governor Kemp out of the Governor's mansion?

9  **A.**  No, I have not.

10  **Q.**  We talked Wednesday about several instances where the police

11  have been called related to your son's activities.  Do you

12  remember that?

13  **A.**  Yes.

14  **Q.**  Did you give that any additional thought after the hearing

15  Wednesday?

16  **A.**  Well, I, you know, replayed our conversation, but not much

17  more than that.

18  **Q.**  Do you have a better idea of how many times the police were

19  called about your son's activity?

20  **A.**  No, I'm not sure how many times.

21  **Q.**  I believe we left it at roughly five or six, does that sound

22  about correct?

23  **A.**  I really don't know how many times, you know.  I don't know if

24  I was home all the time when this happened.  I'm not always home.

25  **Q.**  How many times has it happened while you've been home?

1  **A.**  If I recall, you know, I mean, while I was home maybe it was

2  half a dozen times, at least while I've been there, but I know

3  there's been other times as well.

4  **Q.**  So you're aware of at least six times of which the police have

5  come to your home --

6  **A.**  I don't know the exact number on that.

7  **Q.**  I'll soften it for you.  You're aware of roughly five or six

8  times where the police have come to your home about your son's

9  activities?

10  **A.**  Roughly, yes.

11  **Q.**  And then as we talked Wednesday, you're also aware of the

12  incident that happened at the school because you were present for

13  that, correct?

14  **A.**  Correct.

15  **Q.**  You're aware that there was another instance where your son

16  received a warning related to an air horn, correct?

17  **A.**  Yes.

18  **Q.**  And you're also aware of the January incident where your son

19  was cited for criminal trespass, correct?

20  **A.**  I thought that was also a warning for trespassing.

21  **Q.**  But the trespassing incident, your son, you, awareness, right?

22  **A.**  Correct.

23  **Q.**  And so in essence, you know, we've discussed during your

24  testimony roughly ten or so times in which your son has had an

25  interaction with law enforcement prior to January 6th, 2021?

1  **A.**   Correct.

2  **Q.**   Do you think you're aware of any others?

3  **A.**   I know there were others but, you know, as far as -- I don't

4  know exactly how many.

5  **Q.**   Those others, what do they relate to?

6  **A.**   Well, I think a large part of the interactions with police

7  coming and stuff like that was with -- as I stated on Wednesday,

8  we live in an agricultural zone and we live on a gravel road, and

9  people have farm animals and they have property.  And my boys have

10  the ATVs, and they'll go from property to property on ATVs.  They

11  use these ATVs, they do use them for fun, but they're also used

12  for farm use, they move hay, they spread seed, they drag arenas,

13  they do different stuff.

14       So some neighbors don't like the ATVs.  So when the boys will

15  get on them and go down the road to another property, some

16  neighbors would call the police and say they're not allowed to

17  drive ATVs on the road.  So I think there were several of those

18  instances that involved those conversations.  And those

19  interactions, you know, there were no like arrests or, you know --

20  you know, civil disturbance or anything, it was more discussions

21  and nothing usually resulted from it.

22  **Q.**   Have you ever had any conversations with those folks who

23  called the police -- who keep calling the police on your sons?

24  **A.**   Yeah.  Yeah.

25  **Q.**   And tell us about those discussions.

**A.**   Just, you know, just wondering if there's something we can do,
like did I -- because we've been living there for 14 years and it
wasn't a problem until like a year -- a couple years ago.  The
people who moved in, I guess, didn't like it and started calling,
you know.  But there's several people on the road who have ATVs,
it's not like it's an uncommon thing.

**Q.**   Do those folks get the police called on them as well?

**A.**   Yeah.  My neighbor across the street, his son who lives there,
he was 13 or 14 at the time, he got a ticket, a violation, moving
violation and had to go to court for it.  I think it was the same
neighbor that had called on that.

**Q.**   Despite these times where the police have been called on your
sons about the ATVs, have you ever told them to stop?

**A.**   Told my son to stop?

**Q.**   Yeah.

**A.**   Well, we did curtail the driving of the ATVs quite a bit.  I
mean, he hasn't had an ATV for a year or so.  I think it's broke
down, we just said forget it.  We have a small one that my
daughter uses too.

   But, yeah, we did curtail the driving because we just really
didn't want to -- the interaction anymore.  It was like we just --
we just said, look, just back off ATVs and stay off the roads.

   I know that my former neighbor, who is an FBI agent, he was
pulled over also on the road -- well, he was on his ATV picking up
trash on the road and he was pulled over and he had an interaction

1   with the police as well about the very same thing.

2   **Q.**  Is it the police's fault?

3   **A.**  No, no, no, it's not the police's fault.  It's not the

4   police's fault at all.

5   **Q.**  Then why does it keep happening?

6   **A.**  I -- just -- well, part of it is that this road was just a

7   gravel road until it became part of the parks, the city parks

8   system.  It's part of the Milton Trail System, so it became part

9   of the park system.  And since that happened, a lot of people are

10  parking and walking on the roads, there's a lot more congestion on

11  the roads.  So I think it just kind of -- it wasn't a problem

12  years ago, now it's become kind of a problem I think because of

13  that.

14      And there's discussion, too, about agricultural vehicles, many

15  on the roads, you know, like -- you know, it's an agricultural

16  vehicle because there's a Georgia Code, I'm not sure what the one

17  is about, you know, you can use these in this area, not like

18  driving the streets of the city but you're going from property to

19  property.  So that's kind of what those discussions with the

20  police would revolve around.

21  **Q.**  Has anyone ever alleged or told the police that your son got

22  too close to them on an ATV?

23  **A.**  No.

24  **Q.**  Has anyone ever said that your son got too close to them in

25  his truck?

**A.**   I never heard that until you read it in one of those letters.

**Q.**   You're aware that your son participated in a truck calvary?

**A.**   Correct.

**Q.**   Right?

**A.**   Yes.

**Q.**   Did you participate with him?

**A.**   I did once or twice.

**Q.**   And did any of that participation result in any tension on the roadways with anybody?

**A.**   Never.  We usually coordinated with Alpharetta or Milton Police to help to handle the traffic when we were doing that.

**Q.**   What was the last one of these that you participated in, sir?

**A.**   It was probably -- it was definitely leading up to the election, and I think there were a couple after the -- in November, but there were certainly some in probably September, October, you know.

