## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BURNO JOSEPH CUA,<br><br>      *Defendant.* | Criminal Action No. 21-107 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Bruno Joseph Cua's Emergency Motion for Release from Custody.  Dkt. 11.  Cua was arrested on February 5, 2021 for his role in events at the United States Capitol on January 6, 2021.  He was ordered detained pending trial by Magistrate Judge Alan J. Baverman of the United States District Court for the Northern District of Georgia and now moves "for an order releasing him to the third-party custody of his parents," subject to certain conditions including location monitoring.  *Id.*

For the reasons that follow, Cua's Emergency Motion for Release from Custody, *id.*, is **GRANTED**, subject to the conditions provided herein and in Attachment A to this Memorandum Opinion and Order.  The Court will **STAY** Cua's release from custody, however, until March 16, 2021, the date proposed by Cua's counsel (consistent with CDC guidelines) in light of Cua's recent positive test for COVID-19.

### I. BACKGROUND

The following background is taken from the government's charging instruments, the parties' briefing, and the exhibits tendered to the Court thus far.  It does not represent the Court's findings of fact on the merits of the case, which are the province of the jury.

On January 5, 2021, Bruno Joseph Cua ("Cua"), his mother Alise, and his father Joe, left Georgia for Washington D.C., to protest the congressional certification of the 2020 presidential election results.  Dkt. 12-1 at 52–53 (Ex. 1).  After attending President Trump's speech at the Ellipse, Cua and his parents "walked over to the Capitol." *Id.* at 54.  Cua then told his parents that "[h]e wanted to get a closer look," *id.* at 55, and asked his father's permission to climb the scaffolding affixed to the observation deck that had been constructed for President Biden's forthcoming inauguration, Dkt. 12-2 at 25 (Ex. 2).  Cua's father said "okay," and Cua proceeded to climb the scaffolding and headed toward the Capitol building.  *Id.*

Cua then breached the Capitol building, no later than 4:20 p.m.  Dkt. 12 at 8 n.2.  Upon entering the building, he marched through it carrying (and, at times, twirling) a black baton,[1] attempting to open doors to various rooms.  *Id.* at 4, 14.  Cua eventually made his way to the foyer of Senate Chamber.  *Id.* at 4.  There, he and a group of others shoved aside an officer guarding the entrance, and then entered the Senate Chamber.  *Id.* at 8–13.  Once inside, Cua sat "atop the Senate dais, in the chair previously occupied by former Vice President Mike Pence, with his feet up on [] the desk."  *Id.* at 11.  The government also alleges that Cua used "his cellphone to document the papers of the U.S. Senators present that day to certify the electoral college vote for the 2020 Presidential election."  *Id.* at 4.  Later that night, Cua and his parents drove back to Georgia. Dkt.  12-2 at 6 (Ex. 2) (J. Cua).  On the car ride home, Cua told his

---

[1]  Cua's counsel at the time described the baton to Magistrate Judge Baverman as follows:  "It's an ASP baton, Judge.  It is one that you carry on your belt.  Police use it.  A lot of people have them for self-defense. . . .  The ones I've seen are made out of aluminum. . . .  [I]f it was used defensively in a manner to cause death or serious bodily injury, yes, it would be a dangerous weapon."  Dkt. 12-1 at 26 (Ex. 1) (Morgan).  Cua's father was aware that Cua had brought the baton from Georgia and that he was carrying it with him when he approached the Capitol.  *Id.* at 58 (J. Cua); *see also* Dkt. 12-2 at 6 (Ex. 2) (J. Cua).

parents that he had entered the Capitol building and indicated that he had been involved in "some pushing and shoving" against "a guy in a suit jacket or something." *Id.* at 7–8 (J. Cua).

