UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**BRUNO JOSEPH CUA** | Criminal Action No. 21-00107 (RDM)<br><br>Honorable Randolph D. Moss<br><br>Trial: February 13, 2023 |

**BRUNO CUA'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNT ONE
OF THE SECOND SUPERSEDING INDICTMENT**

Defendant Bruno Cua, through his counsel, files this reply brief in support of his motion to dismiss Count One of the Second Superseding Indictment ("SSI").

**I.    Congress's power under the Commerce Clause is at issue and its plenary power to legislate regarding the District of Columbia does not save the statute.**

The government argues that Congress's power under the Commerce Clause is not at issue because Congress possesses plenary power to legislate regarding the District of Columbia. Opp. at 9. (citing U.S. Const. art. I, § 8, cl. 17). Section 231(a)(3) on its face, however, is not limited in any way to the District of Columbia and its far-reaching scope cannot be cabined through judicial interpretation, i.e., the statute's reach beyond the District of Columbia on its face cannot be narrowed to the District of Columbia.

The D.C. Circuit's decision in *Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013), is illustrative. There, the plaintiff owned a business that sold tobacco products across state lines. He sought a preliminary injunction against enforcement of provisions of the Prevent All Cigarette Trafficking Act (PACT) that, in part, required him, on pain of criminal penalty, to pay state and local tobacco taxes and banned him from sending his products through the U.S. mail. He argued that these provisions violated the due process clause because they did not require minimum contacts between the taxing sovereign and the taxed entity. *Id.* at 641. The district court entered a

preliminary injunction barring the government from enforcing the tax provisions against the plaintiff at all, not just in those jurisdictions in which he lacked minimum contacts.

On appeal, the government argued that the district court improperly applied severability analysis. Even if PACT could not constitutionally reach jurisdictions where the plaintiff lacked minimum contacts, the government argued, the statute's "plainly legitimate sweep" should have been applied to the business in the jurisdictions with conceded minimum contacts. 721 F.3d at 654. The D.C. Circuit disagreed. It did so with a comparison to prevailing severability analysis in the Commerce Clause context:

> [W]hen a statute erases the boundaries that define a sovereign's jurisdiction … any legitimate application is pure happenstance. It is perhaps this consideration that has led the Supreme Court to sustain facial challenges to laws that omit constitutionally required jurisdictional elements, even though all such laws necessarily have a "plainly legitimate sweep." For example, in *United States v. Lopez*, the Supreme Court struck down the Gun-Free School Zones Act of 1990, a federal law that prohibited individuals from knowingly possessing firearms within school zones. 514 U.S. 549, 551, 115 S.Ct. 1624, 131 L.Ed. 2d 626 (1995). The text of the statute "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561; *see also United States v. Morrison*, 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed. 2d 658 (2000) (relying on *Lopez* to sustain a facial challenge to the Violence Against Women Act). Similarly, if [plaintiff's] due process analysis is correct, the PACT Act contains "no jurisdictional element which would ensure" that taxes it imposes comport with the Due Process Clause. It permits state and local taxing powers to bleed over from legitimate objects of taxation to cover objects foreign to the state or local jurisdiction.

*Gordon*, 721 F.3d at 654-55 (alternation in original).[1]

---

[1] *Gordon* is consistent with the Supreme Court's latest word on severability in *Murphy v. NCAA*, 138 S.Ct. 1461, 1482 (2018). The Professional and Amateur Sports Protection Act (PASPA) was passed to prevent widespread legalization of sports gambling. Part 1 of PASPA made it unlawful for a *governmental entity* to sponsor, operate, advertise, promote, license, or authorize sports gambling by law. Part 2 made it unlawful for a *person* to sponsor, operate, advertise, or promote sports gambling *pursuant to the law of a governmental entity*. New Jersey argued that Part 1 was invalid because it violated ani-commandeering doctrine by prohibiting the State from legalizing sports gambling. The Supreme Court agreed and struck Part 1. *Id.* at 1481.

The Court declined to sever Part I from PASPA. The Court found that Parts I and 2 were meant to "work together" to achieve PASPA's goal of preventing "state legalization of sports

*Gordon* shows that the Court cannot simply ignore severability analysis here. The Court must "sustain facial challenges [under the Commerce Clause] to laws that omit constitutionally required jurisdictional elements, even though all such laws necessarily have a 'plainly legitimate sweep.'" *Gordon*, 721 F.3d at 654. As shown below, the so-called "jurisdictional element" of section 231(a)(3) does not satisfy the Supreme Court's precedents in *Lopez* and *Morrison* and the cases on which the government relies do not show otherwise. Even if the government is correct that section 231(a)(3) has a "plainly legitimate sweep" based on Congress's plenary power to legislate regarding the District of Columbia, it contains no jurisdictional element setting the dimensions of that sweep in a way that can be severed. Nowhere is this federal law circumscribed to pertain to only civil disorders affecting commerce or federal functions within the District of Columbia. Accordingly, any such application cannot be severed from the remainder of the statute's illegitimate sweep.

