**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-107 (RDM)** |
| **BRUNO JOSEPH CUA,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bruno Joseph Cua to 57 months' imprisonment, at the top of the applicable Guidelines range, three years of supervised release, $2,000 in restitution, a $23,485 fine, and a mandatory special assessment of $200.

## I.     INTRODUCTION

> That is EXACTLY what they want from us, to lay down our weapons and be sheep! They know they cannot control us if we are armed and dangerous! I don't know who needs to hear this, but they can't arrest all of us. Do not back down and do not be discouraged. Show up and be ready to fight. This really is our #1776.

The defendant, Bruno Cua, posted these words to his Parler account on January 2, 2021. Four days later, on January 6, 2021, Cua – who during various points in the day was armed with pepper spray and an ASP baton[1] – attacked the U.S. Capitol. He climbed the scaffolding on the West Front, made his way through smoke and chaos, and burst through the Upper West Terrace

---

[1] ASP stands for Armament Systems and Procedures, Inc. An ASP baton is an extendable metal baton commonly used by law enforcement.

Doors where he immediately and aggressively confronted awaiting police officers. He then led other rioters up and into the Rotunda before making his way quickly to the third floor of the building where he assaulted a U.S. Capitol Police ("USCP") officer who was trying to lock the doors to the Senate Gallery. After the officer retreated, Cua rushed into the Senate Gallery, jumped down to the Senate Floor, and sat in the Vice President's chair with his feet up on the desk. Cua then opened a door, letting dozens of other rioters stream onto the Senate Floor. Before leaving, he rifled through multiple desks belonging to U.S. Senators.

This Court convicted Cua of two felonies following a stipulated bench trial: (1) obstruction of Congress, in violation of 18 U.S.C. §§ 1512(c) and 2; and (2) assault of a federal officer, in violation of 18 U.S.C. § 111(a). The government recommends a high Guidelines sentence of 57 months' imprisonment because of the significant aggravating factors present in this case, including Cua's possession of weapons, his violent pre-attack rhetoric, his use and threatened use of violence on January 6, and his encouragement and direction of other rioters, including his pivotal role in opening the Senate Chamber to other rioters.  As discussed further below, a sentence at the high end of the Guidelines also takes into consideration the sole mitigating factor in this case, Cua's age at the time of the offense.

## II.     FACTUAL BACKGROUND

### A.       The January 6, 2021, Attack on the Capitol

To avoid exposition, the government refers the Court to the Statement of Facts for Stipulated Trial filed in this case which contains a general summary of the attack on the United States Capitol. ECF No. 281.

**B.     Cua's Statements on Social Media Before January 6, 2021**

In the weeks leading up to January 6, 2021, Cua frequently advocated for violence on his social media accounts on Instagram and Parler. For example, before January 6, 2021, Cua: (1) claimed the 2020 presidential election was stolen; (2) noted the importance of the certification of the electoral vote to be held on January 6, 2021; and (3) promoted the use of violence on January 6, 2021, to stop the certification. *See* Stipulated Trial Exhibits 702-741; 802-809; 902-993.[2]

Cua made clear that he did not believe that peaceful protesting would be effective and that violence was necessary. For example, on December 20, 2020, Cua posted:

> POV: It's #january6th. 5,000,000 angry and armed #patriots are in the streets of #WashingtonDC. #Congress finalizes the stolen election for #sleepyjoe. Do they expect millions of us to just go home and say "well we tried"? HELL NO!!! WE WILL GET AGGRESSIVE! THIS IS #AMERICA! WE WILL NEVER BE A #SOCIALIST COUNTRY OWNED BY #CHINA! #FIGHTFORFREEDOM!

Stipulated Trial Exhibit 725.

On December 19 and 20, 2020, Cua posted:

> On JAN 6th congress will open their blinds and see MILLIONS OF ANGRY #PATRIOTS. OPEN CARRY MISSION. If they vote for sleepy joe and commie KAMALA, we BREAK DOWN THEIR DOORS AND TAKE OUR COUNTRY BACK BY FORCE! THIS IS OUR #1776. #LIVE FREEORDIE.

Stipulated Trial Exhibits 718; 984. On December 21, 2020, Cua posted,

> PEACEFUL PROTESTS ARENT GONNA MAKE THE CORRUPT #DEEPSTATE GO AWAY! They didn't hold signs in #1776, they shot and killed their oppressors! If we don't do something more we are going to loose [sic] our country VERY SOON!

---

[2] For the sake of brevity, the government is not setting out the content of each and every statement contained in these exhibits but will move to admit all of the exhibits into evidence at the sentencing hearing.

Stipulated Trial Exhibit 714. On December 21, 2020, Cua posted,

> Washington DC. #January6th. Bring your guns. We're gonna need them. It ain't illegal if there's an army of us. BRING YOUR GUNS. ALL OF THEM.

Stipulated Trial Exhibit 726. Significantly, Cua was contemplating an attack on the Capitol long before the January 6 rally. On December 22, 2020, Cua sent private messages on Instagram to another Instagram user. Cua asked the other Instagram user if he or she was "going on Jan 6th" and the Instagram user responded, "You think it's gonna change anything? There's gonna be a civil war regardless." Cua responded, "Yeah I do because *we can storm the freaking senate/house. That's what I've been saying. That's why I keep saying to bring guns. Holding signs is useless.*" Stipulated Trial Exhibit 929 (emphasis added). Cua added, "We have to forcefully take our freedom back on Jan 6th." *Id.*

On December 26, 2020, Cua posted,

> #PresidentTrump is going through every possible legal process. But #WeThePeople are sick of waiting. We want the blood of politicians split [spilled]. We want to fight. It's no longer about left or right it's #tyranny vs #freedom.