**Q.**   The ones after these truck and car incidents, I believe you heard me discuss a letter which someone said that your son drove his truck up close to them and blared his horn and that kind of thing.  Do you remember that?

**A.**   Yes.

**Q.**   Were you aware of that?

**A.**   No.

**Q.**   So you've never heard of any incidents related to your son and his truck?

**A.**   No.

**Q.**   Have you had any discussion with your son about what happened in the Capitol after you returned from Washington?

**A.**   Yeah.  I mean, we -- I realized that, you know, he did something very wrong and he could be in a lot of trouble.

**Q.**   And you testified Wednesday that you believed that your son had been misled?

**A.**   I felt like he -- he was parroting a lot of the rhetoric he hears online from a lot of people.  And I feel like he sort of, you know, would repeat stuff that he would hear.  And I felt like he, you know, as a teenager sort of believed a lot of stuff that was going on.

**Q.**   What do you mean?

**A.**   Just about the election.

**Q.**   Like what about it?

**A.**   That, you know, there was all this fraud and that there was -- the election was stolen and, you know, that kind of stuff.

**Q.**   But you acknowledged that you participated in a rally with him after the election, correct?

**A.**   Correct.

**Q.**   And what was the subject of that rally?

**A.**   You mean the local rallies?

**Q.**   The one that you participated in after the election.

**A.**   Yeah.  It was essentially the same thing.  It was, you know -- it was a rally around, you know, the election results, we should

1  see the real results and that type of thing.

2  **Q.**  Do you recognize that that is not true?

3  **A.**  Yes, I do.

4  **Q.**  But you recognize also that you participated in that activity

5  with your son?

6  **A.**  Well, in peaceful rallies, yes.  And in what I thought were

7  going to be peaceful rallies, yes.

8  **Q.**  Do you share in the responsibility in your son's belief and

9  his actions?

10  **A.**  I share, yes, responsibility in that.  And I -- those direct

11  messages and some of the things he wrote were a shock to me

12  frankly.  I had not seen those.  And --

13  **Q.**  Had you heard him say things like that before?

14  **A.**  No, that's just not the way we talk around our house, you know

15  what I mean?  That's why I feel like he's parroting stuff from

16  other leaders on social media and leaders in the public that --

17  **Q.**  Leaders like who?

18  **A.**  Like the President or, you know, the attorneys, like, Lin Wood

19  and all these people saying we have all this information and

20  everything's going to come out, you know, we were stolen, we were

21  robbed.  And I, myself, feel pretty embarrassed, that I think a

22  lot of us felt like that this is what happened and we believed

23  these people and feel pretty disillusioned that there was no big

24  reveal and nothing came out and it's -- it's disillusioned,

25  disheartening and embarrassing quite frankly.

1   **Q.**  When did you reach that conclusion, sir?

2   **A.**  I feel like, you know, January 6th when things came to that

3   kind of -- that awful head, that I felt like this is just --

4   everything is getting out of hand and that -- you know, that type

5   of behavior is just not who that side of the aisle should be, the

6   right side, that's not who we are.

7       And then like when -- just keep getting, saying, it's coming,

8   all this stuff is going to come out, all this.  And at some point

9   you're like I think this is a bunch of BS, pardon me.  You know,

10  at that point I'm like, I'm done, I'm done with all of this, you

11  know.

12  **Q.**  Were you done before or after your son got arrested?

13  **A.**  I was done before.

14              MR. BUCHANAN:  Nothing else, your Honor.

15              THE COURT:  Redirect?

16              MS. PARMER:  Sure, your Honor.  I didn't know if you

17  wanted to follow with any questions before my redirect.

18              THE COURT:  Nope.  Go right ahead.

19              MS. PARMER:  Thank you.

20                        REDIRECT EXAMINATION

21  BY MS. PARMER:

22  **Q.**  Mr. Cua, there has been a lot of talk about a number of

23  interactions with the police and your son.  Of those how many,

24  quantity-wise, how many citations has he ever received?

25  **A.**  None.  Well, I mean, there's the warning that -- the horn

1  violation I think was the only ticket.

2  **Q.**  That's what I'm asking.  How many tickets has he received

3  despite all of those interactions?

4  **A.**  One.

5  **Q.**  So he has never received a citation for driving too closely in

6  his truck to somebody?

7  **A.**  No.

8  **Q.**  Or for an ATV?

9  **A.**  No.

10  **Q.**  Or even for trespass?

11  **A.**  That was a warning.

12  **Q.**  That was a warning.

13      I want to talk a little bit about social media.

14      You testified that you had never heard what was read on

15  Wednesday regarding your son's -- they were called social media

16  posts, correct?

17  **A.**  Correct.

18  **Q.**  What is your understanding now of what those actually were?

19  **A.**  You know, I haven't had a chance to discuss it with him,

20  obviously, but I think that -- like I said to Mr. Buchanan, the

21  rhetoric that he, you know, was fed from other leaders on social

22  media and leaders in the public about everything that was going

23  on.  And as a -- you know, as a middle-aged man I feel like that

24  can filter a little bit of that with reality.  But I feel like as

25  a teenager, he was drinking it in and, you know, just believed it

1  too much.

2  **Q.**  And in terms of the difference between posts and a private

3  direct message, do you understand the difference between those

4  two?

5  **A.**  Yes, I believe I do.  I mean, obviously a post is a public

6  thing and a direct message is between two individuals.

7  **Q.**  And what's your understanding of what was read into the record

8  on Wednesday regarding your son and some of the statements about

9  Revolution 1776?

10  **A.**  I believe those were direct messages; so, in other words, just

11  between two people.

12  **Q.**  And when had you ever seen those or heard those prior to

13  Wednesday?

14  **A.**  Never.

15  **Q.**  Had you been aware of those private direct messages, what

16  would you have done in consideration of January 6th?

17  **A.**  I would have yanked him off social media immediately, and we

18  would probably have never, ever gone to DC that day and the day

19  before.

20  **Q.**  But you have gone to rallies with your son prior to

21  January 6th?

22  **A.**  Yes.

23  **Q.**  Did he stay by your side during those rallies?

24  **A.**  Unless he was driving a truck with a bunch of other folks.

25  **Q.**  And at those rallies tell me about any acts of violence that

1  you witnessed.