Roughly one month later, on February 5, 2021, Cua was arrested pursuant to a criminal complaint. During a search of his vehicle, home and person, law enforcement recovered three black batons, the physical appearance of which matched the one that Cua carried with him on January 6. Dkt. 12 at 16; Dkt. 12-1 at 10 (Ex. 1) (Buchanan). On February 10, 2021, Cua was indicted by a grand jury on twelve counts: civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(l); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(l) and (b)(l)(A); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(l)(A); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(l)(A); entering and remaining on the floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); entering and remaining in the gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); entering and remaining in certain rooms in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(C); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The same day that he was indicted, Cua appeared before Magistrate Judge Baverman. Dkt. 12 at 16. At the hearing, the government argued for Cua's pretrial detention under the Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, principally on the ground that he poses a threat to

community safety.  The government explained that Cua had several previous encounters with

law enforcement (although none resulted in any legal action beyond the imposition of a fine on

one occasion) and that his social media posts in late 2020 and early 2021 called for the execution

of public officials, glorified violent protest, and exalted a call to arms against the government.  In

response, Cua argued that he has disavowed his prior social media posts and that he should be

released to the custody of his parents, who expressed a willingness to "put [their] home on the

line if that were required to secure [Cua's] bond."  Dkt. 12-1 at 43 (Ex. 1) (J. Cua).

        After argument and testimony, including cross examination of the defendant's father,

Joseph Cua, Magistrate Judge Baverman granted the government's motion, concluding that "Mr.

Cua is a danger, and that there are no conditions or set of conditions that have been proposed that

will reasonably assure the safety of the community."[2]  Dkt. 12-2 at 48 (Ex. 2).  Magistrate Judge

Baverman also concluded that Cua's parents were not suitable custodians because they "were

maybe not instigators but aiders and abettors [in Cua's alleged crime] and didn't take steps to

stop their child from going off the rails."  *Id.* at 45–46.  Magistrate Judge Baverman, accordingly,

ordered Cua detained pending trial.  *Id.*

        On February 26, 2021, Cua filed an emergency motion in this Court seeking his release

pending trial.  Dkt. 11.  The government filed its opposition on March 2, 2021.  Dkt. 12.  Cua

then filed additional supplemental authority for the Court to consider.  Dkt. 13; Dkt. 15.  The

Court held a hearing on March 3, 2021, at which Cua was arraigned—pleading not guilty on all

counts—and at which the Court heard argument on Cua's pending motion for release.  After the

hearing, Cua filed additional materials for the Court's consideration, including a letter from Cua.

---

[2]  Magistrate Judge Baverman did not find that Cua presented a risk of flight.  *See* Dkt. 12-1 at
30 (Ex. 1).

Dkt. 16; Dkt. 17.  In response to the Court's inquiry, Pretrial Services indicated that, in its view, Cua's parents are not appropriate third-party custodians.  Dkt. 18.  Cua then proposed that the Court consider alternative third-party custodians and submitted a letter from a family that has agreed to serve in that capacity.  Dkt. 20.  Three days later, on March 8, 2021, Cua brought to the Court's attention that he was assaulted while incarcerated and had recently tested positive for COVID-19.  Dkt. 21 at 1.  In light of Cua's positive test result and the Court's inquiry about how best to proceed, Cua's counsel proposed that the Court stay his release until March 16, 2021— ten days after his positive COVID-19 test.  *Id.*  In response, the government reiterated its position that Cua should not be released, but agreed that, if he is released, March 16, 2021 would be an appropriate date.  Dkt. 22 at 2.  The following day, the government filed a compilation of direct messages that Cua had sent and received on Instagram, which had also been shared with Magistrate Judge Baverman during Cua's initial detention hearing.  Dkt. 23.

Cua's Emergency Motion for Release from Custody, Dkt. 11, is now ripe for decision.

## II. LEGAL STANDARD

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "a court having original jurisdiction over the offense."  18 U.S.C. § 3145(b).  Although the D.C. Circuit has yet to opine on the question, substantial precedent supports the view that a magistrate judge's detention order is subject to *de novo* review by the district court, *see United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases supporting this proposition from the Second, Third, Fourth,

Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits), and this Court has adopted

that view, *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

The question for the Court is whether any "condition or combination of conditions will

reasonably assure the appearance of the person as required and the safety of any other person and

the community." 18 U.S.C. § 3142(e). If not, the Court "shall order the detention of the

[defendant] before trial." *Id.* In determining whether Cua should be detained, the Court must

consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence

against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and

seriousness of the danger to any person or the community that would be posed by the defendant's

release. *Id.* § 3142(g). "The facts the judicial officer uses to support a finding . . . that no

condition or combination of conditions will reasonably assure the safety of any other person and

the community [must] be supported by clear and convincing evidence," and the government

bears the burden of proof as to that evidence. *Id.* § 3142(f)(2)(B). That is because "[i]n our

society liberty is the norm, and detention prior to trial or without trial is the carefully limited

exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also Taylor*, 289 F. Supp. 3d

at 62 ("The default position of the law . . . is that a defendant should be released pending trial.")