Moreover, in addition to the fact that the statute says nothing about limiting it to the District of Columbia, the legislative history of section 231(a)(3) plainly reveals that Congress had no intention of creating a riot statute that would apply only in the District. To the contrary, the central purpose of the Civil Obedience Act of 1968 (COA), which contained section 231(a)(3), ran in the opposite direction, i.e., to extend federal law enforcement assistance to the States in their arrests and prosecutions of civil rights leaders in those states. *See* Mot. at 1-2. And the statute's sponsor, Senator Russell B. Long of Louisiana, addressed the Commerce Clause issue, stating that the statute would "not leave available to Rap Brown and Stokely Carmichael the technical defense that they did not *cross the State boundary* with the intent to create a riot."

---

gambling." *Id.* at 1483. Second, after Part 1 was struck, Part 2 "cease[d] to implement any coherent federal policy." *Id.* By itself, Part 2 would render *legal*, under federal law, sports gambling that was prohibited by state law and render *illegal*, under federal, law sports gambling allowed by state law. *Id.* Because the Court doubted "that Congress ever contemplated … such a weird result" the Court declined to sever and instead heal the statute infirm in its entirety. *Id.*

3

114 Cong. Rec. 5533 (emphasis added).

In sum, the legislative history is full of evidence that Congress "'would not have enacted [D.C.-alone] provisions which are within its power, independently of [those] which [are] not.'" *Murphy*, 138 S.Ct. at 1482 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). To the contrary, the history shows that giving federal law enforcement aid to the States was the central purpose of the COA. Thus, section 231(a)(3) is in no sense "fully operative" if it only applies in D.C. *Id.* (citing *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010)).

If Congress intended section 231(a)(3) to apply only in Washington, D.C., it knew how to state so. Indeed, the District already benefits from a local "civil disorder" felony statute, enforced by local and federal law enforcement and carrying penalties that potentially reach higher than those in section 231(a)(3), D.C. Code § 22-1322. It therefore would make no sense for Congress to enact section 231(a)(3) for the District of Columbia alone, something it plainly did not do. *See Murphy*, 138 S.Ct. at 1482.

Accordingly, as discussed below and in Mr. Cua's motion, Count One for violation of section 231(a)(3) should be dismissed because Congress did not possess the authority to enact that statute under the Commerce Clause. Further, such unconstitutional aspects of the statute cannot be severed from any "legitimate sweep" the statute might have had over conduct within the District of Columbia.

**II.     Section 231(a)(3) is unconstitutional because it exceeds Congress's power under the Commerce Clause.**

The government also argues that Mr. Cua's Commerce-Clause challenge is meritless in its own right. Opp. at 14-16. The government misapprehends and misapplies the Supreme Court's requirements under *Lopez* and *Morrison*.

4

The Supreme Court has set a "controlling four-factor test for determining whether a[n] activity 'substantially affects' interstate commerce" and is thus subject to congressional regulation pursuant to the Commerce Clause. *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)):

> (1) Whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Id.* at 1028 (citing *Morrison*, 529 U.S. at 610-12).

Although the "most important" factors are the first and the fourth, *Adams*, 343 F.3d at 1028, the government addresses only the second: whether an express "jurisdictional element" is provided in section 231(a)(3) to "limit its reach." It has therefore forfeited any argument with respect to the remaining *Morrison* factors.

The government argues that, "[i]n both *Lopez* and *Morrison*, the challenged statutes contained no 'jurisdictional element' that required the Government to prove that the offense conduct affected interstate commerce." Opp. at 15 (citing *Lopez*, 514 U.S. at 561-62; *Morrison*, 529 U.S. at 613). By contrast, the government argues, section 231(a)(3) "has an 'explicit jurisdictional element' that requires the Government (when relying on the Commerce Clause alternative) to prove that the offense conduct interfered with interstate commerce." *Id.* (citing *United States v. Wood*, 2021 WL 3048448, at *4-6 (D. Del. July 20, 2021)). Presumably, the government is referring to the requirement that a charged "civil disorder" must "in any way or degree obstruct, delay[], or adversely affect[] commerce or the movement of any article or commodity in commerce …" § 231(a)(3). This argument rests on several flaws.