Stipulated Trial Exhibit 728.

On January 1, 2021, Cua posted:

> IMPORTANT: I hear chatter of DC having "firearm checkpoints", where they will stop you, search your car (without a warrant) and arrest you for having a gun. Which is an unconstitutional felony in DC. Bring other weapons if you prefer, like pepper spray, tasers, baseball bats, whatever you want. Although may I remind you that that is EXACTLY what they want from us, to lay down our weapons and be sheep! They know they cannot control us if we are armed and dangerous! I don't know who needs to hear this, but they can't arrest all of us. Do not back down and do not be discouraged. Show up and be ready to fight. This really is our #1776.

Stipulated Trial Exhibit 732.

On January 1, 2021, Cua posted:

Just a reminder, there's strength in numbers. They can't arrest all of us. Don't be afraid.

Stipulated Trial Exhibit 731.

### C.   Cua's Role in the January 6, 2021, Attack on the Capitol

Cua and his parents drove from Milton, Georgia to Washington D.C., arriving on January 5, 2021. On January 6, 2021, they parked their car and walked to the "Stop the Steal" rally at the Ellipse. Before leaving the car, Cua equipped himself with a can of pepper spray and an ASP baton. Below is a photograph of Cua standing atop a statue at the Peace Circle with a can of pepper spray visible on his left hip.



*Image 1: Photograph of Cua on top of a Statue at the Peace Circle on January 6, 2021*



*Image 2: Close-up of above photograph*

After attending the rally, Cua walked to the U.S. Capitol building. At approximately 2:30 p.m., shortly after the police lines at the west front of the Capitol building were breached by rioters, Cua climbed up the scaffolding on the northwest front of the Capitol building while clutching his ASP baton.



*Image 3: Still Image from Stipulated Trial Exhibit 212 at Timestamp 00:12*

After reaching the Lower West Terrace, Cua climbed up onto the ledge of the inaugural stage and confronted a nearby police officer, screaming and pointing at him while threatening the officer with his baton.



*Image 4: Still Image from Stipulated Trial Exhibit 214 at Timestamp 00:31*

Cua then made his way quickly up to the Upper West Terrace where he entered the Capitol through the Upper West Terrace Doors at approximately 2:36 p.m. At the time he entered, the double doors were open, and a loud alarm was sounding. *See* Stipulated Trial Exhibits 201 and

202. Signs on the inside of the doors read, "EMERGENCY EXIT ONLY."  Cua, with his phone in his hand, screamed and waved his baton at one of the officers, USCP Sergeant Millard, as the officer walked into the building and attempted to establish a police line to stop the rioters.



*Image 5: Still Image from Stipulated Trial Exhibit 101 at timestamp 2:36:12 p.m.*



*Image 6: Still Image from Stipulated Trial Exhibit 101 at timestamp 2:36:15 p.m.*

Sergeant Millard explicitly remembered Cua, whom he referred to as "Red Hat Guy" after viewing the CCTV footage. In summary, he stated that Cua was the loudest, most aggressive, and most verbose of anyone in the crowd of rioters at that time and that he seemed to be the angriest of the group of rioters. Indeed, Cua can clearly be heard on video shrieking, "We back you!" and "You guys have your barricades all the way up [inaudible]" and "LET US IN!" Stipulated Trial Exhibit 202, timestamp 1:11 to 1:45. Cua's actions in that moment contributed to Sergeant Millard's concerns that the officers would not be able to stop the crowd of rioters. After several seconds of attempting to hold the police line at the door, Sergeant Millard and his fellow officers decided that further confrontation with the crowd could cause escalation resulting in injury or even death and, therefore, stepped aside. Cua immediately took advantage and was one of the first rioters to run past the officers, through the double doors, and into the Capitol building. Stipulated Trial Exhibit 202, at timestamp 1:50.

9

Cua then led other rioters up the steps to the Rotunda, running up the steps two or three steps at a time.



*Image 7: Still Image from Stipulated Trial Exhibit 202 at timestamp 2:00*

After charging into the Rotunda, Cua came back out to the stair landing to encourage the rioters who entered behind him and yelled, "Let's go! Good job guys!" *See* Stipulated Trial Exhibit 202, at timestamp 2:12. Cua then paced around the Rotunda for approximately two minutes, entering and exiting the Rotunda multiple times, yelling and waving his baton around. *Id.* at timestamp 2:56; Stipulated Trial Exhibit 203 beginning at timestamp 2:03; Stipulated Trial Exhibit 103 beginning at timestamp 2:37:12 pm.

Cua walked out of the east door of the Rotunda at approximately 2:39 p.m. and entered the hallway near the Rotunda Doors. At this time, rioters were violently assaulting a police officer dressed in riot gear. Cua paused, looked at the assault, and continued up the stairs to the third floor.