2  **A.**   None.

3  **Q.**   I understand that you said your social media use is limited.

4  Despite its limited nature, how many times did you ever read

5  anything about plans to invade the Capitol on January 6th?

6  **A.**   Never.

7  **Q.**   Why did you and your family go?

8  **A.**   We just wanted a show of support, just like we had gone to all

9  the other rallies.

10  **Q.**   Today do you believe the election was stolen?

11  **A.**   No.

12  **Q.**   Why not?

13  **A.**   Because the evidence never came out.

14  **Q.**   And what did you think was going to happen on January 6th?

15  **A.**   I expected the speech.  And I expected us to go over to the

16  Capitol.  And I expected, you know, there to be as many people as

17  we could to -- because I understood that some senators were going

18  to object to Electoral College votes, and I thought, and many of

19  us thought, that seeing masses of people bolsters their courage,

20  their confidence to, you know, object to the election, that's what

21  I thought the intent was.

22  **Q.**   Did you expect that there was going to be violence or an

23  invasion of the Capitol at any point?

24  **A.**   Not at all.

25  **Q.**   Did you and your family have any plans to meet up with a group

1  at that January 6th rally?

2  **A.**   No, not at all.

3  **Q.**   What about on the drive back, tell me what, if any, news

4  reports you were hearing or --

5  **A.**   Nothing.  That older truck that we have is a -- has a terrible

6  radio, so it was -- we didn't really listen to anything on the --

7  couldn't get any kind of FM signal.

8  **Q.**   What, if anything, would you say that you've learned from this

9  experience?

10  **A.**   Many things.  I just, again, feel responsible for bringing him

11  up into that environment.  I feel embarrassed that we drank in a

12  lot of this rhetoric from these so-called leaders that just never

13  materialized.  And I think it's -- I feel like I should have maybe

14  known a little bit better at my age.  I can understand how young

15  people get swept up a little bit more into it, but I think we'll

16  have a very different heart and posture going forward.

17  **Q.**   What about plans to attend any rallies or truck parades, what

18  are you or your family's plans?

19  **A.**   I can't see us doing that any time, maybe ever again.

20  **Q.**   How would you describe your home environment?

21  **A.**   I feel like we have a very great home environment.  I feel

22  like we're very blessed.  I have a daughter who is 17.  I have a

23  son who's 13.  And my mother-in-law lives up the street, she has

24  Alzheimer's but she comes to visit, we bring her to the house

25  frequently.  We have dogs and a cat outside, some chickens.  It's

1  a very normal, stable place.

2     We've been there for 14 years.  And my wife and I have been

3  married for 20 years.  And up until last year I was working for

4  the same company for 21 years.

5  **Q.**  Tell me how if in the event your son is given a bond, how are

6  you and your wife going to be able to make sure that abides by any

7  terms and conditions from the Court?

8  **A.**  I will do whatever the Court says.

9  **Q.**  But how?

10 **A.**  Well, we're -- you know, we're -- my wife is home all the

11 time, you know.  He won't leave the house, won't leave our house.

12 He won't leave his room.  We would agree to any conditions.  I

13 would sign my house -- put my house on the line, you know, sign

14 that over if that's what it took.  But we would do whatever the

15 Court asks to make sure that he can come back and just stay home

16 until the court date.

17 **Q.**  There's been some talk about prior to receiving that single

18 citation for a municipal code violation for honking a horn, there

19 was a warning before that for honking a horn, right?

20 **A.**  Yes.

21 **Q.**  What makes a situation with your son on bond with terms and

22 conditions of bond different from your son being -- getting a

23 warning and then doing the same thing again?

24 **A.**  Very different.  I mean, I'm under orders from the Court to --

25 as his, you know, ward or guardian that he doesn't -- that he

```
 1   abides by those rules.  It's extremely different.  I mean, if we
 2   violate one thing, he goes to jail.  And whatever we agree to
 3   in bond would have to be paid as I understand it.  But it's
 4   completely different, you know.  We would have a completely
 5   different posture that he is not -- does not even leave the house
 6   under any circumstances.
 7             MS. PARMER:  May I have one second to consult with
 8   Mr. Morgan?
 9             THE COURT:  Yes, ma'am.
10             MS. PARMER:  Your Honor, I believe that's it for us, but
11   certainly if you have any questions.
12             THE COURT:  Any further cross, Mr. Buchanan?
13             MR. BUCHANAN:  Just two quick things.
14                        RECROSS-EXAMINATION
15   BY MR. BUCHANAN:
16   Q.  You testified on redirect that it was your hope that when you
17   left the speech and walked to the Capitol, that the masses of
18   people would bolster the confidence of the senators to object to
19   the election, is that correct?
20   A.  Correct.
21   Q.  And at that time when you left from the speech and walked to
22   the Capitol, you were aware that your son had a weapon?
23   A.  Yes.
24   Q.  And when your son left from you and your wife and walked
25   toward the Capitol, you were aware that your son had a weapon?
```

**A.**   Yes.

**Q.**   And you did not stop your son from going into the Capitol?

**A.**   I didn't know -- have any idea that he was going to do that, go into the Capitol at all.

**Q.**   But you do know when he left from you, that he walked toward the Capitol?

**A.**   Yes.

**Q.**   And at that time there was fighting going on, he was walking towards the fighting, correct?

**A.**   Well, he was wanting to climb up to get more of a view to see what was going on.

**Q.**   He was wanting to climb up what?

**A.**   Like there was like a scaffolding on the side, he wanted to see what was happening.

**Q.**   The observation deck for the inauguration, is that what you're talking about?

**A.**   I guess so, yeah.

**Q.**   So you were that close to the Capitol?

**A.**   He wanted to go up there, said can I climb up there and look, and I said okay.

          MR. BUCHANAN:  Nothing else, your Honor.

          THE COURT:  Mr. Cua, when you were at this speech, I guess the speech by the ex-President?

          THE WITNESS:  Yes.

          THE COURT:  Do you recall that there were people around

1    with firearms?

2              THE WITNESS:  No.

3              THE COURT:  You didn't see any people carrying firearms?

4              THE WITNESS:  No.

5              THE COURT:  Did you see anybody wearing paramilitary

6    outfits, camouflage, helmets?