(internal quotation marks and citation omitted).

### III. ANALYSIS

The Court will consider each of the § 3142(g) factors in turn.

### A.     Nature and Circumstances of the Offense

The nature and circumstances of Cua's alleged offenses weigh in favor of his detention.

As Magistrate Judge Baverman observed, "what the defendant was involved in was effectively

an attempt to overthrow the lawful processes of the United States." Dkt. 12-2 at 47 (Ex. 2). That

is, if anything, an understatement of the gravity of what allegedly occurred.  Cua and hundreds of others took over the United States Capitol; caused the Vice President of the United States, the Congress, and their staffs to flee the Senate and House Chambers; engaged in violent attacks on law enforcement officers charged with protecting the Capitol; and delayed the solemn process of certifying a presidential election.  This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself.

There is no reason to believe that Cua was a leader in organizing the attack.  But there is evidence that he acted knowingly and with an intent to undermine the lawful transfer of power.  As explained further below, before coming to Washington, Cua expressed a desire to use force to breach the Capitol and to prevent Congress from certifying that President Biden, in fact, won the election.  Although Cua did not carry a firearm, he did carry a baton, and he cannot plausibly maintain that he carried this weapon into the Capitol to protect himself from some unprovoked attack; he did so either to injure or to intimidate others.  Fortunately for Cua and the public, there is no evidence at this time that Cua hit anyone with his baton or physically injured anyone.  He did, however, shove a plain-clothed police officer three times in his effort to force his way into the Senate Chamber.  He did so, moreover, as part of uncontrolled mob that overwhelmed law enforcement by violence and intimidation.

The Court, accordingly, concludes that Cua's alleged crimes are serious and weigh in favor of pretrial incarceration.

**B.    Weight of Evidence Against the Defendant**

The second factor—the weight of evidence against the defendant—also weighs in favor of detention.  The government's evidence of Cua's guilt involves video and photographic

evidence, as well as social media posts by Cua in which he admits to breaching the Capitol on January 6. *See generally* Dkt. 12; Dkt. 23-1 (Ex. 1). There is also direct video evidence of the more serious crimes with which Cua is charged—assaulting, resisting, or impeding officers, in violation of 18 U.S.C. § 111(a)(l), and engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(l)(A).

In light of the strength of the government's evidence against Cua, the second factor weighs against Cua's release.

## C.   History and Characteristics of the Defendant

The third factor—the history and characteristics of the defendant—weighs in favor of release. In considering Cua's history and characteristics, the Court must "take into account the available information concerning" Cua's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Here, Cua has strong ties to his family and his community, as shown by the many letters submitted on his behalf. *See generally* Dkt. 11-4 (Ex. 4). Moreover, he is only 18 years old and, apparently, is the youngest defendant charged to date in attack on the Capitol. In addition, although contrition is not a defense, it has some bearing on the character of the defendant, and the Court credits Cua's representations that he is "deeply remorseful and regretful;" that he knows that his media "posts were foolish, unnecessary, and untrue;" that those posts do not represent "who [he is] or ever want[s] to be;" that he has "completely lost those aggressive feelings;" and that he knows that he "was wrong." Dkt. 17-1 at 1 (Ex. 1). He also assures the Court that he will "diligently abide by any and all conditions the [C]ourt places on [him]." *Id.*