First, the government's argument proves the defense's point about severability. The government argues that it need only prove that the offense conduct interfered with interstate

5

commerce "when [the Government] rel[ies] on the Commerce Clause alternative.]" Yet, neither the statute itself nor the government in its argument includes any basis to distinguish the statutory requirements when the government is relying on Congress's plenary power to legislate with respect to the District versus when it is proceeding under the Commerce Clause. Indeed, the indictment itself does not specify under which jurisdictional requirement—the Commerce Clause or the D.C. plenary power—the grand jury has charged Mr. Cua, providing an independent ground requiring dismissal under the Fifth Amendment. U.S. Const. amend. V; *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (holding that under the Fifth Amendment, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt").

Second, although the government repeatedly points to a "jurisdictional element" in section 231(a)(3), it does not explain what such an element substantively requires. That is because the statutory language to which it refers has virtually no resemblance to the jurisdictional element required by *Lopez-Morrison*. Federal laws that regulate "forms of conduct that, even in the aggregate, may not substantially affect commerce" must contain a jurisdictional element so that their "applications … do not exceed Congress's authority." *Taylor v. United States*, 136 S.Ct. 2074, 2081 (2016). "[T]he jurisdictional element 'insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree.'" *United States v Jones*, 231 F.3d 508, 514 (9th Cir. 2000) (quoting *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir. 1996)) (emphasis added). All of the statutes that the government uses for comparison are distinguishable because, unlike section 231(a)(3), the crimes referenced all require that a defendant's activity (a) directly impact commerce or (b) involve a commercial good. Section 231(a)(3) requires neither.

Take the Hobbs Act, for example. In *United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996), the court upheld Hobbs Act robbery following the Supreme Court's decision in Lopez. The court determined "that *Lopez*'s 'substantially affects' test is not applicable" because "the Hobbs Act is concerned solely with *inter* state, rather than *intra* state, activities." *Atcheson*, 94 F.3d at 1242 (emphasis in original). Rather than requiring a substantial effect, "the Hobbs Act speaks to one who 'affects commerce' by robbery or extortion," implying "a *direct* impact on interstate commerce." *Id.* (emphasis added). While robbery under the Hobbs Act can only be carried out by "affect[ing] commerce," section 231(a)(3) contains no requirement that an individual "affect commerce" by interfering with the duties of a police officer.

RICO is another example. Unlike section 231(a)(3), RICO can apply criminal liability to any enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c). Courts of Appeals have therefore upheld the constitutionality of RICO under the Commerce Clause because, "[l]ike the Hobbs Act," RICO requires that a defendant's activities impact commerce directly, and that such direct effects "in the aggregate, have a substantial effect on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997). While both RICO and the Hobbs Act require direct impacts to interstate commerce that cause a substantial effect in the aggregate, section 231(a)(3) imposes no requirement "that a defendant's actions implicate interstate commerce to a constitutionally adequate degree." *Jones*, 231 F.3d at 514.

The Sherman Anti-Trust Act is similar. In *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980), the Court held that an indictment under the Sherman Act must indicate that, "as a matter of practical economics," the defendant's offense had "a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246. As with other offenses, the Sherman Act also requires some showing that the defendant's offense conduct itself

7

affected commerce. While recognizing the Commerce Clause may "extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce," the Court in *McLain* added, "it is not sufficient to merely rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *Id.* at 242.

The express terms of section 231(a)(3) – "in any way or degree" – require exactly such a nebulous connection to commerce and are not susceptible to a construction that could resolve the gap between the offense of interfering with police or firefighters and a civil disorder's commercial impacts. "Civil disorders," as section 232(1) defines them, can occur in any situation, in any place, at any time, so long as three individuals are engaged in actions of violence threatening danger to property. Given such breadth, the law has vast potential to sweep up individuals who, while interfering with the duties of police, are utterly lacking in culpability with respect to the separate civil disorder that affected commerce. Nothing in the language of section 231(a)(3) can safeguard such individuals from liability for a federal felony conviction because the statutory language simply cannot be contorted to require that any commercial effect at all result from a defendant's actual acts.