*Image 8: Still Image from Stipulated Trial Exhibit 104 at timestamp 2:40:06 p.m.*

After climbing the stairs, Cua turned right and walked down a hallway towards the Senate side of the building. As Cua walked down the hallway, he tried to open every single office door he passed by pulling on doorknobs, pounding on the doors with his fist, and kicking the doors. *See* Stipulated Trial Exhibit 106 at timestamps 2:41:05; 2:41:09; 2:41:14; and 2:41:19. Cua's intent to intimidate and terrorize the people behind those doors was clear. While Cua tried to open these doors, he yelled, "This is what happens when you piss off patriots!" and "Hey! Where are the swamp rats hiding?!", "Where are the swamp rats hiding at?" and "[Inaudible] swamp rats! Where you at swamp rats?!" Stipulated Trial Exhibit 106, beginning at time stamp 2:41:02, and Stipulated Trial Exhibit 208, from approximately time stamp 4:06 to approximately time stamp 4:50. Another nearby rioter, Josiah Colt, called out to Cua "don't kick the doors!" *Id.* at timestamp 4:27.

At approximately 2:41 p.m., Cua reached the end of the hallway and turned left onto the

southeast hallway outside the Senate Gallery. At this time, USCP officers were attempting to lock the doors to the Senate Gallery to protect the Senate Chamber from the mob. Cua walked down the hallway with other rioters to a set of doors where two USCP officers, including Officer G.L., were trying to lock the doors. As the crowd approached the doors, another rioter, Ronald Sandlin, called out to one of the officers, "Don't you dare lock another door!" Another rioter called out, "Don't let them lock the doors." Sandlin then grabbed one of the doors that the officers were attempting to lock. Cua saw this exchange and, joining the rioters' efforts to stop the officers from locking the doors, moved towards the officers. At approximately 2:42 p.m., Cua shoved Officer G.L. at least once while holding Cua's baton in an effort to prevent Officer G.L. from locking the doors and in order to get inside the Senate Gallery. In the below still image, Cua's hand is circled in blue and is balled into a fist around the top of the ASP baton, which is circled in red:



*Image 9: Still Image from Stipulated Trial Exhibit 208 at timestamp 5:19.*

For the second time that day, Cua's violence and threats of violence forced officers –

namely Officer G.L. and the other officers near the door - to retreat; officer G.L. and the others moved away from the doors and down the hallway. *See* Stipulated Trial Exhibit 107, beginning at time stamp 2:41:53, Stipulated Trial Exhibit 204, at approximately time stamp 4:26, and Stipulated Trial Exhibit 208, at approximately time stamp 5:10.

As the officers retreated, Cua rushed into the Senate Gallery and immediately yelled "This is our house! This is our country!" Stipulated Trial Exhibit 208, at timestamp 5:45. Cua walked around the Senate Gallery, waving his ASP baton in triumph. While standing on the Senate Gallery overlooking the Senate Floor, Cua said to nearby rioters Josiah Colt and Nathaniel DeGrave, "If I go down there and open the doors, will you storm?" Stipulated Trial Exhibit 208 at timestamp 8:11. Colt and DeGrave responded, "We got you bro." Cua then stepped onto the ledge of the Senate Gallery where he remained for at least two minutes. As he stood on the ledge, he cheered on Colt, who jumped from the Gallery to the Senate Floor. Cua also placed his jean jacket over the lens of a nearby camera, preventing it from recording the scene.



*Image 10: Still Image from Stipulated Trial Exhibit 301 at timestamp 14:46:55*

During this time, rioters in the Gallery called for Colt to open the door for others to come in, but Colt was only able to open an interior door. *See* Stipulated Trial Exhibit 208. Shortly thereafter, Cua jumped from the Senate Gallery down to the Senate Floor. Cua walked directly to the dais at the center of the Senate Floor, where the President of the Senate, the Vice President of the United States, presides over the Senate. Cua sat in the Vice President's chair, reclined, and put his feet up on the desk.



*Image 11: Still Image from Stipulated Trial Exhibit 302 at timestamp 14:47:50*

Colt told Cua to get up out of the Vice President's chair and Cua complied. *See* Stipulated Trial Exhibit 306 at timestamp 14:47:552. Nevertheless, proud of his actions, Cua called out to DeGrave who was still up in the Senate Gallery and asked, "Did you get a video of that?" and "Okay, text me!" *Id.* at timestamp 14:48:00. Cua yelled out his phone number so that DeGrave could send him the video. Stipulated Trial Exhibit 209 at timestamp 00:47.

At approximately 2:48 p.m., Colt and Cua rushed through the set of doors[3] that Colt had previously unlocked and entered an alcove containing a second set of doors. Within fifteen seconds, other rioters began to enter the Senate Floor.

---

[3] In preparation for trial, the government interviewed USCP Officer Timberlake who stated that earlier in the day, he had locked the doors to the Senate Floor.



*Image 12: Still Image from Stipulated Trial Exhibit 301 at timestamp 14:48:21*

Cua spent approximately four more minutes walking around the Senate Floor and interacting with other rioters. *See* Stipulated Trial Exhibits 301, 302, 303, and 304, beginning at timestamp 14:45:56. During this time, he rifled through at least three desks belonging to Senators Grassley, Thune and Feinstein,[4] while continually recording video with his cell phone.

---

[4] Exhibits A, B, and C set out the desk assignments for the desks that Cua accessed.



*Image 13: Still Image from Stipulated Trial Exhibit 302 at timestamp 14:49:40 Depicting Cua Accessing the Desk Belonging to Senator Chuck Grassley*



*Image 14: Still Image from Stipulated Trial Exhibit 302 at timestamp 14:49:46 Depicting Cua Accessing the Desk Belonging to Senator John Thune*



*Image 15: Still Image from Stipulated Trial Exhibit 301 at timestamp 14:51:09 Depicting Cua Accessing a Desk Belonging to Senator Dianne Feinstein*

Cua finally left the Senate Floor at approximately 2:52 p.m. He walked back down to the first floor of the Capitol and law enforcement escorted him out of the Capitol through the Senate Carriage Door at 2:53 p.m.