7              THE WITNESS:  At the speech, no.

8              THE COURT:  When you went down toward the Capitol, did

9    you see people wearing camouflage or paramilitary outfits?

10             THE WITNESS:  I mean, there were some people, it looked

11   like they were up very close there that looked like they were

12   wearing some gear, yes.

13             THE COURT:  Were people carrying weapons?

14             THE WITNESS:  I didn't see people carrying weapons, no.

15             THE COURT:  Did you see -- you saw your son carrying a

16   weapon?

17             THE WITNESS:  Yes.  Well, the baton, yes.

18             THE COURT:  Yeah.  A weapon?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Right.  And you didn't tell him to put it

21   away?

22             THE WITNESS:  No, sir.

23             THE COURT:  You didn't tell him not to bring it?

24             THE WITNESS:  No, sir.

25             THE COURT:  You didn't tell him to leave it in the

1  truck?

2          THE WITNESS:  No, sir.

3          THE COURT:  And you saw the people dressed in their

4  paramilitary outfits before your son said I'm going to climb up on

5  the scaffold?

6          THE WITNESS:  Yes.

7          THE COURT:  And you didn't tell your son not to do that?

8          THE WITNESS:  No.

9          THE COURT:  And on the 6th you already were aware that

10 there had been no disclosure of evidence that the election was

11 fraudulent or stolen, is that correct?

12         THE WITNESS:  That's correct.

13         THE COURT:  So by then whatever evidence you expected to

14 see, you hadn't gotten?

15         THE WITNESS:  Correct.

16         THE COURT:  And yet you were going down to be part of

17 the crowd to bolster the senator?

18         THE WITNESS:  Allegedly some senators said they were

19 going to object to certain states.  I don't understand the exact

20 process, but they were going to object to certain states.  So, you

21 know, the idea when you assemble is to show that the people are

22 behind -- you know, their constituents are behind there so that it

23 bolsters their confidence to do what they needed to do to object

24 or whatever they needed to do legislatively.

25         THE COURT:  And you had these conversations about your

1  purpose of the trip with your son, correct?

2          THE WITNESS:  Yes.

3          THE COURT:  And after -- on your way back did you

4  discuss with your son what was on social media?

5          THE WITNESS:  No, I didn't.  The social media that we're

6  talking about here --

7          THE COURT:  I'm not talking about your son's social

8  media.  The sort of stuff on social media, did you have

9  conversations with your son about the stuff that was on social

10 media about Revolution and Civil War and I'm not going to let them

11 steal the election and all those things that were being talked

12 about in some segments of the media, social and otherwise?

13         THE WITNESS:  Yeah, I didn't have a conversation with

14 him at that time.  In fact, I'm, you know, again, surprised about

15 all that stuff that I had seen and heard.  I'm not much on social

16 media.

17         THE COURT:  But you knew that your son was on social

18 media?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  And you knew that your son took this -- the

21 results of this election very personally?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  And so did y'all discuss what you were

24 reading, both of you were reading on media and social media?

25         THE WITNESS:  Yes, we did discuss it, and I did feel

1  like let's wait and see, let's wait and see.  We had conversations

2  that said that there's going to be all this evidence, they said

3  they have it all, it's going to come out, I said let's wait and

4  see.  And it never came.

5          THE COURT:  Well, and then how about after the 6th, did

6  you have conversations about what was on social media after the

7  6th?

8          THE WITNESS:  Well, after the 6th I said, look, this --

9  you know, that's the last rally we're ever going to go to.  You

10 know, it's done.  They're not -- they keep promising there's going

11 to be all this information.  And I said, that's it, no more

12 rallies about anything.  You know, the election is over, it's time

13 to move on.

14         THE COURT:  And when did you say that?

15         THE WITNESS:  You know, in days -- I don't know, days

16 after that incident.

17         THE COURT:  Not on the ride back?

18         THE WITNESS:  On the ride back it was late.  I think we

19 got gas, we got food.  And he, you know, was in the back.  My wife

20 and I were talking, and we just drove back.

21         THE COURT:  How close in time -- you got back to Georgia

22 on the 7th?

23         THE WITNESS:  In the early morning, might have been like

24 maybe 2:00 in the morning or something like that.

25         THE COURT:  When do you all think you had this

1  conversation about moving on?

2            THE WITNESS:  Those -- that -- those next couple of

3  days, I said, we're done, this is it, we are done.

4            THE COURT:  I do not have any other questions.  Does

5  anybody else have any other questions for Mr. Cua?

6                    FURTHER RECROSS-EXAMINATION

7  BY MR. BUCHANAN:

8  **Q.**  Just, Mr. Cua, you mentioned that you don't have social media,

9  you don't post public things on social media?

10 **A.**  Well, I'm not on social media much.  I'm on LinkedIn.  I check

11 Instagram once in awhile.  And then I had opened a Parler account

12 like a couple of months maybe or something like that.

13 **Q.**  What about your wife?

14 **A.**  Yes, she is on social media more than I am.

15 **Q.**  Which social media platforms?

16 **A.**  I think maybe Twitter, Instagram, maybe Facebook.  I'm not

17 really sure.

18 **Q.**  Have you ever seen any of her tweets?

19 **A.**  I don't really check her tweets.  And I don't think I even

20 follow her on pages.

21 **Q.**  Ever seen a Tweet from her related to live free or die

22 fighting?

23 **A.**  No, I haven't.

24 **Q.**  Does that sound surprising?

25 **A.**  I think that's a pretty common -- I see that a lot on, you

1  know, T-shirts and flags and military people, live free or die.  I

2  feel like, you know, I've seen that phrase quite a bit.

3  **Q.**  Okay.  And just so we're clear, when your son -- when you told

4  your son he could go climb the scaffolding of the observation deck

5  for the inauguration, did your wife try to stop him?

6  **A.**  No.  She was next to me, and it was me that allowed him to do

7  that.

8  **Q.**  But she saw where he went as well?

9  **A.**  Yes.

10  **Q.**  And she didn't scream, come back, stop, no?

11  **A.**  She was very nervous, you know.

12  **Q.**  Did she also know that he had the baton?

13  **A.**  Yes.