Cua's criminal history is not spotless, but neither is it substantial.  The only criminal action ever taken against him was a municipal citation he received from local police for distributing the peace by blowing an airhorn.  Dkt. 12-1 at 33 (Ex. 1) (Parmer).  Cua has, however, exhibited a reluctance to abide by the rules and to follow the directions of law enforcement and other authorities.  As Cua's father acknowledged in his testimony before Magistrate Judge Baverman, Cua "has had . . . interaction[s] with law enforcement" on more than ten occasions "prior to January 6th, 2021."  Dkt. 12-2 at 11–12 (Ex. 2) (Buchanan).  Those interactions involved, by way of example, warnings for trespassing in a private neighborhood to go fishing, Dkt. 12-1 at 47 (Ex. 1) (J. Cua), and multiple warnings for driving all-terrain vehicles on roads on which they did not belong, Dkt. 12-2 at 12 (Ex. 2) (J. Cua).  It therefore may be true, as the government contends, that the frequency of Cua's interactions with the police suggest that his willingness to abide by law enforcement's commands is less than ideal.  But the Court cannot conclude that Cua's noise violation or other misconduct weighs in favor of pretrial detention.

Overall, the Court concludes that Cua's young age, family and community ties, expressed remorse, and lack of a significant criminal history weigh in favor of his pretrial release.

## D.    Danger to the Community

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release."  18 U.S.C. § 3142(g).  "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety."  *Taylor*, 289 F. Supp. 3d at 70.  In making that assessment, moreover, the Court may consider all relevant indicia of risk to the community, including evidence that would not be admissible at trial.  *Id.*  Because this factor substantially overlaps with the ultimate question

whether any conditions of release "will reasonably assure . . . the safety of any other person and the community," 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis.  On the facts of this case, the question is not an easy one, but the Court is ultimately unpersuaded that Cua poses a substantial risk to any person or the community.

As discussed above, Cua engaged in violent, albeit not life threatening, activity at the Capitol—he repeatedly shoved an officer guarding the entrance to the Senate Chamber in order to breach the Chamber.  That, however, is the only violent act—before, during, or after the assault on the Capitol—that the government has proffered in support of Cua's pretrial detention. But that is far from the end of the matter.  Even more concerning to the government and the Court are Cua's many social media posts—before and after the attack on the Capitol— threatening political violence.  His posts on Parler and direct messages on Instagram reveal that he was, at least as of early January 2021, angry, hostile, and bitter about the 2020 Election and ardent that the use of violent force was necessary to correct what he perceived to be an injustice. Just three days after the election, Cua inquired about purchasing an "AR . . . under the table," Dkt. 12-1 at 13 (Ex. 1), and as early as mid-December he appeared committed to taking the "fight" to Congress, *id.* at 13; Dkt. 12 at 2, 4, 20.  In Cua's view, violence was justified on the same terms as the American Revolution.  Dkt. 12 at 3.

His public Parler posts included the following:

December 19, 2021

On JAN 6th congress will open their blinds and see MILLIONS OF ANGRY #PATRIOTS. OPEN CARRY MISSON.  If they vote for sleepy joe and commie KAMALA, we BREAK DOWN THEIR DOORS AND TAKE OUR COUNTRY BACK BY FORCE

January 1, 2021

I hear chatter of DC having "firearm checkpoints", where they will stop you, search your car (without a warrant) and arrest you for having a gun.  Which is an unconstitutional felony in DC.  Bring other weapons if you prefer, like pepper spray, tasers, baseball bats, whatever you want.  Although may I remind you that that is EXACTLY what they want from us, to lay down our weapons and be sheep!  They know they cannot control us if we are armed and dangerous! I don't know who needs to hear this, but they can't arrest all of us. Do not back down and do not be discouraged.  Show up and be ready to fight.  This really is out #1776.  Please echo to spread awareness.

January 7, 2021

The tree of liberty often has to be watered from the blood of tyrants.  And the tree is thirsty.

Violent protests against the capital (NOT SMALL BUSINESS'S) are well within our constitutional rights

Dear Swamp Rats, The events at the capital were a reminder that WE THE PEOPLE are in charge of this country and that you work for us. There will be no 'warning shot' next time.

Everyone who works in congress is a traitor to the people and deserves a public execution.

*Id.* at 1–3.  Although less public, his Instagram direct messages express similar, violent

sentiments:

November 9, 2020

I'm trying to find an AR to buy under the table.  Know anybody?