In an attempt to save its argument, the government cites to a handful of out-of-circuit, mostly unpublished decisions. Opp. at 14-15. These decisions are not persuasive. The government relies primarily on *United States v. Phomma*, 561 F.Supp.3d 1059, 1064-66 (D. Or. 2021), where a defendant challenged section 231(a)(3) on Commerce Clause grounds. In rejecting the challenge, the *Phomma* court relied on the Ninth Circuit's upholding of a statute banning guns in school zones in *United States v. Dorsey*, 418 F.3d 1038, 1045-46 (9th Cir. 2005). The *Phomma* court stated in conclusory fashion that the statute in *Dorsey* contained

"jurisdictional elements" that were similar to section 231(a)(3). 561 F.Supp.3d at 1065. To the contrary, *Dorsey* illustrates the *invalidity* of section 231(a)(3).

In *Dorsey*, the court addressed a previously invalidated statute after Congress addressed the issues rendering it unconstitutional and, by amending the statute, established Commerce Clause compliance. After *Lopez* invalidated the Gun-Free School Zones Act, Congress amended the statute's language to require actual use of channels of interstate commerce and made detailed congressional findings establishing bases for federal action. In *Dorsey*, the court addressed the new statutory language that narrowed the offense to possession of a firearm that has "moved in or that otherwise affects interstate or foreign commerce." 418 F.3d at 1045. This jurisdictional element, the Ninth Circuit recognized, established a "concrete tie to interstate commerce" by requiring, "through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 1046. Section 231(a)(3) has no equivalent requirement for analysis on a defendant-by-defendant basis.

Further, the amended statute in *Dorsey* included extensive and detailed finding to establish a substantial effect on commerce. Unlike the general platitudes in the previous statute, and in section 231(a)(3), Congress considered and listed eight express and detailed findings establishing the effects on interstate commerce of guns in school. 18 U.S.C. § 922(q)(1). Nothing remotely similar to such findings can be gleaned from section 231(a)(3)'s legislative history.

The government's remaining unpublished decisions either do not provide any reasoning or rely on misplaced analogies to the Gun-Free Schools Zones Act, the Hobbs Act, and section 922(g), which are distinguished above. *See United States v. Howard*, 2021 WL 3856290, at *11 (E.D. Wis. Aug. 30, 2021) (upholding section 231(a)(3) on the basis of comparison to the Hobbs Act, even though the latter, unlike section 231(a)(3), is concerned solely with interstate, rather

than intrastate state, economic activities such as robbery);[2] *United States v. Pugh*, 1:20-cr-00073-TFM-B, ECF No. 95 at 7-11 (S.D. Ala., May 13, 2021) (upholding section 231(a)(3) on the basis of comparison to Hobbs Act and § 922(g), both of which, unlike section 231(a)(3), contain elements requiring a link between the defendant's conduct and interstate commerce); *United States v. Huff*, 630 F. App'x 471, 484-85 (6th Cir. 2015) (unpublished) (upholding section 231(a)(2), which concerns a Commerce Clause issue different from that raised by subsection (a)(3), as subsection (a)(2) requires that the defendant's firearm move in interstate commerce). *See also United States v. Wood*, 2021 WL 3048448, at *6 (D.Del. July 20, 2021) (relying on *Pugh* without addressing the need for a link between defendant's conduct and interstate commerce).

The government's position that the Commerce Clause encompasses individual acts to interfere with police and firefighters, as described under section 231(a)(3), "would effectually obliterate the distinction between what is national and what is local and create a complete centralized form of government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). For that reason, and for all the other reasons cited in Mr. Cua's motion to dismiss, Count One should be dismissed.

### III.  Neither of the functions proffered by the government meets the definition of "federally protected function."

The government briefly addresses in one paragraph Mr. Cua's argument that any "federally protected function" it could proffer does not qualify under the statute. Opp. at 16. The government argues that it can rely upon either (1) the Secret Service's protection of the Vice President and his family or (2) the United States Capitol Police's obligation to protect the

---

[2] *Atcheson*, 94 F.3d at 1242.

Capitol. Mr. Cua, however, has already addressed why neither of these proffered bases passes muster. See Mot. at 8-9. The government does not address Mr. Cua's arguments.

## **CONCLUSION**

For all the foregoing reasons, and the reasons stated in Mr. Cua's motion, Mr. Cua respectfully requests that the Court dismiss Count One of the Second Superseding Indictment.

Respectfully submitted,

DATED: January 4, 2023

*/s/ William E. Zapf*
Jonathan Jeffress (D.C. Bar No. 479074)
William E. Zapf (D.C. Bar No. 987213)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jjeffress@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Bruno Joseph Cua*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2023, I filed the foregoing with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system and served a copy of it by electronic mail on counsel for the United States, Assistant United States Attorneys Kaitlin Klamann, Carolina Nevin, and Kimberly Paschall.

Dated: January 4, 2023                                              */s/ William E. Zapf*
                                                                                    William E. Zapf