By approximately 3:02 p.m., Cua was back on social media and spent the next several hours bragging about his role in the attack on the U.S. Capitol:

- At 3:02 p.m., Cua exchanged private messages with another Instagram user who asked him, "I storming the capitol rn [right now]? You*." Cua responded, "Yes. I did." Stipulated Trial Exhibit 952.

- At approximately 3:05 p.m., another Instagram user asked Cua, "Are you at the capital?? This is insane!" At approximately 5:11 p.m., Cua responded, "Yes. We made them wish they were in hell." Later in the same conversation, Cua said, "We didn't attack the American people we attacked the swamp rats." Stipulated Trial Exhibit 948.

- At approximately 5:21 p.m., Cua commented on Instagram stating, "HELL NO IT WASN'T ANTIFA! IT was patriots and we stormed in. WE ARE FIGHTING." Stipulated Trial Exhibit 909.

- At approximately 5:24 p.m., Cua posted a public comment on Instagram stating, "It's not wrong, we warned them peacefully at the million Maga March Nov 14th. THEY DIDN'T LISTEN!" Stipulated Trial Exhibit 913.

- At approximately 5:46 p.m., Cua sent a private message to another Instagram user saying, "I'm out, and it's a good thing. We are taking our country back by force." Stipulated Trial Exhibit 932.

- At approximately 5:50 p.m., Cua posted a story on Instagram that stated, "Pence is a traitor. An absolute [absolute] traitor I can't believe it." Stipulated Trial Exhibit 960.

- At approximately 5:54 p.m., Cua sent another message saying, "We fought like hell brother." Stipulated Trial Exhibit 955.

- At approximately 6:21 p.m., Cua posted a story on Instagram stating, "Stop preaching '1776 fight for freedom' then cry when we actually do 1776." Stipulated Trial Exhibit 959.

- At approximately 6:45 p.m., Cua sent a private Instagram message that stated, "Failed to fix the election today. Nothing stolen, nothing burned, but tyranny felt our wrath." Stipulated Trial Exhibit 940.

- At approximately 6:45 p.m., Cua exchanged messages on Instagram about starting the next civil war. Stipulated Trial Exhibit 928.

- At approximately 7:56 p.m., Cua sent a private message to another Instagram user stating, "Okay, this was 1777 trust me. Best day of my life." Stipulated Trial Exhibit 807. Cua then clarified, "1776*." *Id.*

- At approximately 8:53 p.m., Cua sent a private message that stated, "If Trump doesn't get Im we will be back in DC for a blood bath." Stipulated Trial Exhibit 937.

**D.  Cua's Statements on Social Media After January 6**

After January 6, 2021, Cua continued to use his social media accounts to boast about and

justify – in public posts and private messages – his participation in the attack on the Capitol. For

example, on January 7, 2021, Cua made the following statements on social media:

- "Exactly, this was a constitutionally protected right. We did not attack the citizens, we attacked the corrupt government. Consider this the beginning of the second

19

Revolution." Stipulated Trial Exhibit 916.

- "One cop was about to cry. We were screaming at them to join us." Stipulated Trial Exhibit 931.

- "What happened at the capital was a constitutionally protected right. WE THE PEOPLE have a right to rise up and overthrow a tyrannical government. Violence is never the answer? You denounce violence? Do you denounce the revolutionary war? Do you denounce the "shot heard around the world"? The only reason you're here today is because of violence against tyranny. This country exists because of violence. I'm not saying its always the answer, but it's a final resort when all else fails and the entire government ignores its people. THEY HEAR US NOW!" Stipulated Trial Exhibit 734.

- "The left violently tore apart our lives and our rights as Americans in 2020, while the right peacefully protested. The peaceful protests didn't work. They want war, they got it." Stipulated Trial Exhibit 965.

- "We have a first amendment to protect our right to peacefully protest. We have a second amendment incase the first one doesn't work. It didn't work. Violent protests against the capital (NOT SMALL BUSINESS'S) are well within our constitutional rights." Stipulated Trial Exhibit 735.

- "If patriots can easily preach [breach] the capital of the United States of America, good luck hiding anywhere in the country Swamp Rats." Stipulated Trial Exhibit 968.

- "Dear Swamp Rats, the events at the capital were a reminder that WE THE PEOPLE are in charge of this country and that you work for us. There will be no "warning shot" next time. Signed, #WETHEPEOPLE." Stipulated Trial Exhibit 736.

- "Challenging the left to 'have a conversation' means nothing Benny. They've showed us they only respond to violence, so we adapted." Stipulated Trial Exhibit 920.

Cua continued to justify the attack on the Capitol and made clear that he not only anticipated, but welcomed, future violence. On January 8, 2021, Cua posted on Parler, "Friendly reminder that in 1776 the politicians called us traitors, terrorists, rebels, and many other false names. Don't let it demoralize you, Americans are pissed of [off], and we have a right to be as

well as a right to overthrow a tyrannical government." Stipulated Trial Exhibit 737. Cua also posted on Parler, "We already knew the democrats were swamp rats, but the last two months have clearly proven that the name republicans or democrats means nothing. Everyone who works in congress is a traitor to the people and deserves a public execution. Time for a new party, the patriot party." Stipulated Trial Exhibit 738. Cua also posted on Parler, "Little history for those of you that don't know, Dracula was a real person who lived during the 15th century in Romania. He was known as "Vlad the Impaler". One memorable act of his, is when he invited all the deep state swamp rat tyrants to a dinner party, locked them all in the building, and burnt it to the ground. Maybe we should take notes." Stipulated Trial Exhibit 739.