14          MR. BUCHANAN:  Okay.  Nothing else, your Honor.

15          THE COURT:  Mr. Cua, you may step down.

16          (Witness excused)

17          THE COURT:  Any other evidence on behalf of Mr. Cua?

18          MS. PARMER:  No evidence, just argument, your Honor.

19          THE COURT:  Any other evidence by the government?

20          MR. BUCHANAN:  No, your Honor.

21          THE COURT:  Mr. Buchanan, tell me why we can't fashion

22  conditions for this young man.

23          MR. BUCHANAN:  Your Honor, we cannot fashion conditions

24  for this young man because he has proven time and time again that

25  he is unresponsive to the instructions of law enforcement.  He has

1  had multiple run-ins with law enforcement over the past couple of

2  years.  They are escalating in type.  Many of these sort of

3  involve just blatant disregard for what he's told to do.

4           That trespassing that we talked about the other day that

5  his father testified about is a great example.  He was told not to

6  do something, right in the presence of the person who told him not

7  to do it, and he did it any way.  This behavior has not stopped.

8  Having one, two, three, four, five, six, seven, eight, nine, ten

9  instances prior to this trip to the Capitol has not deterred him.

10          So I believe that we can't fashion conditions because

11  he has proven to us with his behavior in the past that he is

12  unwilling to follow those conditions.  Perhaps this is just the

13  first time where there's been a consequence to it, and so there's

14  an exhibition of contrition or maybe some remorse, but that

15  doesn't lead us to conclude that he would do any better.

16          Plus, your Honor, the rhetoric, as his father said, that

17  they had a talk after he got back from DC, gives us more about how

18  he would behave going forward.  On these messages, someone says to

19  him on January 7th, after this, they say:  I don't understand why

20  Trump wants us to back down.  We should be running in there with

21  guns ablazing all over Congress.  That's what our founding fathers

22  would have done.

23          (Noise interruption)

24          THE COURT:  Hold on one second.  I don't know who is

25  talking online, but I'm going to shut it down if you don't shut

1  down the noise right now.  You've been warned, one more sound and

2  it's getting cut off.

3          Sorry, Mr. Buchanan.

4          MR. BUCHANAN:  No worries.

5          And then Mr. Cua responds:  I don't think he wants us to

6  back down.  He has to call for peace.  But he also said this is

7  what happens when you steal an election.

8          That's no backing down.  That's no -- it's not an

9  instance where he has realized what happened on that day was wrong

10 and he wants to do differently.

11          After this January 6th post thing, his post

12 insurrection, he said:  We're taking our country back by force.

13          January 7th:  If Trump doesn't get in, we will be back

14 in DC for a blood bath.

15          And, your Honor, this tracks with what we talked about

16 Wednesday in December, he said, we can storm the Capitol, we can

17 run in the Senate.  And then that's exactly what he did.  And then

18 there's no letup, there's no backing away, there's no backing down

19 since then.  So that's precisely why I don't believe we can

20 fashion conditions because he hasn't shown us personally that he

21 is willing to abide by any conditions.

22          Secondarily to that, your Honor, Mr. Cua is by no means

23 a sufficient custodian for him.  In addition to sort of allowing

24 this rhetoric, participating in this activity that essentially led

25 his son to this point, he went with him, drove hours to DC, walked

1  from the speech with his son to the Capitol with the intent, as he

2  testified, to bolster senators whom he thought would disagree with

3  the election.

4         And in addition to just being there, he knew his son had

5  a weapon and he essentially -- not essentially, he gave his son

6  permission to climb the scaffolding at the observation deck on the

7  side of the Capitol.  Your Honor, there's no way he can now come

8  back and say, well, I'll make certain that he'll do what the Court

9  says when he expressly gave him permission to start the very crime

10 that led to his son's indictment.  His mother was right there, she

11 didn't try to stop him.

12        I mentioned some of these other instances, like the

13 trespassing.  After that happened, the police went to his house,

14 they met with his father.  That didn't stop any of his activity.

15 He said there are a half-a-dozen times where the police have come

16 to his house related to the ATV activity.  That hadn't stopped his

17 son's behavior.

18        The noise ordinance that happened for blowing the horn,

19 which he initially said, well, you know, that noise ordinance,

20 it's difficult to tell about the duration and this teacher person,

21 she might disagree politically with my son, he was there, he was

22 present, that hasn't stopped his son's activity.

23        So we have zero reasons to believe that any conditions

24 that this Court sets, the father would have any meaningful

25 participation in enforcing those conditions.  I would just say

1   it's not guesswork, your Honor, we're just looking at what's

2   happened in the past because that's the proof of what we have that

3   will likely happen in the future.  It's been 14 or a dozen or so

4   instances, and it has all concluded with his son participating in

5   this insurrection.

6        His son was displayed yesterday during the impeachment

7   trial.  He participated -- the Court asked the other day about

8   Government's Exhibits 8 and 9, those pictures where he assaulted a

9   US Capitol police officer with the initials GL, that was at -- we

10  believe it was at the door to the gallery of the Senate.  And then

11  there is footage of him inside the gallery of the Senate.  So we

12  can conclude that they went through that door.  His son wound up

13  in the Senate chamber.  He wound up right in the very place where

14  this impeachment trial is happening today.  His parents and his

15  father and his lawyer have both admitted that he was where he was

16  not supposed to be.

17       To move toward the 3142 factors that the Court

18  considers, the weight of the evidence.  It's on video.  His lawyer

19  said he was not where he was supposed to be.  His lawyer said he

20  carried a weapon into the Capitol.  His father testified about

21  that weapon.  His father is essentially an eyewitness to the

22  crime, and he testified that his son went in, again, with the

23  weapon.

24       So, your Honor, I -- our motion related to danger, I

25  believe, has been substantially supported by the testimony that

1   the Court has heard over these past couple of days, which our

2   position is there's not a condition or set of conditions to

3   reasonably assure the safety of the community.  And I'll address a

4   couple of points that the defense raised earlier in the week.

5           I submitted to the Court some letters.  Mr. Morgan made

6   an inference that they're the same typeface or font.  I don't know

7   if that's an implication that the letters are fabricated.  I

8   redacted -- because the agents haven't had time to interview those

9   folks, I redacted the addresses for them, but I can relate to the

10  Court that those came from different addresses and they're not

11  made-up letters.

12          THE COURT:  I recognize that, Mr. Buchanan, but do

13  really the circumstances of this case rely upon that sort of

14  anonymous evidence?  It's not like a CI in a drug case where the

15  ATF makes representations about the credibility.  I don't know

16  anything about these folks.