December 14, 2020

I don't want to sit here in GA and watch I want to fight

December 22, 2020

[T]his [January 6, 2021] could possibly be one of the most important days in American history . . . because we can storm the freaking senate/house . . .  That's why I keep saying to bring guns . . . Holding signs is useless . . . We have to forcefully take our freedom back on Jan 6

11

January 7, 2021

In response to a message stating "You know if trump really doesn't get in because of the traitors all I can say is he exposed the swamp," Cua writes "If Trump doesn't get Im we will be back in DC for a blood bath"

January 8, 2021

Trump or not, our fight against the government is far from over . . . I would lay down my life for him but I'm gonna keep fighting

January 9, 2021

I want a bloody war I'm ready to start shooting and I'm ready to die before I watch America crash and burn . . . I'll be on the front lines . . . I want to lock the swamp rat tyrants in the capital and burn the place to the ground

Dkt. 23-1 at 5, 6, 9, 12 (Ex. 1).

Three things standout about these posts and messages.  First, they are chilling and violent.  They are not mere political rants; they are calls for violent revolution against the duly elected representatives of the People.  Second, Cua threatened to "storm" the Senate and House of Representatives and to "break down their doors" to "take our Country back by force" long before he traveled to Washington on January 6, 2021.  Dkt. 12 at 2.  As a result, he cannot plausibly maintain that he was merely swept up by the fervor of the crowd of adults who were present.  He came to Washington planning to participate in a violent attack that, in fact, occurred. Most Americans could never have imagined that the U.S. Capitol, our elected officials, and the certification of a presidential election would be subject to such an assault.  Cua not only foresaw those tragic events, he looked forward to participating in them.  Third, Cua had no regrets in the days shortly after the attack.  The day after the attack, for example, he wrote a Parler post declaring that those who work for the United States Congress are "traitor[s]" and "deserve[] a public execution."  *Id.* at 3.  He clearly was not chastened by anything that his parents may have

said to him during the ride home from the District of Columbia, and he continued to express his desire for "a bloody war" three days later.  Dkt. 12-1 at 17, 47 (Ex. 1) (Buchanan).

In the government's view, these posts and messages demonstrate a propensity to commit horrifying acts of political violence.  In Cua's view, in contrast, they merely reflect a young man who became intoxicated with social media while never intending to act on any of his admittedly disturbing posts and messages.  Although what Cua was actually thinking—and what he was actually prepared to do—eludes any certain answer, in the Court's view, the truth likely lies somewhere between these poles.  There is no evidence that he ever purchased an "AR," and, to the Court's knowledge, Cua has never intentionally injured anyone.  Although he shoved a law enforcement officer on January 6, there is no evidence that he hit him with his baton or injured that officer or anyone else.  At the same time, the evidence does show that Cua did, indeed, act on some of his posts and messages, refuting any contention that they were mere fantasy or idle chatter.  Cua repeatedly threatened to come to the District of Columbia, breach the Capitol, and to "take [the] Country back by force,"—and he, in fact, made his way into the Senate Chamber by force and, in doing so, he (and others) unlawfully obstructed the democratic process.  Dkt. 12 at 2.  That is all deeply troubling, but the government likely goes too far in arguing that Cua actually intended to kill anyone or to engage in "bloody" revolution.

Although Cua did not condemn his posts and messages until after he was arrested and indicted on several, serious federal charges, his own account of what he was thinking bears consideration.  To start, Cua appears genuinely remorseful for his actions and has disavowed the violent views reflected in his social media history.  In a letter filed with the Court, Cua states:

> I understand that you [*i.e.*, the Court] are concerned that I may be a danger, that I may act upon things I said.  Given how inappropriate my social media activity was, I truly understand your worries, and I appreciate you taking time to really consider the options.  I would like to strongly assure you that I am not a danger

to anyone, and I will absolutely never act on what I said. . . .   My posts were
foolish, unnecessary, and untrue, that[']s not who I am or ever want to be[.] . . .
I have completely lost those aggressive feelings and moved on from the entire
political idea.

Dkt. 17-1 at 1 (Ex. 1).  To be sure, Cua's regret came only after he was caught, which minimizes

its value.  Nevertheless, the Court concludes that his remorse (even if late in coming) reduces the

likelihood that Cua will engage in any violent political activity in the future.