The following day, January 9, 2021, Cua sent a private message on Instagram that said, "Idc [I don't care] either I want a bloody war I'm ready to start shooting and I'm ready to die before I watch America crash and burn. I'll be on the front lines. I want to lock the swamp rat tyrants in the capital and burn the place to the ground." Stipulated Trial Exhibit 931.

### E.  Cua's Arrest and Searches of His Home, Truck, and Social Media

Cua was arrested pursuant to a warrant at the City of Milton Municipal Court on February 5, 2021. On the same day, Cua's home and truck were searched pursuant to warrants. Among other things, law enforcement seized three ASP batons, items of clothing worn by Cua on January 6, and Cua's cellular phone during these searches. Law enforcement did not recover any videos or photographs taken inside the U.S. Capitol building from Cua's cellular phone.

Law enforcement also obtained warrants to search Cua's social media accounts. According to messages exchanged by Cua on these accounts, it appears that in late January 2021, Cua deleted many of his social media accounts. For example, members of an Instagram group chat to which

Cua belonged exchanged messages on January 22, 2021, and discussed how Cua deleted their group chat and that his YouTube channel, Instagram, and Parler accounts were all gone. *See* Exhibit D.

### F.  Injuries

Although Officer G.L, the assault victim in this case, reported that he did not suffer any physical injuries, the defendant's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A), *supra.* His violent conduct served to incite and embolden other violent rioters around him.

### III.    THE CHARGES AND CONVICTIONS

On December 1, 2021, the grand jury returned a Second Superseding Indictment charging Cua with: Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2; Count Three, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)( 1); Count Four, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) Section 1752(a)(1) and (b)(1)(A); Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Six, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Count Seven, Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); Count Eight, Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); Count Nine, Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); Count Ten, Disorderly Conduct in a Capitol

Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Eleven, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § Section 5104(e)(2)(F); and Count Twelve, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 90.

On February 24, 2023, Cua was convicted of two of these offenses following a stipulated trial on those counts: Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2, and Count Three, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).[5]

## IV.   STATUTORY PENALTIES

The government agrees with the statutory penalties set out in the Presentence Investigation Report (PSR). Specifically, Cua faces the following maximum possible sentences on each count of conviction:

- Count Two: twenty years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Three: eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

---

[5]Cua did not fully stipulate to his guilt on Count Three. Instead, he contested the crucial question of whether he, in fact, assaulted Officer G.L. Additionally, Cua argued that if the Court found he did not assault G.L., the Court should not convict him on Count Three under a strained interpretation of section 111(a)(1). In these ways, Cua's stipulated trial differs from many (if not all) of the other stipulated trials held in the January 6 cases and required a greater degree of litigation and government resource expenditure.

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Guidelines calculation set out in the PSR (ECF No. 326). PSR ¶¶ 49-63. Specifically, the government has calculated the applicable Guidelines range as follows:

### A.  Offense Level Calculations

**Count Two: 18 U.S.C. § 1512(c)(2) and § 2—Attempted to and Aided and Abetted the Obstruction of an Official Proceeding before Congress**

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) Obstruction |
|---|---|---|
| Specific Offense Characteristic | +8 | U.S.S.G. § 2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." Cua shoved Officer G.L. at least once, waved his ASP baton at officers, and used threateningly language, all of which constitutes at the very least "threatening to cause physical injury" to Officer G.L. |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." This enhancement has been applied to all January 6 defendants convicted of violation of Section 1512(c)(2). The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.

This Court has applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6. *See, e.g., United States v. Hodgkins*, No. 21-cr-188; *United States v. Matthew Miller*, No. 21- |

24

| | | cr-075 (uncontested, but independently addressed by the Court) |
|---|---|---|
| Total | 25 | |

## Count Three: 18 U.S.C § 111(a)(1) —Assaulting, Resisting or Impeding Certain Officers (Assault of USCP Officer G.L.)

| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault[6] |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): "If the assault involved more than minimal planning." Cua's social media posts make clear that he contemplated the use of violence and an attack on the Capitol several weeks before January 6, 2021. Additionally, Cua's decision to carry weapons – namely an ASP baton and pepper spray – to the Capitol also indicates he planned to use violence on January 6. |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Officer G.L. was identifiable as a government officer or employee. He was dressed in a suit and attempting to lock the doors of the Senate Gallery with other USCP officers who were wearing the same clothing. Cua's assault on G.L. was motivated by the fact that as an officer, G.L. was trying to prevent rioters from entering the Senate Gallery. |
| Total | 22 | |

### B. Grouping Analysis

The two counts of conviction group pursuant to U.S.S.G. § 3D1.2(c) because Count Three

embodies conduct – namely the assault of Officer G.L. – that is a specific offense characteristic of

---

[6] Cua's conduct constituted aggravated assault such that U.S.S.G. § 2A2.2 determines the offense level. U.S.S.G. § 2A2.2 Note 1 defines "aggravated assault" as "a felonious assault that involved … (D) an intent to commit another felony." Following the stipulated trial, the Court found that Cua's assault was committed with the intent to commit several other felonies, namely: (1) Obstruction of an Official Proceeding before Congress charged in Count Two; (2) Civil Disorder, charged in Count One; (3) Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, charged in Count Four; and (4) Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, charged in Count Five.