17          MR. BUCHANAN:  Sure.  And the Court is perfectly fine

18  and I -- had we felt that strongly about it, we would have

19  identified those folks and potentially had them in.  No, there's

20  plenty of evidence that comes from law enforcement sources about

21  Mr. Cua's behavior.  In fact, this case was borne out of a law

22  enforcement review, law enforcement in Milton who saw -- because

23  they've interacted with him a dozen times, they saw his picture

24  on -- the pictures that came out of the siege from Government's

25  Exhibit 1, and they alerted the FBI that, hey, we know this

 1  person.  And then a subsequent investigation took place and the

 2  review of the social media.

 3          And I mentioned earlier, and I believe I did with the --

 4  with Mr. Cua, the father, this case is not about a neighborhood

 5  squabble.  We can take the neighborhood squabbling part out of it.

 6  My focus here and my emphasis to the Court is Mr. Cua's

 7  interaction with law enforcement in terms of curtailing and

 8  watching his behavior, because that's what the Court needs to

 9  consider in analyzing whether or not he's a candidate for bond,

10  and that's the evidence that I would point to.  These interactions

11  which his father testified to, he didn't deny that they happened,

12  but the volume of it and the lack of a change of behavior is why I

13  highlight all these instances to the Court.  And that's --

14          THE COURT:  Why isn't home incarceration and not

15  allowing him to be on the Internet or communicate or view any

16  social media, why isn't that sufficient to keep him from

17  reviolating?

18          MR. BUCHANAN:  I didn't catch the last --

19          THE COURT:  To keep him from reviolating.

20          MR. BUCHANAN:  Your Honor, I don't believe that home

21  incarceration will work because he is an 18-year-old who's

22  homeschooled.  And so this case did not arise out of him traveling

23  or going different places.  It's simply these things that he has

24  ingested, not just from the Internet.

25          He said that -- Mr. Cua testified that he believes some

1  of this came from him.  He acknowledged that he bears some

2  responsibility for his son's belief structure and then the actions

3  that arose out of those.

4        And so absent the Internet, absent going to any rallies,

5  his parents are still there and so I don't believe they're

6  suitable custodians.  And I don't believe that just removing him

7  from the Internet removes him from these influences that drove him

8  to commit this activity.

9        THE COURT:  Well, but wouldn't locking him up be

10  effectively the same?  I mean, he won't have access to the

11  Internet or social media sitting in the DC jail or wherever they

12  hold them?  In DC they used to hold them in Loudoun, but I don't

13  know where they handle them now.

14        MR. BUCHANAN:  No, your Honor, it sounds like the

15  alternative would be he would remain in the custody of his

16  parents.  And I think that the custody of his parents, as his

17  father testified, has led to some of this activity.  And so I

18  don't think that that is a suitable place for him.  And that's

19  based on his father's testimony and his father and his mother's

20  witness to these other activities that have happened that have not

21  sort of curtailed any behavior.

22        Your Honor, for those reasons the United States moves

23  for Mr. Cua's detention while this matter is pending trial in the

24  District of Columbia.

25        THE COURT:  Before you sit down, talk to me about the

1  *Bates* issue.

2          MR. BUCHANAN:  Sure.  Your Honor, I do not believe there

3  is a *Bates* issue.  If the Court is familiar with our motion for

4  detention, the United States has moved to detain Mr. Cua pursuant

5  to 18 USC, 3142(e) and (f).  3142(e) and (f) are the standard

6  provisions under which we move for detention.  3142(f) notes that

7  we can move for detention upon a motion by the government in a

8  case that involves, (e) notes, any felony that is not otherwise a

9  crime of violence that involves a minor victim, or that involves a

10  possession or use of a firearm or destructive device as those

11  terms are defined in 921; or any other dangerous weapon.

12          I believe that the charge alleges that Mr. Cua went into

13  the United States Capitol with a dangerous weapon.  The testimony

14  from this hearing established by his father said that he saw him

15  with that weapon heading into the Capitol.  I believe that's more

16  than sufficient for us to make this motion.

17          And further, your Honor, a reading that Ms. Parmer

18  suggests that, you know, a case is not eligible for detention

19  unless there's a crime of violence charge, that just doesn't

20  square with the statute.  There are many times in which there are

21  folks who are not accused of crimes of violence but pose dangers

22  to the community or flight risks in which this Court has found

23  that they should be detained.  You don't have to allege an

24  enumerated crime of violence to argue that a person is a danger to

25  the community, and so that has no impact on the United States

1  motion for detention.

2          THE COURT:  Ms. Parmer or Mr. Morgan.

3          MS. PARMER:  Your Honor, just briefly on the *Bates*

4  issue, I was going off of the filed motion for detention which

5  cited 3156, which does lay out the definitions of crime of

6  violence, but I think my time is much better used by saying that

7  even if Mr. Cua is a danger, there are certainly conditions that

8  you can craft to assure the safety of the community in this case.

9          I understand the government says that my client has been

10 unresponsive to instructions from law enforcement.  And I think

11 that argument would have much more merit and strength if during

12 all of these interactions we saw a pattern of citations, arrests.

13 We haven't.  And here there's one citation, one citation.  I think

14 if there truly were solid and strong bases for the police to give

15 him some sort of document that alleged an infraction, they would

16 have.

17          And we do have the horn honking violation.  And what

18 happened is my client got a citation for municipal code ordinance,

19 and he called the Court and they said come to the police station

20 to pay it.  He went with his father to pay it.  He was arrested by

21 the FBI.  His father watched that and then paid the ticket.  So I

22 do think they're responsive from law enforcement.  You heard

23 testimony from his father that he backs the blue.

24          You've seen 50 pages of character letters that describe

25 him as respectful and as somebody who does respect police in

1  particular, including a letter from a former FBI agent that I

2  think couched many of those interactions in a fair and accurate

3  light.