That conclusion is buttressed by the Court's observation of Cua's contrite demeanor at

the March 3rd hearing and the fact that conditions can be fashioned to minimize the risk that Cua

will pose a danger to others:  He will, among other things, be restricted from accessing social

media, will be confined to his home, will be placed on GPS monitoring, and will have no access

to firearms or other weapons.  Cua's young age and the absence of a significant criminal record

or a history of violent behavior further support the Court's conclusion.

To be sure, Cua's parents will play an important role in ensuring that Cua complies with

the Court's conditions, and, in particular, that he does not access social media while on pretrial

release.  And it is true that Cua's parents bear some responsibility for Cua's actions—they were

the ones that drove him to Washington D.C., permitted him to bring and carry a baton to the

Capitol, and allowed him to scale the scaffolding, leading to Cua's breach of the Capitol

building.  With that said, though, Dr. Cua has agreed under oath to ensure that her son complies

with the Court's conditions, and she will be required to provide the Court with a declaration,

signed under the penalty of perjury, every week attesting to Cua's full compliance.  The Court is

convinced, moreover, that Dr. and Mr. Cua deeply regret permitting their son to act as he did and

that—for his sake—they will do all that they can to ensure that he does not take any action that

might risk revocation of his pretrial release or other criminal exposure.  As Dr. Cua stated at the

March 3rd hearing:

> I will say that since [Cua] has been arrested, everything has changed for us. We . . . really just hope for . . . mercy, that we would just have a chance to show that.
>
> And we are prepared to do absolutely anything the Court wants. I—I—we know that it's not just being parents now. It's being custodians, and there's a legal— very serious legal responsibility with that, and we're just asking for a chance, Your Honor. We—you will not be disappointed. You will not be disappointed, and I just ask for your forgiveness, whatever you decide.
>
> I ask for your forgiveness for just my failures as a mom, and I am very well aware of them, and I just—I'm really just hoping that we get a chance to prove that this is behind us. We just want our family together. . . . [W]e are completely broken and completely just, honestly and truthfully, remorseful to the core of our beings, and we're asking for a chance.

Tr. 36 (A. Cua). Based on these representations and the record as a whole, the Court is convinced that Dr. and Mr. Cua will safeguard their son's interests by ensuring that he does not breach the conditions of his pretrial release and end up again where he is now.[3]

\* \* \*

Cua's violent social media posts and messages are disquieting, to put it mildly, particularly when viewed alongside his actions on January 6. The Court is granting Cua pretrial release only by the slimmest of margins, guided by the default rule favoring liberty. Cua's posts reveal him to rank that virtue—liberty—above all others. He can do well to honor it by fastidiously following the Court's orders.

## CONCLUSION

For the foregoing reasons, Defendant Bruno Joseph Cua's Emergency Motion for Release from Custody, Dkt. 11, is **GRANTED** subject to certain conditions; it is further

---

[3] The government argues, albeit only cursorily, that Cua "poses a serious risk of flight." Dkt. 12 at 18. The Court disagrees. Cua's young age, family and community connections, and the conditions described herein and in Attachment A—including, for example, GPS location monitoring and home detention—are sufficient to ensure Cua's presence at future court proceedings.

**ORDERED** that Cua shall be released from custody on March 16, 2021 and shall immediately upon his release abide by the conditions set forth below and in Attachment A to this Memorandum Opinion and Order; it is further

**ORDERED** that Cua shall report to the United States Probation Office for the Northern District of Georgia ("N.D. Ga. Probation Office") immediately upon his return to Georgia, and in no event later than March 17, 2021; it is further

**ORDERED** that the N.D. Ga. Probation Office shall, at its initial meeting with Cua, provide him a copy of Attachment A; it is further

**ORDERED** that Cua shall, at his initial meeting with the N.D. Ga. Probation Office, sign Attachment A and provide the signed copy of the Attachment to the N.D. Ga. Probation Office; and it is further

**ORDERED** that Cua's mother, Dr. Alise Cua, shall on Monday of each week beginning March 22, 2021, complete, sign, and (through her son's counsel) submit to the Court Attachment B, attesting under penalty of perjury to Cua's compliance with the conditions of his pretrial release.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 10, 2021