Count Two – namely, U.S.S.G. § 2J1.2(b)(1)(B), causing or threatening to cause injury to another person or property. Therefore, the combined offense level is 25.

### C. Acceptance of Responsibility

Cua is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). The government is not moving for the third point pursuant to U.S.S.G. § 3E1.1(b) because Cua did not assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, permitting the government to avoid preparing for trial. In fact, the stipulated trial in this case took place on February 13, 2023, the date that the original bench trial was scheduled. Cua executed the Statement of Stipulated Facts on February 1, 2023, just twelve days prior to that date. *See United States v. Price*, 409 F.3d 439, 443-44 (D.C. Cir. 2005) (finding that a defendant was entitled to a third-point reduction under U.S.S.G. § 3E1.1(b) because no trial date had been set). As set out above, Cua also contested elements of one of the two charges against him, requiring the government to undertake additional litigation and expend additional resources. Thus, the defendant did not prevent the government from having to fully prepare for trial. Therefore, the total adjusted offense level is 23.

### D. Criminal History Category

The defendant has no prior criminal history and therefore has a criminal history category of I.

### E.  Anticipated Guidelines Range

An offense level of 23 combined with a criminal history category of I results in an anticipated Guidelines range of 46 to 57 months' imprisonment. These convictions are not eligible for a sentence of probation. The defendant's fine range is $10,000 to $100,000.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    The Nature and Circumstances of the Offense Support a Sentence at the Top of the Guidelines.

Bruno Cua's actions on January 6, 2021, form one of the strongest and clearest examples of obstruction of Congress in the January 6 investigation to date and support a sentence at the top of the Guidelines range. Cua did not come to Washington, D.C. for a protest – he planned his attack on the Capitol weeks in advance and posted his plans to social media. He used social media to incite others and encourage them to join him in violence against the U.S. government. Consistent with his plan, Cua brought weapons to the U.S. Capitol on January 6, tried to terrorize staffers behind office doors, and was repeatedly aggressive toward law enforcement, culminating in his assault of Officer G.L. Last, Cua played a unique and prominent role on January 6, opening the Senate Chamber to the rioters, escalating confrontations, and leading other rioters into and through the Capitol.

#### 1.   Cua's Statements on Social Media Show His Intent to Attack the Capitol Weeks in Advance and Were Aimed at Inciting Others.

Cua planned his actions on January 6 weeks in advance. He posted numerous messages on social media about the certification and called for the use of violence on January 6 to stop it. Given

his dozens of prior statements indicating his intent to break into the Capitol building on January 6 and to use violence to stop the certification, Cua cannot now reasonably claim that his violent actions on January 6 were the result of "crowd dynamics," spur of the moment bad decision-making or the influence of other rioters. In fact, the evidence shows that to the extent other rioters gave Cua directions, they were directions to *de*-escalate, not to ramp up his actions. *See e.g.*, Stipulated Trial Exhibit 306 at timestamp 14:47:52 (Josiah Colt tells Cua to get out of the Vice President's chair); Stipulated Trial Exhibit 208 at timestamp 4:06 (Colt tells Cua to stop kicking doors). Cua's advanced planning for January 6 is an aggravating factor supporting a higher sentence. *See United States v. Chrestman*, 525 F.Supp.3d 14, 26 (D.C. Cir. 2021) (J. Howell) (noting that one of the factors in January 6 cases indicating the dangerousness inherent in a defendant's conduct is whether he pre-planned his activities at the Capitol).

Cua's prolific posts on social media were also clearly aimed at encouraging others to take violent action. This too is aggravating. The spread of disinformation online was no doubt a significant contributing factor to the riot at large. Cua participated in the spread of that disinformation through his incessant and inflammatory postings on his social media accounts claiming that the election was stolen, that members of Congress were "traitors," and that the only way to rectify the "stolen" election was to use violence. In fact, Cua's attempts at inciting violence continued even after January 6, as set out above.

### 2. Cua's Possession of Weapons Shows Pre-Planning and an Intent to Use Violence.

Cua also brought weapons on U.S. Capitol grounds and into the U.S. Capitol building. Photographs of Cua at the Peace Circle show that at least at that time, Cua had pepper spray with

him. Cua also carried – and frequently brandished and waved – an ASP baton the entire time he was inside the U.S. Capitol building. His possession of the pepper spray and baton is further evidence of his pre-planning and his intent to commit violence. It is clear from the video evidence that Cua possessed the ASP baton, not in self-defense, but as a weapon to use against law enforcement if needed. This is evident, for example, from Cua's interaction with USCP Sergeant Millard at the Upper West Terrace Doors. Sergeant Millard walked *away* from Cua, but Cua followed him, screaming at him and waving the baton at him. Cua certainly did not use the baton in this instance in self-defense, but instead clearly used it to try to intimidate Sergeant Millard.

### 3.   Cua was Repeatedly Aggressive Toward Law Enforcement.

Cua was also extremely aggressive with law enforcement on at least three different occasions and in three different locations. First, Cua encountered an officer on the Lower West Terrace on his way into the Capitol building. *See* Stipulated Trial Exhibit 214 at timestamp 00:31. Amidst the obvious chaos in the area at that time – the video shows smoke billowing around the outside of the Capitol building and numerous uniformed police officers – Cua took the opportunity to confront a police officer, waving his ASP baton in a threatening manner at the officer.