4            Pretrial services recommends release in this case.  And

5  I think a lot of that goes to, again, what those letters show,

6  that my client is not a risk of danger, or even if he is, that we

7  can craft conditions.  And I think that goes to the fact that he

8  is drug free, he has never smoked a cigarette in his life, he has

9  never had a sip of alcohol in his life, he has absolutely no

10  mental health history.  He, I think compared to many 18-year-olds,

11  is arguably stable and arguably moral and ethical and does believe

12  I think in doing right in respecting authority.

13            You heard from his church that he's tithed over $400 in

14  the past year.  These things give the Court confidence that with

15  conditions and with the proper amount of terms and a Court

16  document, an order that says what he has to do, that this is the

17  type of 18-year-old who will do it.

18            I also think it's incredibly important to make sure that

19  everyone understands the distinction between a social media post

20  and a private direct message.

21            THE COURT:  But the Court doesn't understand the

22  difference at all.  I mean, really, I don't understand the

23  difference between posting to the world violent revolutionary

24  thoughts and just stating it to another person.  It's the fact

25  that it's stated.  It doesn't make a difference what the forum is.

1          MS. PARMER:  My argument, your Honor, is simply that

2    this goes to whether his father and mother are suitable people to

3    release him to.  And I think if he -- if they knew that he was

4    posting those things and they took him to this rally on

5    January 6th, we would be in a far different situation than we are

6    because they never saw those private messages.  And you heard from

7    Mr. Cua, his father, that had he been aware of any of that, which

8    he was not, he never would have taken him.  And I think it goes to

9    the custodian piece rather than to an argument that, oh, we don't

10   consider them simply because they're private.

11          And in terms of the complaint, what we saw was these

12   posts on Parler are sharing the ex-President's Tweets, I think

13   that that is telling as well.  And we heard from Mr. Cua, his

14   father, that he does feel manipulated and duped and does not

15   believe the election was stolen.  And I think it's relevant that

16   there is this arguable paradigmatic shift with this family.

17   They've been through something, and who they were and what they

18   thought and what they believed before and now is different.

19          And I believe his testimony was credible.  And that is

20   why you can craft conditions to release this child to his parents

21   because his parents have changed.  And what his father said I

22   thought was very compelling about feeling as though he was misled

23   by leaders and how it's shifted his entire philosophy and view of

24   politics.  And that was very powerful to me.  And I think that's

25   why pretrial services agrees that releasing my client into the

1  custody of his parents is sufficient.  And we can craft the least

2  restrictive conditions, which may be a complete lockdown, which

3  may be an entire band on Internet, social media, whatever the

4  Court sees fit.

5          But when you have an 18-year-old who has absolutely no

6  criminal history but for a paid citation for municipal code

7  violation, who is active in his church, who has submitted 50 pages

8  of character letters that attest to his morals and his habits, who

9  stays away from drugs and alcohol, who overall I think is very

10  dissimilar to the majority of 18-year-olds and who has a lot of

11  potential to learn and grow from this and not have this be what

12  defines the rest of his life, we can follow 3142's mandate that he

13  shall be released with the least restrictive conditions, which I

14  believe is exactly what has been shared from the pretrial services

15  report and all of the evidence before the Court.  You can find his

16  conduct completely unpatriotic and completely reprehensible and

17  still have a ruling that comports with the law.

18          Thank you.

19          THE COURT:  Mr. Buchanan.

20          MR. BUCHANAN:  A couple of things, your Honor.

21          We keep having these references to he supports law

22  enforcement.  I provided Ms. Parmer and Mr. Morgan with another

23  conversation.  December 24th he says to a friend:  I truly hate

24  Milton Police.

25          This person responds and says:  Are the Alpharetta

1  Police the good ones?

2          Mr. Cua says:  From my experience, yes.

3          He goes on to say:  Milton Police are pieces of shit.

4          January 7th he's in a conversation and someone says to

5  him, the cops should have joined in.

6          He says, that's what I fricking told them.  Mr. Cua says

7  this.

8          And then the other person says this:  We're literally

9  fighting for them.

10          Mr. Cua:  One cop was about to cry.

11          Mr. Cua:  We were screaming at them to join us.

12          Your Honor, it's not just the rhetoric.  As I mentioned,

13 in the sort of explosive rhetoric in November he said he was

14 trying to buy a gun under the table.

15          And in December of '20 he says:  We can storm the

16 Senate, House.  I keep saying bring guns.

17          That's not political speak, that's planning.  And he

18 followed through on the planning.  He went up to DC, his parents

19 went with him, and then he committed multiple felonies there.  And

20 so the idea that, you know, he -- this is some type of learning

21 experience and this is consequential and he's learned from it, the

22 danger he poses has not been mitigated.  The danger that he poses

23 I believe is mitigated with him in custody.

24          And so I wanted to respond to this idea that some of the

25 language and the rhetoric is sort of politically based because

1   it's not.  This is actionable speak that is supported by the

2   actions that he's taken.

3            THE COURT:  First of all, for the record, I find that

4   the -- that the charges constitute a crime of violence, not only

5   because *Bates* says that a charge under 18 USC, 111 is a crime of

6   violence, 111(a), but also other cases have held that as well.

7            And that includes the *Kanahele* case in the District of

8   Hawaii, the cite of which I used to have and now I don't.

9   *Kanahele*, K-A-N-A-H-E-L-E, 951 F. Supp, 921, 926.

10            And also *United States v. Perea*, P-E-R-E-A.  That's a

11   District of New Mexico case, 2010, West Law 2292419.  That's a May

12   of 2010-case.  And it cites that the 111(a)(1) charge has an

13   element as to the use, attempted use or the threatened use of

14   physical force against the person or property of another.

15            So regardless of the indictment, the criminal complaint,

16   which is what started this proceeding, satisfies that.

17            (Noise interruption)

18            THE COURT:  I need quiet.  Thank you.

19            This is a very unusual case because, you know, we have a

20   lot of really serious, a lot of really, really dangerous people

21   who show up here in federal court.  I also have a whole lot of

22   folks who don't have parents come in to federal court when they're

23   sitting at that table over there.  But I have to say that this is

24   the first time in a number of years in a non-family drug case

25   where the parents were maybe not instigators but aiders and

1  abettors and didn't take steps to stop their child from going off
2  the rails.  That's one of the really, really problematic aspects
3  of this case.

4         It was not very credible to me that Mr. Cua, Sr., didn't
5  see what was happening in that march from the ex-President's
6  speech to the front of the Capitol and how the people were heated
7  and how some were dressed in paramilitary gear.  And his son is
8  carrying a weapon.  And his son wants to get closer and climb up
9  on a scaffold.  It's not his scaffold to climb up.  And, yet, go
10 right ahead.  And that's really troubling because Mr. and Dr. Cua
11 are being proposed as custodians.  I've rejected custodians far
12 less involved in the criminal conduct of the defendant.