Cua's second aggressive interaction with law enforcement was at the Upper West Terrace Doors. As discussed above, Sergeant Millard remembered Cua specifically – an extraordinary thing given the number of places, the number of rioters and the sheer chaos Sergeant Millard must have endured that day – and recalled he was one of the most aggressive rioters he encountered, contributing to the officers' decision to step aside rather than risk injury or death.

Cua's third interaction with law enforcement was his most serious. Cua shoved Officer G.L. as Officer G.L. tried to lock the doors to the Senate Gallery. Cua did this in order to prevent

Officer G.L. from carrying out his duty to protect the U.S. Capitol. Cua's repeated aggression toward law enforcement is yet another aggravating factor that supports a sentence at the top of the Guidelines range.

### 4. Cua Influenced the Crowd on January 6.

Cua also repeatedly led the charge on January 6. First, he helped to break the police line at the Upper West Terrace Doors. As Sergeant Millard said, he was one of the most aggressive rioters, leading the officers not to resist the rioters' progression into the building. He was also one of the first rioters to push his way through the police line at the Upper West Terrace Doors. And, once he was through, he was the first rioter up the stairs to the Rotunda. He also helped to breach the Senate Floor by assaulting Officer G.L., thereby preventing him from locking the door. And finally, once inside the Senate Gallery, he was the first to suggest that he should jump down and open the doors for others. Josiah Colt ultimately jumped down before him and at least opened the innermost set of doors. But when Cua jumped down, it appeared he helped Colt to open the exterior doors and let others in. In this way, Cua played a pivotal role in opening the Senate Floor to dozens of other rioters. Those rioters stole items, rooted through desks (as did Cua) and generally disrupted one of the most sacred spaces of our democracy. Cua's leading presence within the mob on January 6 is extremely aggravating and supports a sentence of 57 months' imprisonment.

### B. Cua's History and Characteristics Support a Guidelines Sentence.

Cua was an 18-year-old high school student on January 6, 2021, with no criminal history. He was raised in a loving family with financial resources. He has a high school diploma. He did not suffer any abuse or neglect. Cua's upbringing and his family support are both mitigating and aggravating. The support of Cua's family may indicate that he is not likely to reoffend – though

as discussed further below, his family was present with him at the U.S. Capitol. However, Cua's history can also be seen as aggravating. Cua appears to have had every advantage in life and many choices other than to attack the seat of our government. Cua's crimes were not motivated by poverty or need and that sets him apart from many criminal defendants appearing in this courthouse.

Cua's age at the time of the offense is mitigating, but only slightly. While Cua is one of the youngest people charged in the January 6 attack[7],  Cua was not a child on January 6, 2021. He was an adult. Americans who reach the age of 18 are entrusted with several important responsibilities and duties including voting, joining the military, signing a contract, and serving on a jury. In this way, the law recognizes that an 18-year-old is capable of making mature decisions.

Additionally, there is absolutely no evidence that Cua was under the influence of others, either when he made his inflammatory posts on social media advocating violence or when he breached police lines to storm the Capitol. Indeed, on January 6, he was the one leading the charge, not following others. And in Cua's case, there is clear evidence that on January 6, the people who knew him best had no concerns about his maturity. Cua was accompanied on his drive from Georgia to Washington, D.C. by his parents. After parking the car, Cua's father gave him the pepper spray and the ASP baton that he later carried with him onto U.S. Capitol grounds and into the building itself. If Cua's father had any concerns about his ability to make mature decisions, surely he would not have given him weapons in such an environment.

Finally, a defendant's age is not a justification for a downward variance. *See e.g.*, *United*

---

[7] Cua is the sixth youngest person to be charged in the Capitol attack to date.

*States v. Madison*, 990 F.2d 178 (5th Cir. 1993) (Criminal defendant's young age is invalid justification for departing downward from Sentencing Guidelines range); *United States v. White*, 945 F.2d 100 (5th Cir. 1991) (Youthfulness was not relevant factor for downward departure from Sentencing Guidelines and, thus, 31-month downward departure from minimum sentence given on account of 18-year-old defendant's age was error); *United States v. Shoupe*, 929 F.2d 116 (3d. Cir. 1991) (Defendant's youth and immaturity at time he committed his first two offenses did not warrant downward departure from recommended range under Sentencing Guidelines' career offender provision; although defendant was only 18 years old when he committed prior offenses and might not have been treated as an adult had he committed those offenses a short time earlier, there were no extraordinary circumstances relating to defendant's age that warranted downward departure); *United States v. Sally*, 116 F.3d 76 (3d Cir. 1997) (Defendant's age was not sufficiently extraordinary to be used as factor to support downward departure under Sentencing Guideline stating that age was ordinarily not relevant; age of 17-year-old defendant was not so unusual that it could justify downward departure). Therefore, while Cua's young age is slightly mitigating, it does not counterbalance the significant aggravation present in his case and a sentence at the top of the Guidelines is warranted.

### C.      A Top of the Guidelines Sentence will Satisfy the Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports an above-Guidelines sentence. Cua's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

### 1.  General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### 2.  Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As discussed above, Cua's social media statements indicate there is a higher need for specific deterrence in his case. After Cua left the Capitol on January 6, 2021, he used his social media platforms to glorify the violence at the Capitol, label those who did not support his cause as traitors, and call for future violence. While some of Cua's statements on social media may appear hyperbolic, Cua proved they were not by following his words with actions. His social media statements were also a "call to arms" to others; Cua didn't content himself with planning his own crimes but also attempted to recruit others, as well. Lastly, Cua was utterly without remorse after the attack; he continued to advocate for violence against the Capitol even after January 6. Cua didn't leave the U.S. Capitol on January 6 humbled by the violence he observed and ashamed of his own actions. If anything, he was galvanized. And he made that known on his social media accounts. All of this indicates a more

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

33

serious sentence is necessary to deter future crimes by Cua.