13        And Mr. Cua says that they were misled by leaders.
14 Well, Mr. Cua is supposed to be the lead, they're the parents.
15 And there was no parenting involved here, nobody who said tone it
16 down.

17        So what I'm confronted with here is not a speech case,
18 because speech is relevant just because it shows what Bruno Cua's
19 mindset was.  His mindset was pretty severe beginning in December
20 trying to obtain an AR weapon under the table, saying that he's
21 going to -- and that was in November, that this is going to be a
22 war; I don't want to watch, I want to fight.

23        Already on December the 22nd he said he was going on the
24 6th and we can storm the fricking Senate or House.  Bring guns.
25 Holding signs is useless.

1          December the 30th, we're going to take back what's ours.

2          On January the 6th, I'm not sure if this is before or

3  after, but it must be after because it said, made them wish they

4  were in hell.  Attacked the swamp rats.  Peaceful protests don't

5  work.  Going to fight like the founding fathers.

6          January the 8th, supposedly when the scales fell off of

7  the eyes, our fight is far from over, I will lay down my life.

8          January 9th, I don't care, I want a bloody war, I'll be

9  on the front lines and burn the place to the ground.  The Capitol

10 is just the beginning of the revolution.

11         Justice Jackson once famously said in a dissent that the

12 Constitution is not a suicide pack.  And, yet, does this case

13 involve someone who has been arrested a number of times, who

14 engages in violent behavior, assaultive behavior, anti-social

15 behavior, things of that nature?  No.  But in part it's more

16 serious, because what the defendant was involved in was

17 effectively an attempt to overthrow the lawful processes of the

18 United States.  And now we're sitting here saying, well, darn, he

19 really didn't mean any of that, but that's what his mindset was.

20 And his mindset continued after the 6th when there was no

21 evidence, even when the ex-President said, go peacefully, we're

22 still hearing talk from this defendant of revolution, I want to

23 fight.

24         And I didn't hear any consequences, zero consequences

25 from the parents of the conduct of their son.  Zero.  So they are

1  not effective custodians because they're after-the-fact mea culpas

2  ring hollow because they exercised no parental consequences on

3  their child when they realized that their child had engaged in

4  counter-constitutional behavior.

5         And these were not spontaneous, youthful actions of a

6  misled individual.  The character references that were submitted

7  talk about his maturity beyond his years, his respectfulness.  So,

8  you know, he's already succumbed to the false statements of his

9  superiors, of his so-called leaders, and I don't see where

10  anything that I say is going to convince him that I'm not part of

11  the problem.

12         So the parents are not an adequate custodian because I

13  haven't heard anything from the parents that lead me to believe

14  that I have confidence in them to do what a custodian does, which

15  is to pick up the phone and call pretrial services or the court

16  and say he's done something that he's not supposed to do.  They've

17  done nothing since January the 6th other than to say we were

18  misled.  So there might be something but they have not been

19  proposed to me.

20         So I find that based on his pre- and post-activity in

21  this case, Mr. Cua is a danger, and that there are no conditions

22  or set of conditions that have been proposed that will reasonably

23  assure the safety of the community; therefore, I'm detaining

24  Mr. Cua and I am moving him to the District of Columbia.

25         To the extent that I haven't done so already, pursuant

1    to the Due Process Protections Act and the Federal Rule of

2    Criminal Procedure 5(f), the government is ordered to comply with

3    the disclosure obligations required by *Brady v. Maryland*, and to

4    provide all materials and information that are arguably favorable

5    to the defendant as to either guilt or punishment in compliance

6    with the obligations under *Brady*, *Giglio* and their progeny.

7    Exculpatory material as defined in *Brady* and *Kyles v. Whitley*,

8    shall be provided sufficiently in advance of trial to allow the

9    defendant to use it effectively, and exculpatory information is

10   not limited to information that would constitute admissible

11   evidence.

12           The failure of the government to comply with its *Brady*

13   obligations in a timely manner may result in serious consequences,

14   including, but not limited to, the suppression or exclusion of

15   evidence, the dismissal of some or all counts, adverse jury

16   instructions, contempt proceedings; or other remedies that are

17   just under the circumstances.

18           Also to the extent that I didn't advise Mr. Cua of his

19   Rule 20 rights, because I was sort of struggling with the mask the

20   other day, he has a right to resolve his case that's pending in

21   the District of Columbia here in this district.  And if the US

22   Attorney's Office in this district and the US Attorney's Office in

23   the District of Columbia agree, he intends to plead guilty to the

24   offenses charged against him in the District of Columbia, this

25   case would be transferred here and assigned to a United States

District Judge, if it was a felony.  And if the district judge

accepted his guilty plea, then the judge would impose sentence and

enter judgment against him.

        The fact that I have told you this is not a hint,

suggestion, advice, directive or order that you plead guilty.

I know that the government has presented evidence here.  The

standard here is a lot less than the government has to prove at

trial and, of course, it goes in front of a jury.  Nobody on this

earth can cause you to plead guilty.  You have an absolute right

to plead not guilty, demand a trial with a jury of your peers, and

that is your right.  And you should discuss whether you want to

exercise your Rule 20 rights with your fine lawyers here in this

district, and I know you have counsel in DC, and discussing it

with them.  And you can always exercise that right in the future.

But, again, don't take any hint or suggestion that I'm telling you

what to do because I'm not and I can't.  Federal law requires that

I tell you that, so I'm telling you.

        Anything else in this matter?

        MR. BUCHANAN:  Not on behalf of the United States, your

Honor.

        MS. PARMER:  Not on behalf of the defendant, your Honor.

        THE COURT:  Mr. Cua, you're remanded to the custody of

the Marshal pending removal to the District of Columbia.

        (PROCEEDINGS REPORTED WERE CONCLUDED AT 4:44 P.M.)

                    _____

1                  C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6     I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by electronic

8  equipment and transcribed by me in the case aforesaid.

9     This the 17th of February, 2021.

10

11

12

13

14

15

16  _____

17  PENNY PRITTY COUDRIET, RMR, CRR
    OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25