Cua's self-direction on January 6 also demonstrates the need for specific deterrence. Cua was a lone wolf and led others by example on January 6. Despite knowing no one around him, he was undeterred. He was aggressive from the very moment he entered the building, going toe-to-toe with law enforcement on multiple occasions and boldly entering spaces that symbolize the heart of our nation. But none of these things – his solo status, the intense law enforcement presence, nor the symbolic significance of his surroundings – deterred Cua at all on January 6. His persistence in committing his crimes even in the face of factors that should have, but failed to, deter him, shows he poses a higher risk of recidivism, necessitating a sentence at the top of the Guidelines range.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

34

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Cua's conduct is most closely comparable to that of Ronald Sandlin (21-CR-88 (DLF)), Nathaniel DeGrave (21-CR-88 (DLF)), and Josiah Colt (21-CR-74 (DLF)). All three of these defendants also entered through the Upper West Terrace Doors, confronted the USCP officers who were attempting to lock the Senate Gallery doors, and in Colt's case, jumped from the Senate Gallery to the Senate Floor. Sandlin, DeGrave, and Colt were all in their 30s on January 6, 2021, and did not have any criminal history that counted for criminal history points. However, as discussed below, there are also important distinctions among their conduct.

Sandlin, DeGrave, and Colt were acquainted with each other via social media before January 6, 2021. They planned to meet in Washington, D.C. for the rally. They wore tactical gear and filmed their progression through the U.S. Capitol building. Cua entered the Capitol via the Upper West Terrace Doors just minutes before Sandlin, DeGrave, and Colt. They followed the same route through the Capitol – from the Upper West Terrace Doors, up to the Rotunda, up the stairs to the third floor, through the hallway outside the Senate Gallery, into the Senate Gallery, and ultimately, Colt and Cua jumped onto the Senate Floor. Cua features prominently in the video footage that Sandlin, DeGrave, and Colt took while they were inside the Capitol.[11]

In the Senate Gallery hallway, Sandlin, DeGrave, and Colt were part of the group of rioters that confronted the USCP officers who were attempting to lock the doors. Sandlin punched an officer in the back of the head and DeGrave squared off in a fighting stance with the officers once the officers retreated from the doors. Once the mob entered the Senate Gallery, Colt was the first

---

[11] Stipulated Trial Exhibit 204 is Sandlin's footage. Stipulated Trial Exhibit 208 and 209 are Colt's footage. Stipulated Trial Exhibits 205, 206, and 207 are DeGrave's footage.

person to jump to the Senate Floor. Cua jumped quickly thereafter. Colt accompanied Cua when he opened the Senate Floor doors, allowing many more rioters onto the Senate Floor.

Sandlin pleaded guilty to conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) and assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a) in a plea agreement with the government. 21-CR-88 (DLF), ECF No. 84. Judge Friedrich imposed 63 months' incarceration. Though Sandlin's assaultive conduct at the doors to the Senate Gallery was more egregious than Cua's, Sandlin did not engage as extensively in pre-planning as Cua or call for violence on social media as Cua did.  Moreover, unlike Cua, Sandlin pled guilty soon after being charged, and accepted responsibility fully.

DeGrave and Colt also accepted responsibility fully by entering into plea agreements with the government, unlike Cua. Colt pleaded guilty to obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c). 21-CR-74 (DLF), ECF No. 21. DeGrave pleaded guilty to conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k), and assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a). 21-CR-88 (DLF), ECF No. 74. More significantly, unlike Cua, both DeGrave and Colt met with the government, acknowledged their remorse, and agreed to cooperate. DeGrave and Colt are scheduled to be sentenced on May 10, 2023, and because they agreed to cooperate, it is likely they will receive sentence reductions for which Cua is not eligible. Nevertheless, it is instructive to compare the guideline ranges that they face before cooperation is taken into account. Under their plea agreements, DeGrave's sentencing range is estimated at 63-78 months, and Colt's is estimated at 51-63 months.

Accordingly, a sentence of 57 months' imprisonment for Cua would not create any unwarranted sentencing disparities.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes,

the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Cua to pay $2,000 in restitution for his

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts Two and Three. This amount fairly reflects Cua's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Cua's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Cua has raised $23,485 in an online campaign on the website "Give Send Go" entitled "Bruno Cua: An American's Future at Stake." PSR ¶ 98. The website indicates the funds will be used for his "many expenses in his pursuit of his freedom." As the PSR also notes, his current attorneys are appointed by the Court and are paid through CJA funds. PSR ¶ 93. While defense counsel represent that the money collected by this fundraising campaign was paid to them prior to their appointment in this case, that begs the questions of why the website stayed up after their appointment, how much was collected after their appointment, and why it is still up and collecting money. The government also submits it is likely

41

that publicity surrounding his sentencing will result in additional funds being collected after sentencing. Therefore, the government recommends imposing a fine in the amount of the entirety of this account— $23,485—which can be offset by evidence demonstrating payments to defense counsel made prior to their appointment.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months of imprisonment, a term of supervised release of three years, restitution in the amount of $2,000, a $23,485 fine, and a mandatory special assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:      */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov

CAROLINA NEVIN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
NY Bar No. 5226121
(202) 803-1612
Carolina.Nevin@usdoj.gov