**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM NO. 21–cr–00107-RDM |
| | ) | |
| BRUNO JOSEPH CUA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT BRUNO JOSEPH CUA'S MEMORANDUM IN AID OF
SENTENCING AND MOTION FOR DOWNWARD DEPARTURE**

William E. Zapf (D.C. Bar No. 987213)
Jonathan Jeffress (D.C. Bar No. 479074)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
wzapf@kaiserdillon.com
jjeffress@kaiserdillon.com

*Attorneys for Bruno Joseph Cua*

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ..................................................................................3

    A.  Mr. Cua's Childhood and Pre-January 6 Life ...............................................4

        *1.   Bruno as a Young Child*.................................................................. *6*

        *2.   Bruno's Strong Work Ethic* ............................................................ *7*

        *3.   Bruno as an Entrepreneur*.............................................................. *8*

        *4.   Bruno's Generosity* ........................................................................ *9*

        *5.   The Southern Adventures YouTube Channel* ................................ *10*

    B.  The Offense Conduct and Acceptance of Responsibility .............................12

        *1.   Bruno's Political Activity on Social Media and the Giant Trump Flag* .......... *13*

        *2.   Bruno's actions on January 6* ........................................................ *20*

    C.  Arrest and Pretrial Detention....................................................................23

    D.  Pretrial Release .........................................................................................24

    E.  Bruno's Support Network and Outlook .......................................................29

    F.  Psychological Evaluation ...........................................................................32

        *1.   Dr. Daniel Murrie* ........................................................................ *32*

        *2.   Dr. Robert Montes* ........................................................................ *33*

II.  A SENTENCE OF TIME SERVED, PLUS SUPERVISED RELEASE WITH TWELVE MONTHS OF HOME CONFINEMENT WOULD BEST SATISFY THE STATUTORY SENTENCING FACTORS. ........................................................34

    A.  Nature and Circumstances of the Offense and Character of the Defendant .............36

        *1.   The Nature and Circumstances of the Offense*................................ *36*

        *2.   The Character of the Mr. Cua* ...................................................... *37*

    B.  The Purposes of Sentencing .......................................................................38

        *1.   Need for Just Punishment in Light of the Seriousness of the Offense* ............38

        *2.   Need for Deterrence* ...................................................................... *40*

   *a)*    *General Deterrence*.................................................................40

   *b)*    *Specific Deterrence* ..............................................................42

  *3.*  **Need for Incapacitation** ...............................................................43

  *4.*  **Rehabilitation** .................................................................................44

**C.** **Need to Avoid Unwanted Disparities and Unwarranted Similarities**.........................44

**D.** **Kinds of Sentences Available**.................................................................51

**E.** **The Sentencing Guidelines**....................................................................52

  *1.*  **Count Two: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2)**.....................................................................................52

   *a)*    *Neither enhancement applies because the term "administration of justice" in the enhancements does not apply to the certification of electoral votes*......................................................52

   *b)*    *An 8-point enhancement for the section 1512 offense under section 2J1.2(b)(1)(B) does not apply.* ..........................................................57

   *c)*    *A 3-level enhancement for the Section 1512 offense under section 2J1.2(b)(2) does not apply*.................................................................58

  *2.*  **The offense level for Count Two should be reduced by three levels under section 2X1.1 because Mr. Cua's conduct constitutes an attempt.** ..................59

  *3.*  **The Court Should Grant Downward Departures Pursuant to Sections 5H1.1 and 5H1.3 of the Sentencing Guidelines.**.........................................59

   *a)*    *Departure Under Section 5H1.1* ......................................................59

   *b)*    *Departure under 5H1.3* ...................................................................63

**F.** **The Need to Provide Restitution** .........................................................64

**III.** **FINANCIAL ABILITY TO PAY A FINE** .............................................64

**IV.** **CONCLUSION** ...................................................................................64

In accordance with Federal Rule of Criminal Procedure 32(i)(1)(C) and Section 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Bruno Joseph Cua ("Mr. Cua" or "Bruno"), by and through his attorneys, submits this memorandum to assist the Court in determining an appropriate sentence. Mr. Cua also moves for a downward departure from the Guidelines range pursuant to United States Sentencing Guidelines sections 5H1.1 and 5H1.3, as set forth more fully below.

Mr. Cua has been found guilty of Counts Two and Three of the Second Superseding Indictment, for (1) obstruction of an official proceeding under 18 U.S.C. § 1521(c)(2), 2 (Count Two) and (2) assaulting, resisting, or impeding certain officers under 18 U.S.C. § 111(a) (Count Three). *See* ECF No. 304 (Feb. 24, 2023 Tr.), at 64:16-73:3. Mr. Cua respectfully submits that, in lieu of a sentence of additional imprisonment, a sentence of time served (40 days), plus a substantial term of supervised release, including home confinement and a condition requiring a substantial period of community service, would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a).

The U.S. Probation Office has submitted a Presentencing Investigation Report ("PSR") in which it has calculated the Guidelines range of imprisonment to be 46 to 57 months based on a total offense level of 23 and a criminal history category of I. The PSR's total offense level of 23 consists of (1) a base offense level of 14 under section 2J1.2 of the Sentencing Guidelines, plus (2) 8 levels under subsection 2J1.2(b)(1)(B), plus (3) 3 levels under subsection 2J1.2(b)(2), and less (4) 2 levels for acceptance of responsibility.

Mr. Cua submitted objections and responses to the draft PSR, which included the same Guidelines calculation. The letter set forth the defense's objections to the suggested Guidelines range, which are reiterated here. Mr. Cua submits that the applicable Guidelines range is 4 to

10 months based on a total offense level of 9 and a criminal history category of I. Mr. Cua's

proposed Guidelines range consists of the same base offense level of 14, less (1) 3 levels

because Mr. Cua's conduct constitutes an attempt to violate section 1512(c)(2), and less (2) 2

levels for acceptance of responsibility. Mr. Cua submits that the 8-level and 3-level

enhancements under sections 2J1.2(b)(1)(B) and (b)(2) do not apply.

Neither the Guidelines range calculated by the Probation Office nor Mr. Cua's

proposed range, however, provides for an appropriate sentence in this case under the 18 U.S.C.

§ 3553(a) factors. First, a substantial downward departure under section 5H1.1 (Age) and/or

5H1.3 (Mental and Emotional Conditions) is warranted due to Mr. Cua's youth at the time of

the offense and the influence of social media and the crowd on Mr. Cua in the days leading up

to January 6, 2021, and at the Capitol itself. This also includes the influence of his parents, who

espoused beliefs that the 2020 presidential election results were fraudulent and brought him to

the Capitol on January 6. Second, the Guidelines fail to account for other mitigating

circumstances supporting a truly significant variance here, including the circumstances of Mr.

Cua's entry, the lack of preparation or planning, the relatively short time he was inside the

Capitol, and the brief and minor contact Mr. Cua had with the officer that forms the basis of his

conviction under section 111(a).

This is an exceptional case. Mr. Cua was just eighteen years old[1] and still in high

school when he entered the Capitol on January 6, 2021. The attached psychological evaluation

by Dr. Daniel Murrie (Ex. 1), discussed further herein, addresses the mental and emotional

condition of Mr. Cua at the time of the offense, including the role that his youth and the

---

[1] The PSR incorrectly states that Bruno was 19 at the time of the offense. PSR, at 30. That is
incorrect. He was 18, and based on counsel's understanding, the youngest person charged in
connection with the January 6 riot. He did not turn 19 until May 2021.

influence of the numerous adults all around him played in both his online activity and his actions at the Capitol on January 6, 2021. Such facts warrant a both a substantial downward departure and variance from even Mr. Cua's proposed Sentencing Guidelines.

Aside from Mr. Cua's youth and his mental and emotional state, Mr. Cua's relative culpability is low as compared to the mine-run of cases, including other January 6 cases. Although Mr. Cua recognizes the serious nature and scope of his conduct—for which he takes full responsibility—Mr. Cua's actions on January 6 were less violent and less serious than other defendants sentenced in this Court, both by Your Honor and other Judges. Nevertheless, Mr. Cua remains deeply remorseful, as he explains in his letter to the Court at Exhibit 2.

Under these circumstances, a sentence of time-served with a period of home confinement and community service would serve the purposes of sentencing by satisfying the need for just punishment in view of the circumstances of the case, including Mr. Cua's youth, his mental and emotional state, and his relative level of culpability.

## I.     FACTUAL BACKGROUND

Bruno Cua is currently twenty-one years old. He was an eighteen-year-old high school student when he left the company of his parents and entered the Capitol on January 6, 2021. He earned his diploma while on pretrial release. Bruno has always lived with his parents, Dr. Alise Cua and Joseph Cua, who have been married for twenty-three years. They, along with their three children, reside in Milton, Georgia, in a single-family home on farmland. Bruno has two younger siblings: a 19-year-old sister a 15-year-old brother. The Cuas are a close family of deep Christian faith who enjoy the support of their church community, their neighbors, and their wider community.

As Bruno's cousin succinctly put it: "If I defined Bruno in 3 words it would be passionate, compassionate, and impressionable." Ex. 3. Bruno's sister summarized Bruno's personality nicely:

> Bruno has a big compassionate heart. He is a creative thinker and will mull a problem in his head until he finds a practical solution. He is extremely smart and a great mechanic and engineer. He is very generous with his time and knowledge, and consistently gives those away to help others; not only family, and friends, but total strangers. When someone is in need, he helps in any way he is able.

Ex. 4. "Bruno's heart is pure and his intentions always come from a place of love and passion." *Id.*

On January 6, 2021, Bruno Cua was an impressionable eighteen-year-old kid who was in the middle of finishing his online coursework to graduate from high school. In many ways, he was less of an "adult" than many other teenagers. With the exception of his time in jail, he has never lived away from his parents. Since he was very young, he has lived in a rural area on the small farm in Milton. His favorite things to do are to go fishing, spend time with his family, work on his truck, and to do any kind of work that involves building or fixing just about anything. His projects range from building elaborate tree houses, to constructing a deck, to repairing or remodeling cars; he loves to engage in tasks that will challenge his mind and his hands. He has never smoked, vaped, drank alcohol, or done drugs. He has never run around at night partying with other teenagers. He has never gotten a speeding ticket,[2] much less been arrested or jailed before his arrest and incarceration in this case.

### A.     Mr. Cua's Childhood and Pre-January 6 Life

In many ways, Bruno Cua is a study in contrasts. Raised with a strong spiritual backing within a close-knit family, Bruno is widely regarded within his community as smart, polite,

---

[2] Bruno received one citation for a noise violation for blowing the airhorn on his truck in an empty school parking lot, which he was on his way to pay when he was arrested for this case.

hard-working, responsible, kind, and extremely generous with his time. "It shows in his demeanor that he has developed a very generous spirit, a humble attitude, as well as a deep respect for everyone he interacts with." Ex. 5. This has caused many to label Bruno as "mature" beyond his years, which is true in some ways. One longtime family friend describes Bruno as "a very gifted young man with incredible life skills and character. He has always been mature beyond his years, honest and willing to help those less fortunate." Ex. 6. "The consistent traits I see in Bruno are his high level of responsibility, punctuality, honestly, strong work ethic, and professional yet warm behavior toward us and others." Ex. 7.

This is all true. He is not a rabble rouser or a lazy teenager/twenty-something sitting around playing video games. "He was never the kid to get caught up in cussing, underage drinking, vaping/smoking, or any other activities of that nature. He has a reputation for being clear-sighted and driven to be successful in the real world through his entrepreneurial mindset and exceptional work ethic." Ex. 8. Bruno's sister tells how, "as we both became teens and were surrounded by lots of friends, some of whom drank, smoked or did drugs, I began to look up to Bruno for his refusal to do any of those things. He never seemed to feel pressure, and clean living came easily to him." Ex. 4.

But within that exterior of hard work and impeccable manners was an exuberant and inexperienced teenage boy, full of vigor and naivete. "Bruno always puts his whole heart into everything he does." Ex. 9. A former teacher describes Bruno as "passionate, creative, and exuberant." Ex. 10. "He was passionate about his outdoor life, fishing, ATV's, hunting, building beautiful treehouses, and creating his You Tube Channel like an entrepreneur, sharing this exciting adventure and inspiring others." Ex. 11. In many ways, "Bruno was a very immature socially inept teenager." Ex. 12. Although close with his family and church

5

community, he also sought self-worth and confidence from "the men he met on the internet who solicited him to join their forces and 'become a man for this country.'" *Id.*

### 1.   *Bruno as a Young Child*

Growing up, Bruno's mother sought to teach her children "honesty, hard work, integrity, gratitude, personal responsibility, love of family, community and country." Ex. 13. From a young age, Bruno was focused on helping others before himself. His younger sister tells of her oldest memory, when she and Bruno were small children and a dog attacked Bruno, biting his face and neck. She retells looking out the window and being terrified when "Bruno pulled me down from the windowsill and comforted me, telling me everything would be okay." Ex. 4. One of Bruno's elementary school teacher's recalls that Bruno stood out to her "because of his happy smile and his willingness to help me clean tables after an outside event…. Bruno helped clean the tables after his classmates were finished and stayed until all was complete, he did not run off and play like the other children. To me, it was unusual to see a boy at that young age wanting to help his teacher." Ex. 14.  One longtime family friend notes that Bruno is always "willing to help those less fortunate." Ex. 6.

Bruno's mother relates: "As a little kid, Bruno did well in school. His learning style was, and still is, hands on. He is more inclined to take something apart and figure out how it goes back together, than to read the instructions." Ex. 13 at 2. "In 6th grade, as the lectures and school days got longer, learning in a traditional style became more challenging." *Id.* After talking with a friend, Bruno's mother decided to homeschool him. "I came to really appreciate this self-paced, hands-on experience based learning." *Id.* Bruno "thrived as collaboration, and creativity bloomed." *Id.*

### 2. *Bruno's Strong Work Ethic*

Bruno is a hard worker who is good at what he does. The best friend of Bruno's dad, who has employed Bruno and known him for 15 years, notes: "He always showed up to the job sites on time, maintained a clean and safe environment, and worked efficiently without complaint. I fully believe he is a hardworking and dependable individual who puts in 110% into [sic] everything he does." Ex. 5. Another person recounts that Bruno's "work ethic was marked by extreme punctuality, precise communication, thoroughness, and trustworthiness. Not once did I ever think that any corners were being cut or my family was in danger. His spotless character prevented that perception. … he went above and beyond to complete the job with excellence, showed up to work early, and finished the project at half the price and time compared to other general contractors." Ex. 15. He is also a person of integrity: "On many occasions, I've tried to pay Bruno extra for a job well done, and he refuses to take it. He says, we agreed on a price and that's that." Ex. 16.

A person who hired Bruno for a construction project relates her experience: "he had a small crew of men working to help him, that he had hired and was overseeing. He was extremely organized and efficient and professional. He spoke to his team with kindness and strength. I remember being impressed at such a young age how he handled himself." Ex. 17. "We were so pleased that over the next two years, we hired him for more and more jobs …." *Id.* "Bruno is extremely responsive and collaborative, texting pictures of ideas, asking what we'd like for this part, or that part." *Id.* "[W]e have been blown away by not only the professionalism such a young man exhibits, … but he always treats our home and our family with respect." *Id.* She continues: "Oftentimes our 8 year old son will ask questions as he watches Bruno work. He thinks Bruno is a kid and marvels that a kid can do such 'big work.'

… Bruno has always been extremely kind to our son and graciously smiles at him, and answers his questions. … He was very gentle and kind with my soft-spoken son." *Id.*

### 3.    *Bruno as an Entrepreneur*

He is also an entrepreneur. "As a young teenager he started his own business building custom tree houses. I was always amazed by the dedication, heart and quality of the craftmanship he put into every dream treehouse he built for each client." Ex. 9. "[W]hile many 17-year-olds I taught did not have a job, Bruno had a business [building tree houses]. And he was running it himself." Ex. 10. One young friend who worked for Bruno building treehouses remarks: "I respected his ability to communicate with clients from start to finish and deliver on these incredible floating structures, especially given his young age. If Bruno said he would be on job at 8 am sharp, you could count on him being punctual every time. His integrity, and high standards for quality of work led to many client referrals and a surge in business, which was unusual compared to most others his age." Ex. 8.



### 4.      *Bruno's Generosity*

"Bruno is an exceptional man with a kind heart and pure intentions. He cares for his community, those who have no one, and his family." Ex. 18. "He is the first person to volunteer a helping hand." Ex. 3. One neighbor who has known Bruno for sixteen years remarks: "Bruno has helped many neighbors with various jobs around their homes and farms and has received many compliments on jobs well done." Ex. 19. There are many examples. He has been a great source of comfort over the loss of a friend's father. Ex. 18. A pastor remarks: "He has come to help me at the church and at my home countless times out of the kindness of his heart." Ex. 20.

As a younger teenager, Bruno "traveled to Romania as part of his church youth group and worked at the ProVita Orphanage. That group serves disadvantaged children by building tree houses, cleaning, cooking, and serving them in a service-oriented manner." Ex. 21 at 2. Bruno also "tithes 10% of every dollar he earns or receives to his church and donates to charities—a practice which is unheard of among the young people or even adults today." Ex. 21 at 2.

In particular, Bruno loves to help others with his mechanical skills. He even saved a friend from a botched at-home oil change when she replaced her transmission fluid with oil. Ex. 18. One person he met at a Bible study more recently tells of a time they crashed their car and Bruno "did not hesitate to help me with the damage. He was willing to labor himself for a new friend for free simply because that is the hard working and loving person Bruno is." Ex. 22. One letter writer speaks of Bruno rescuing a motorist in need.

> I saw a car stalled in the middle of a busy intersection. The driver appeared confused as to what to do. I watched a truck quickly back up to the front of the stalled car, the man got out of the truck with a chain and hooked it to the hitch of his truck. Then he approached the man in the driver's seat and appeared to explain his plan to move him out of danger. Then he slid himself under the man's vehicle to attach

the chain to the undercarriage. When he returned to his truck I noticed it was Bruno Cua! … Bruno connected his truck to the car and pulled him to a service station about a ½ mile down the road. I don't know if he knew we saw him."

Ex. 14 at 2.

A friend who has worked for Bruno relates a story of his thoughtfulness while out on a

job:

Through teamwork, the three of us were making very quick progress not thinking to break for lunch, despite the unusually bitter cold. Bruno was at the hardware store purchasing additional materials for the job, and while he was out, he bought lunch for all of us [and] thanks us for our hard work. This may not seem like a big deal, but for a kid making little money for hard work, it actually is significantly generous. This story isn't unusual, but rather typical of his generosity and selflessness.

Ex. 8 at 2.

Bruno is also a role model for young people. One family friend explains:

When our children needed a role model, we pointed to Bruno to show them how to be charitable and help others. He taught them how to build things using nature. He worked with them on thinking through designs to build their projects successfully. He let them make mistakes, and he coached them into fixing their designs on their own.

Ex. 23 at 1.

### 5.    *The Southern Adventures YouTube Channel*

When Bruno was thirteen years old he started a YouTube channel called "Southern Adventures" focused on outdoor activity, including trucks, ATVs, hunting, fishing, his treehouse construction, and other outdoor adventures. A trailer Bruno created for his channel long before the events of January 6 is being provided to the Court as Exhibit 32.

As his mother relates:

He created and filmed content throughout the day, then edited the footage late into the night. He would come around the corner, sliding in his socks across our wooden floor. He was excited to share the fruits of his day's labor, which was usually a short video clip, distilled from hours of creating, filming, and editing the footage of the day.

10

Ex. 13. His sister further explains: "The videos were entertaining and good clean fun, and often made us laugh out loud. He really had a knack for editing and capturing his adventures and creations." Ex. 4 at 2.

Bruno worked hard to build his channel. "Every dollar he made was invested back into the Southern Adventures channel." Ex 13. "Bruno invested money he made doing odd jobs, back into the Southern Adventures Channel, paying for expert advice on how to succeed on YouTube, use the algorithms, content creation, editing, marketing, and so on." Ex. 4. One man with a successful social media presence writes: "I remember him seeking my help and advice for his YouTube channel, Southern Adventures. He wanted to have the highest quality channel, and he saw that I had built a large channel of my own. Whenever he saw me, he would always ask questions on how to produce the highest quality and most informative video's [sic]. He saw that my channel was based on helping people, and he wanted the same for his subscribers." Ex. 9.

And he experienced success. "Five years from the inception of Southern Adventures it reached the required number of subscribers and hours of watch time needed to became (sic) monetized." Ex. 13. His sister recalls "how excited he was when he received his first payment from Youtube…. It had really begun to take off, and we often heard of entire families who enjoyed his videos together, because it was fun and clean, with no cussing or inappropriate content." Ex. 4. One family friend writes: "I joined that channel, and I was just astounded at how well made his videos were. He loved teaching and entertaining others about the adventures he had, be they tweaking and fixing his truck, or building his beloved tree houses, or reclaiming wood to build a dock. He poured his heart into these videos …." Ex. 10.

11

## B.     The Offense Conduct and Acceptance of Responsibility

Mr. Cua signed an 18-page stipulation admitting to his conduct at and inside the Capitol on January 6, 2021.[3] *See* ECF No. 281. As expressed in his letter to the Court included at Exhibit 2, Mr. Cua accepts full responsibility for his conduct and is deeply remorseful for his role in in one of the most disturbing events in the history of the United States.

Pleading guilty to two felony charges—and accepting a future of constantly navigating the collateral consequences of such convictions—was extremely difficult for a young man with his entire life ahead of him. It should be noted, however, that before signing the stipulated agreement, Mr. Cua and the government had been in plea negotiations for many months. The process for reaching an agreement to resolve the case short of trial was complicated by novel legal questions regarding (1) whether the events that occurred at the Capitol on January 6, 2021, fall within the purview of section 1512(c)(2) and (2) whether a violation of section 111(a) requires an assault, what is required to constitute an assault, and whether Mr. Cua's interactions with Officer G.L. constituted such an assault.

Indeed, in view of these legal issues, Mr. Cua had agreed to plead guilty to a felony *not* involving section 1512 or 111 as early as October 2022. And on December 19, 2022, nearly three months before the original trial date on February 13, 2023, defense counsel informed the government that Mr. Cua would be willing to proceed with a stipulated bench trial with respect to the section 1512(c)(2) charge and a plea to Count One for violating 18 U.S.C. § 231(a)(3), a felony. Prior to this, Mr. Cua had not been offered a stipulated bench trial—only a plea agreement for section 1512(c)(2) and 111(a). Subsequently, on January 11, 2023, more than a month before trial was set to begin, defense counsel proposed a stipulated bench trial on

---

[3] As agreed with the government, Mr. Cua reserved the ability to appeal certain discrete issues.

section 1512(c)(2) and 111(a), to which the government eventually agreed. Although Mr. Cua did not enter into the stipulation agreement until February 1, 2023, he had resolved to avoid a full trial on the merits and accept responsibility for a section 1512(c)(2) violation—the most serious charge against him—well in advance of trial.

### 1. *Bruno's Political Activity on Social Media and the Giant Trump Flag*

Mr. Cua takes full responsibility and is deeply remorseful for not only his actions on January 6, but also his words on social media in the weeks leading up to that fateful day. He explains in his letter to the Court:

> When I hear those statements [from my social media] read out, or I read them on the stipulation, I am horrified. I am in shock I wrote those things and decided it was acceptable to post them or send them in messages to other people. People I don't know look me up and immediately read about them. It's painful and embarrassing. What I said doesn't even align with my faith. It's so backwards and twisted from how I'm called to act as a Christian.

Ex. 2.

As terrible as Mr. Cua's social media sounds, his words must be put in context, especially coming from someone so young. In the months and days leading up to January 6, former President Trump and his surrogates repeatedly sowed the seeds of distrust in the democratic institutions of this country, claiming that the presidential election had been stolen from him. He engaged in violent rhetoric and fomented a growing outrage among his supporters. Other politicians, prominent persons, and members of the media amplified and radicalized the message further: that the Democrats had stolen the election and Trump's supporters must "stop the steal." The message echoed across social media, as outrageous and unsubstantiated allegations were hurled back and forth in the echo chambers and the rhetoric grew more and more violent. Trump and many of his supporters falsely promoted the belief that our democratic institutions had failed, that Trump had won the election, and that President

Biden was illegitimately chosen. As January 6 grew closer, Trump called his supporters to Washington to "fight." From the Office of the President of the United States, he tasked them with an illegal, impossible, and immoral task—to stop Congress from certifying the election results.

While Mr. Cua is ashamed of his social media activity and first expressed his deep remorse long ago, *see, e.g.*, ECF No. 25 at 13-14, his posts surrounding January 6 should still be viewed in their proper context. First, the inflammatory posts the government highlights were selected from a much larger pool, including many posts depicting Bruno's more mundane interests (trucks, ATVs, and treehouses) and one very important interest—the 800-square-foot "World Record Trump Flag." Indeed, Bruno had designed and constructed a collapsible flagpole in the bed of his truck capable of flying such a massive flag on a moving vehicle—a remarkable engineering feat for an adolescent in and of itself. *See* Ex. 1 at 10-11 & n.7.





Second, without minimizing the disturbing nature of the social media posts the government emphasizes, they should be viewed in the context of Bruno's overarching goal—to develop a large social media following in the hopes of monetizing his accounts, including on YouTube. Mr. Cua's interest in developing a robust social media following is not uncommon among young people these days. *See id.* at 10. While admittedly sharing the beliefs with a large swath of Americans at the time that the 2020 election was "stolen" or fraudulent, this desire to gain attention and followers on social media was one reason Mr. Cua made such provocative political posts, many of which were not his words originally but were copied and reposted from others. *See id.* at 12. For example, Bruno has described taking content from "an ex-military guy who already had like 42,000 followers." *Id.* The large, one-of-a-kind flag was another strategy for gaining followers, one more prominently featured on his social media than the posts highlighted by the government. As Bruno told Dr. Murrie, the flag "was a huge part of my life online." That is why Mr. Cua included his social media "handles" on his truck, *see* ECF No. 12-1 at 11—so people would see the flag on the truck and follow his social media accounts.

To be clear, as Dr. Murrie reports, "Mr. Cua never disputed the general political perspectives he conveyed in Parler posts. That is, he clearly acknowledged he was supportive of Trump, suspicious of election results, against firearm restrictions, staunchly politically conservative, and so forth; perspectives that were fairly similar to his parents and his broader social context." Ex. 1 at 12. As Bruno described it:

> My social media was not an accurate representation of how I really was. It was like taking my thoughts and blowing them up to try to get views. It was all about the views. I don't really know what I was thinking or doing …. It was definitely crazy. Some of the political ideas I would state, I do believe them, but not on the level I posted. I could have a calm conversation with people about this, and be reasonable, but on media it sounds like I'm screaming. I feel like if I could've taken 30 second[s] to just stop and re-read everything, a lot of those probably wouldn't have been posted.

*Id.* That at least some of the posts were parroted became evident when Dr. Murrie queried Bruno about the meaning of some of the phrases or concepts he posted. While he was conversant in some of the "popular phrases or hashtags he used," he "often had only superficial understanding," regarding some detailed statements, like "the tree of liberty has to be watered from the blood of tyrants" and "the shot heard round the world." *Id.* at 13.

Others have also attested that, although Bruno fervently supported President Trump, much of his conduct "appeared to be driven by an immature need for affirmation and celebrity." Ex. 24. One person noted: "[H]is inappropriate and immature social media comments caught me off guard. His character around me and his family just didn't line up with this online bravado." *Id.* "My observation about Bruno is he has an innocence about him, which might hard be [sic] for you to believe given the unfortunate episode on January 6th. Like millions of folks, Bruno caught up on social media and lost his center at that time, and yet even with these mistakes, there was a pure intention that went desperately wrong." Ex. 11.

Bruno's mother, Alice Cua, recognizes with great sorrow how her own political activity influenced her son and radicalized his views. Those views include his beliefs about the election that served as a catalyst to his actions on January 6:

> [L]ooking back, I see how my beliefs about the election later contributed to my young son's entanglement in that tragic event. As an adult, I could draw a hard line between beliefs and acting on those beliefs. As an 18 yo kid, that line was very blurry. I should have recognized and anticipated that.

Ex. 13 at.

Bruno's mother explains how Bruno became involved with election rallies. She explains that, in late summer of 2020, "the Trump election rallies were brought to MY attention NOT to Bruno's." Ex. 13. While Bruno and his father were away on a fishing trip, Bruno's mother drove Bruno's truck mounted with an American flag to a sign-holding event in Milton. *Id.* at 3-4. At the end of the event, she "drove back and forth through the intersection a few times honking the horns. People loved the oversized truck with the flag flying behind and asked me to bring the truck to other upcoming events." She asked Bruno: "do you want to drive your truck in rallies?" He responded, "Heck yeah mom!" After driving his truck in several rallies, Bruno developed the idea of flying a giant Trump flag to express support and garner more attention. "These rallies offered an opportunity for major exposure and major channel subscriptions" and Bruno wanted to capitalize on the crowds for his social media business. *Id.*

> Flying an 800-square-foot flag on the back of a truck would require a lot more than a normal flag pole. He went to work to conceptualize, engineer, design, manufacture and test a flagpole capable of flying such a flag safely off the back of a truck. There were many factors to consider; the size, the weight, the drag, the height of the pole and that it would need to be collapsible to fit under standard bridges, and countless other details.

*Id.* at 4.

17

Bruno and his flag gained a lot of attention when it debuted at a local Trump rally, as bystanders took and posted their pictures and videos on social media. Unfortunately, they were not credited to Southern Adventures, so the channel did not benefit. Bruno next asked to take his giant flag to Washington, D.C., in November 2020 to a major rally protesting the November 2020 election. Bruno's father took him to Washington. As Bruno father relates: "We stayed on the back of his truck the entire day, unfurled the large flag and watched hundreds of thousands of people march past us … and by late afternoon we packed up and drove home." Ex. 25. This time images of the flag were "shared thousands of times without thousands of views on social media channels that had huge followings." Ex. 13. The video had gone viral, but again Bruno didn't get the credit. "It worked! For someone else. Someone else got the views. Someone else got the subscribers." *Id.* Bruno posted on social media: "[I]t is freaking annoying that half the country has seen my flag and nobody is giving me credit." *Id.*

Given the attention the flag received in November 2020, Mr. Cua asked his parents to return to Washington to fly his flag again to hopefully gain even more attention and get credit for it. This motivation is corroborated by extensive work Mr. Cua did to modify the truck and flagpole prior to the trip, the fact that the family drove a large, noisy truck with poor gas mileage to D.C. instead of another more efficient vehicle or mode of transportation, and the family's multiple attempts (over about 2.5 hours) in the early morning of January 6 to park his truck in the same or similar central location where he had parked in November (attempts that ultimately failed due to the heightened security). *See* Ex. 1 at 13.

The defense is providing three short videos Bruno posted on his Instagram "story" where is he is standing next to his truck at a gas station talking about the logistical problems of

transporting the flag and flagpole to D.C. on January 5. *See* Government Exhibits GX903A, GX903B, and GX903C.



In the video, Bruno is pointing the camera at his truck animatedly explaining to his social media audience how he has wrapped the flag and the flagpole in the bed of his truck with a tarp to protect it during transport. He says: "We have like ten bungie, four or five ratchets on here. This is going to be an incredible pain to transport." He explains that, at that point, "we've already stopped four times; we're still in Georgia." GX903A. He then expresses his fear that he might have to go to "Plan B" and disassemble the whole thing. GX903B.

19

### 2.      *Bruno's actions on January 6*

Bruno and his loved ones understand and regret the gravity of what happened on January 6, 2021. As Bruno describes it: "Everything that happened that day was absolutely disgusting and an embarrassment to our entire country. I am ashamed that I participated in what happened that day. The events that day are now an embarrassment in our history." Ex. 2. Similarly, Bruno's father describes seeing videos and images of the day and having a "nauseating, visceral reaction" and is "still in disbelief that we had anything to do with such an ugly event in our nation's history." Ex. 25. Bruno's mother states: "What happened on January 6th was a disgrace." Ex. 13 at 1. She continues: "January 6th was an atrocity. I am disturbed and distraught by every aspect. I feel terrible that people were in fear and traumatized by that event. I feel terrible that the men and women of law enforcement who were there to protect us, felt unsafe because of us. I feel terrible that the residents of DC felt invaded." *Id.* at 9.

Bruno's conduct on January 6 must be viewed in context. Not only was he 18 at the time—he was an 18-year-old whose parents brought him to DC. They now recognize the role that they played in not only bringing Bruno to DC but also the atmosphere they fostered—and the views they were complicit in promoting to Bruno—prior to coming to D.C. Bruno's father tells the Court in his letter: "I also need to accept responsibility for my own role in the events surrounding that day." Ex. 25 at 1. Bruno's father also recognizes and takes responsibility for how he may have fostered Bruno's entry into the Capitol: "We got far too close to the building that day and after he asked me three times, I reluctantly allowed Bruno to climb the scaffolding for a better place to record video channel. It was at that point that he must have gone into the building." *Id.*

The defense received in discovery a public video showing how close Bruno's parents got to the Capitol building with their son. Below is a screenshot from the video at the 1:25

mark. The Cuas are outlined in yellow below with Bruno.[4] On the left is the concrete in front of the steps up to the Upper West Terrace, where Bruno entered a short time after this video was filmed.



Bruno's mother also recognizes the detrimental role she played, referring to herself as "a very flawed mom, whose own failures have greatly contributed to her son's tragic situation." Ex. 13.

> My heart is heavy and contrite. Due to our participation on January 6th, my then 18 yo son was found guilty of serious offenses. In the aftermath, in the courtroom of public opinion, many asked: what about the parents? They are correct to ask. Your Honor, I have examined my every decision, failure and thought, in a seeming endless cycle on repeat. I know Bruno bears responsibility for his own words and actions. But Your Honor, so much of it is my own fault.

*Id.* at 1. She adds: "I feel terrible that instead of protecting my young son, I led him into harm's way. The irony is sometimes overwhelming." *Id.* at 9.

---

[4] The full video can be viewed at https://www.youtube.com/watch?v=VmJRqUYjlY4&t=85s.

Although Mr. Cua's actions on January 6 are undoubtedly serious, there are important differences from other, more culpable actors—even setting aside his tender age. Unlike many who arrived in Washington with body armor and plans to meet up with others, Mr. Cua took no steps in preparation for violent confrontations. He wore his normal clothes with a bright red hat and did not cover his face. As to the baton and pepper spray, Joe Cua explains in his letter to the Court that he "told Bruno to carry those items with him for self defense, as I had heard reports between protesters and counterprotesters at the November rally…. I was worried about him as a 140-pound teenager."[5] Ex. 25 at 1.  Bruno told his father "*he did not want to" carry them*. *Id.* (emphasis added). Joe also expressed his deep regret for the position he put his son in: "Like many other decisions that lead to that tragic day, I have regretted this decision ever since. In retrospect, believing one needs items of self-defense, is reason enough to conclude that maybe shouldn't be there with your wife and son." *Id.*

In sum, while some of Mr. Cua's social media messages appear to foretell his actions at the Capitol, and undoubtedly that mindset drove him to enter the Capitol, it was not his primary motivation for going to Washington in the first place. He had brought his oversized Trump flag and had planned to stay put to try to draw attention to his social media. Accordingly, despite those messages, Mr. Cua's entry into the Capitol in fact reflects impulsiveness, rather than pre-planning; immaturity, rather than thoughtfulness; and being swept up in the crowd, not independent thinking. As one letter writer relates about Bruno's thought process immediately after being arrested: "He was baffled because he had only done what the grownups, people he respected and believed, told him was the right thing to do, take

---

[5] *See, e.g.,* https://www.buzzfeednews.com/article/olivianiland/dc-protests-million-maga-march-arrests-violence.

back our country for the sake of democracy." Ex. 12. "Bruno believed what the adults were telling him was true. These adults included his parents, Fox News, and social media. Bruno was told that Trump won the election, the presidency had been stolen from Trump, and it was Bruno's patriotic duty to join forces and take the election back." *Id.*

### C.      Arrest and Pretrial Detention

On February 5, 2021, Mr. Cua was arrested in his hometown of Milton, Georgia. Being incarcerated was a truly rough awakening for Bruno and a punishment he will never forget. In a call to his family from jail that the defense is submitting to the Court as Exhibit 26, Bruno can be heard sobbing inconsolably. He cannot stop crying during the entire 20-minute call. What can be heard is an extremely terrified teenager. In discussing a visit from his Atlanta attorney, Bruno desperately asks if she can come back the next day: "Papa, can she come back tomorrow? … I need her to. I need her to. That's the only time they let me out." "I have to talk with someone. I have to, I have to." "I'm so scared, Mom." "What if DC appeals and says they don't want me to go home? If they do that, then I won't see you guys for months or years."

Bruno also experienced brutally harsh treatment in jail. As he related to his parents in the same call: "I have nothing, not even a toothbrush. I have absolutely nothing. I have a blanket." He continued: "I don't want to shower because it's my only time to talk to you." "I need to go back in there for 23 hours. They let me go out for an hour. 23 hours in a cell with nothing." He talks of "people howling and screaming all day long." He wasn't allowed to see his family due to COVID. "It's so cold, I have to go the [fitted] sheet and put the blanket on top and put my hands under my arms and between my legs."

After 32 days, he was transferred to Grady County Jail in Oklahoma as part of his transit to Washington, D.C. As his mother relates:

> Being young, small, and quiet, Bruno was an easy target. This bully decided Bruno was no longer allowed to use the common phone to call home. Bruno stayed away from the phone for several days but decided to try and call home in the early morning hours when it appeared safe. The bully saw him anyway. He struck Bruno in the face and threatened to murder my son. Shortly after this, Bruno tested positive for covid, and was placed into isolation once again.

Ex. 13 at 6.

### D.    Pretrial Release

This Court granted Bruno's release under stringent conditions on March 10, 2021, and he was released to his parents in Oklahoma on March 16, 2021—a delay that was necessary because Bruno had contracted COVID-19 while in jail. Bruno's parents drove to Oklahoma to pick him up and immediately returned to Georgia. They immediately set Bruno up with a psychologist and counselor to begin processing everything he had experienced, on social media, at the Capitol, as well as his arrest and traumatic incarceration. He began seeing Dr. Robert Montes, a psychologist, and Ryan Stringfield for therapy and pastoral guidance. He has been assessed and undergone therapy with Dr. Montes. And Mr. Stringfield has spent "countless hours" with Bruno processing the events of January 6 and his life more generally since his release. Ex. 27.

On June 9, 2021, less than three months after being released, Mr. Cua debriefed with FBI agents and prosecutors in Atlanta regarding his involvement. He cooperated in every possible way, answering all questions asked of him truthfully and completely. He explained at that time that he and his parents came to D.C. together on January 5, 2021. He admitted to entering the Capitol and described his movements through the building and his interactions with Officer G.L. Mr. Cua also explained his interest in getting views for his social media accounts. He stated then that his plan in coming to D.C. was to fly his large Trump flag and hopefully drive traffic to his YouTube channel and other social media accounts. He told the

government about driving to the particular parking lot to the night of January 5 to attempt to park his truck and how he was denied by police. With respect to social media posts, he explained that he would visit websites that would tell you the hottest hashtags and he would add those to his posts to increase views. He also relayed then that his father had given him the baton that morning for self defense. He also explained that, after he was in the Senate Chamber for a few minutes, he realized what he had done was wrong and left.

On the day the Court released him, Bruno swore an oath to Your Honor that he would abide 100% with all conditions of release. He has fulfilled that solemn vow. He reflects in his letter: "In the 2 years since [I was released] I have carefully obeyed every condition as promised. I took your release instructions to heart." Ex. 2. He has had zero violations in nearly 26 months – not one, not even an allegation of a violation.  As one of his employers explains: "He worked hard and was always very insistent that we follow all of the requirements of his probation." Ex. 24.

Bruno's counselor Ryan Stringfield has observed "how [Bruno] has approached the constraints of his pretrial diversion (house arrest) with an attitude of gratitude." Ex. 27. As Bruno explains: "I look at my life now from a much more positive perspective. Instead of grumbling, I am grateful for every single day I have." Ex. 2. Bruno has used the time since his release to further his education and continue to work. He earned his high school diploma shortly after his release. He has completed an online course in structural engineering and is taking online courses in architectural design, mechanical engineering, and electrical engineering and notes "I still have many more courses to finish." Ex. 2.

He also has been working on business ideas: "Since last summer I've been attempting to build a truck restoration business, where I restore, upgrade, then sell trucks. I've already

built a couple," but he explains "it's just very difficult to market and sell without social media platforms." Ex. 2. He is also partnering with his father to build a "treehouse AirBNB business" and hopes to open the first treehouse by late 2023 or early 2024." *Id.*





Bruno has also made efforts to use his experience to help others. He has spoken with a youth group "on the topic of social media pitfalls, the consequences of foolish words, and the importance of honoring one's parents." Ex. 8. Bruno explains: "I share my own experience of foolish behavior leading to severe consequences…. I fully and truly intend to use this experience to help prevent other young people, and mostly young men, from making similar mistakes. Maybe even let this be a career path for me." Ex. 2. He has also helped "a local family harvest their yearly crops, help[ed] people broken down or stuck on the roads near my

house, and help[ed] people at church whenever I can." *Id.* He states: "I basically try to share whatever I can and know how to do, with anyone in need." *Id.*

Bruno's time on pretrial release has also been trying. Although Bruno is extremely grateful for being released, he has been subject to home detention for more than two years now. As such, he has been unable to travel except for family funerals and a family wedding. For approximately 14 months, he was required to wear an ankle monitor, which inevitably would malfunction on occasion, resulting in frantic telephone calls in the middle of the night and trips to the Probation Office to repair or replace the monitor. He was precluded from accessing any social media. And he was placed in the custody of his parents as third-party custodians. One of his parents and any of Bruno's employers were required to submit a written declaration each week attesting that Bruno had abided by his conditions, an embarrassing process that hampered his ability to find work.

Given the media attention surrounding January 6, Bruno and has family have been subjected to harassment regularly, including frightening letters they have received at their home, a few examples of which are shown below. Unlike many defendants, this is not a case that will allow Mr. Cua to quietly go about his business. His name will forever be associated with the tragedy of January 6.



Bruno and his family were not the only ones subjected to harassment. One person who employed him was harassed online for doing so. When the person ran for city council, an activist in the community published the employer declaration he had signed on social media and "claimed that I supported a 'dangerous insurrectionist.'" Ex. 23 at 1. Later, this person

explains, "the behavior by this activist spiraled into attacks on our young children. Our family became a target. I lost the city council race because of the negative attacks, which were unfair and unfounded. It broke my heart, as I only wanted to serve my community." *Id.* at 1-2.

### E. Bruno's Support Network and Outlook

Bruno has a tremendous support network, including his family, his church community, and many other friends and neighbors, as shown by the numerous letters of support submitted with this memorandum.[6] If given time served and/or home detention, Bruno will continue to live with his parents, who will support him, including financially, while he further explores his career and education.

Bruno is terribly remorseful for his actions at the Capitol. He has written to the Court: "I want to apologize from the bottom of my heart. I deeply regret what I did on Jan 6, 2021. My conduct was inexcusable. My actions were impulsive and foolish and most importantly." Ex. 2. He continues:

> I apologize to the Capitol police officers, and for my ignorance of their authority. I apologize for participating in putting them in such an impossible position. I apologize to Officer GL and his colleagues trying to lock the doors to the Senate Gallery who had to run away in fear. I apologize to every person in that building that day that had to flee in terror. It's painful to think I contributed to someone else's misery.

*Id.*

Others have seen his remorse. One person writes: "I saw this 18 year old boy have such deep remorse and regret over his words and actions, as if he was looking back on someone he did not even know. This posture continues to this day and it is obvious to all who are near him, that he has grown tremendously." Ex. 11. Another corroborates the same: "I've seen him

---

[6] This memorandum does not cite all the letters submitted. Additional letters can be found in the exhibits that are not cited herein.

accept responsibility for his choices and willfully yield to the consequences that have come thereafter." Ex. 27. "[H]e is subdued. He is a changed young man. … He is a remorseful, humbled young man." Ex. 10. One neighbor, who recognizes that "Bruno committed egregious acts at our sacred Capitol on January 6th, 2021," stated her belief that "not a single day goes by that he is not sorry for that and has shown great remorse… I just honestly had to let you know that I feel Bruno is a good young man that got caught up in a very bad situation." Ex. 19.

Bruno has also maintained a positive attitude as he works to learn and even benefit from this experience. As his counselor has observed: "He has consistently demonstrated resilience and perseverance, not allowing this mistake to hold him back from pursuing his passion, purpose, and potential." Ex. 27. "I believe his season of correction and discipline is bearing fruit in his life 100-fold." *Id.* Rather than be bitter, he is grateful. "He knows this will haunt him the rest of his life but I never saw him get angry or blame anyone but himself." Ex. 24. "His growth and maturity" after the events of January 6 "are obvious. His desire to move forward in a positive manner using his gifts and talents to begin his life as an adult are clear and honorable." Gramith, at 2. One neighbor, a retired U.S. Naval aviator, said: "[S]ince the horrific event of January 6th, I have seen a great change in him. He has become a very humble and contrite person instead of the sometimes brash teenager that has been sometimes portrayed by a few others. He fully realizes the errors of his participation in the halls of Congress and has learned from his mistakes." Ex. 28.

Bruno's sister explains his attitude well:

His attitude of gratitude has remained the same, although it has now been two years since he came home. I am amazed at his good attitude, given the stress of the last 2.5 years, and the uncertainty of his future. It may seem odd to say this in these terrible circumstances, but Your Honor, Bruno is once again setting an example for me and many other friends who are watching him. He is not bitter,

> he is not angry or blame shifting. Instead he is compassionate and humble and
> remorseful, yet still hopeful to be given the chance to start his life.

Ex. 4. As a long-time family friend expresses it: "I have seen him throughout the last couple of

years, express true remorse, repentance and taken full responsibility for his actions. I believe

that he has been positive during this experience, and I have seen him grow into a fine young

man from the passionate boy he was in 2021." Ex. 6.

Given all of this, the outlook for Bruno is promising. One supporter remarks: "Bruno is

a bright young man whose future is in need to be just as bright. I believe he can achieve the life

we all want to see him have." Ex. 5. Another adds: "Bruno Cua is the kind of young man that

our community needs more of." Ex. 6. "He is a young man that will do remarkable things for

his community and country. He is one that is teachable. In fact, I know that this experience is

one that he continues to learn from which will push and mold him to become one that will

reach his full potential and destiny as a man and a citizen of the United States." Ex. 29. And

Bruno's support system is strong: "Bruno has the character, heart, friends, and family support

system that will be the best things for him at this stage of his life." Ex. 30.

Bruno also has career plans. He is working on developing a business restoring and

building custom trucks. His first project was to restore a 1981 Ford F-150 truck. The man from

whom he bought it marveled that Bruno "was able to take a dilapidated, shoddy truck that was

barely working, and restored it into a beautiful, fully functional, nostalgic work of art." Ex. 15.

Another family friend, a retired pilot and flight instructor, talks about Bruno's interest in

perhaps getting a pilot's license someday. Ex. 31. He has also been discussing with one person

who has employed him the idea of "build[ing] a series of treehouses on my property that I can

rent out through VRBO. They will be fully functional with multi-level bedrooms, electricity

and perhaps small kitchens." Ex. 16. She is even considering a business partnership with Bruno

for the treehouse rental project. She reports she "is hoping to break ground on this project in 2024." *Id.* She describes Bruno as "very optimistic and his 'can-do' attitude will help him overcome any obstacle that presents itself." *Id.*

### F.   Psychological Evaluation

#### 1.   *Dr. Daniel Murrie*

Dr. Daniel Murrie was retained to perform a forensic psychological evaluation of Mr. Cua. Dr. Murrie's evaluation report, including his findings and opinions, was previously filed under seal. *See* ECF No. 85, Ex. 1. It is also included with this memorandum at Exhibit 1. Dr. Murrie's curriculum vitae is appended to his report. Dr. Murrie is a licensed clinical psychologist who specializes in forensic assessment. He is Director of the University of Virginia's Forensic Clinic; Associate Director of the University of Virginia's Institute of Law, Psychiatry & Public Policy (ILPPP), and Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia School of Medicine. Ex. 1 at 1.

To prepare his report, Dr. Murrie conducted hours of interviews with Mr. Cua, his parents, and his treating therapists, performed thorough psychological testing, and reviewed extensive case materials. Ex. 1 at 2-3. Psychological testing "revealed no signs or symptoms of psychiatric illness, psychological or emotional problems, or other clinical concerns." *Id.* at 9. Perhaps most relevant, "there were no elevations on scales measuring antisocial attitudes or behaviors, or on scales measuring any form of aggression." *Id.* Rather, "his scores on scales measuring aggressive, antisocial, and egocentric features (i.e., the scales most relevant to concerns about violence, criminal offending, and noncompliance with supervision) were all below the average range." *Id.* (emphasis in original).

In response to the question of whether Mr. Cua "pose[s] a risk of violence or criminal recidivism," *id.* at 20, Dr. Murrie has concluded: "[C]onsidering Mr. Cua's history and context

reveals little reason to anticipate future violence or problems with standard risk-management strategies such as supervised release," *id.* at 22. He has further concluded: "[A]pplying threat assessment principles to Mr. Cua at this point in time reveals little reason to anticipate violence." *Id.* Utilizing the most widely used risk assessment tool, Dr. Murrie observed that Mr. Cua's "level of violence risk is best categorized as Low." *Id.* at 21 (emphasis in original). Indeed, Dr. Murrie observed that "he warrants the lowest score on every item." *Id.* He has no historical violence risk factors, no current clinical factors, and no evidence to anticipate future problems. *See id.*

Additional analysis and findings of Dr. Murrie are discussed *infra*.

### 2.    *Dr. Robert Montes*

Bruno has also been under the care of Dr. Robert Montes, a psychologist, since his release in March 2021. Dr. Montes explains his observations in a letter attached at Exhibit 39. As he explains:

> Bruno has a personality that is agreeable that incorporates a more-or-less naïve sense of wonder and curiosity. And while this benefits him greatly for innovation, this agreeableness is lined with a naivete that sometimes makes him less able to read people accurately. Fortunately, this does not cause him much harm since he is surrounded by very loving, giving, and generous people that wish only to see him succeed in life.

Ex. 39 at 1.

> Dr. Montes also explains Bruno's impulsivity:

> Bruno is a conscientious person in some ways but excitable and impulsive in other ways. He has to has the type of personality associated with high energy, enthusiasm, and creativity, but in other ways, can leap before looking in an impulsive way, if the situation seems fun in the moment.

*Id.* at 1.

Nevertheless, Dr. Montes relates: "Over the last three years, Bruno has come a long way in managing impulsive symptoms and as mentioned above, places his energy on his work as the primary outlet for these symptoms." *Id*.

## II.    A SENTENCE OF TIME SERVED, PLUS SUPERVISED RELEASE WITH TWELVE MONTHS OF HOME CONFINEMENT WOULD BEST SATISFY THE STATUTORY SENTENCING FACTORS.

The Court must "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). Under Section 3553(a), the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996).

To reach such a sentence, the Court is to consider seven factors:

(1)    the nature and circumstances of the offense and the history and character of the defendant;

(2)    the purposes of sentencing, as reflected in the statute (and enumerated below);

(3)    the kinds of sentences available;

(4)    the applicable advisory sentencing guideline range;

(5)    pertinent policy statements by the Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to victims of the offense.

18 U.S.C. § 3553(a).

Under the second factor, the purposes of sentencing include "the need for the sentence imposed—

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

34

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"

18 U.S.C. § 3553(a)(2).

The Guidelines, of course, are but one among the seven factors listed in Section 3553(a). Although the Guidelines may serve as a "starting point," they are not "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Courts should not presume "that the Guidelines range is reasonable." *Gall*, 553 U.S. at 50. The Court may consider arguments that a "Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007). Moreover, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Gall*, 553 U.S. at 47. Instead, the Court is directed to determine a sufficient sentence after "mak[ing] an individualized assessment based on the facts presented" in the particular case. *Id.*

The advisory guideline range, whether the one proposed by the Probation Office and the government or the one proposed by the defense, offers little useful guidance here because it (1) fails to fully account for Mr. Cua's specific circumstances, including his extreme youth and low risk of recidivism; (2) would result in unwarranted disparity as compared with sentences for similarly situated defendants; and (3) is far greater than necessary to promote the goals of sentencing in this case.

As discussed below, a downward departure under Section 5H1.1 is appropriate in this case due to Mr. Cua's age at the time of the offense its contribution to the criminal conduct in

this case. If the Court determines that a departure is not warranted, the Court should

nevertheless sentence Mr. Cua to a period of home confinement based on a downward variance

after taking into account the Section 3553 factors. In truth, in the post-*Booker* world, there is

little practical difference between a departure and a variance. *See Gall*, 552 U.S. at 50 (using

"departure" and "variance" interchangeably in describing a district court's decision to sentence

a defendant outside the Guidelines range, noting that the court must "ensure the that

justification is sufficiently compelling to support the degree of the variance," while noting in

the next sentence that "a major departure should be supported by a more significant

justification than a minor one"). *See also United States v. Diosdado-Star*, 630 F.3d 359, 365

(4th Cir. 2011) (noting that under *Gall* and *Rita* there is no practical difference between a

variance and a departure).

A.   **Nature and Circumstances of the Offense and Character of the Defendant**

1.   ***The Nature and Circumstances of the Offense***

As discussed above, Mr. Cua fully recognizes the wrongfulness and seriousness of his

conduct in this case. The defense would nevertheless urge the Court to consider the differences

between his case and the breadth of cases covered by the Guidelines range applicable to this

case before any departures. As more fully described elsewhere, by the time Mr. Cua climbed

the scaffolding on the West side of the Capitol, numerous others had already passed police

lines and entered the Capitol. The senators, congresspersons, and staff had been evacuated. He

was not on the "front lines" breaking windows or damaging property to gain access.

Once inside, Mr. Cua again followed others, including Josiah Colt, who had been

yelling from the stairs leading to the Senate for everyone to go upstairs from the Rotunda. Mr.

Cua was walking just behind a helmeted Mr. Colt when he entered the hallway outside the

Senate Chamber. Even in his interactions with Officer G.L., he was following others—he was

responding to a call from another person to prevent them from locking the doors. And while Mr. Cua has been convicted under section 111, his interactions with Officer G.L. were brief and minor compared to other January 6 defendants, such as Matthew Miller, and other police assaults. At every stage, he was preceded by much older adults, including Mr. Colt when he jumped to the floor of the Senate.

Mr. Cua also realized soon after he was on the floor of the Senate that he should not be there and left the chamber promptly. He then asked multiple police officers how to get out of the Capitol and left as soon as he was able. All told, Mr. Cua stayed in the Capitol for only 17 minutes.

### 2.    *The Character of the Mr. Cua*

The Court should recognize that the actions Mr. Cua on January 6 are a complete break from other aspects of his as described above, a life filled with friendship, charity, hard work, and love for others. Indeed, there is no other episode in Bruno's life even remotely comparable to this one; the conduct here is entirely aberrant.

Mr. Cua lived an entirely law-abiding life until January 6. He did not engage in any criminal conduct. His offense is completely uncharacteristic when viewed in the context of his past. This Court should grant a variance based on the aberrant nature of his conduct. *See, e.g., United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (upholding a variance based on "isolated mistake" in otherwise long and entirely upstanding life despite engaging in a two-year cover up); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (upholding six-level downward departure based in part on fact that the defendant was a "law abiding citizen, who [did] an incredibly dumb thing").

Moreover, Mr. Cua is fully contrite for his conduct, as he has recognized in his letter at Exhibit 2 and which he plans to recognize in his personal statement to the Court. And in

addition to his words, he has shown the Court he should be trusted through his conduct; in the past 26 months, he has not violated a pretrial release condition a single time, just as he promised the Court he would.

**B.     The Purposes of Sentencing**

The purposes of sentencing can be met in this case through the requested sentence of time served, with a substantial term of supervised release, a part of which is served in home confinement.

### 1.     *Need for Just Punishment in Light of the Seriousness of the Offense*

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his or her degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005). The Guidelines include none of these factors bearing on Mr. Cua's degree of culpability.

Measured by these factors, Mr. Cua's degree of culpability is low compared to typical cases. As discussed above, while the events at the Capitol on January 6 are indisputably horrible, Mr. Cua's activities reflect his immaturity at the time and the effects that the crowd had on such a young person. And while M

Mr. Cua has also already been punished substantially. Mr. Cua is now a convicted felon, which may preclude him from certain employment opportunities, and he has lost his voting and firearm privileges. Courts have considered such collateral consequences in deciding a just sentence. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing

court properly considered under Section 3553(a)(2)(A) that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession) (internal quotation marks omitted); *United States v. Virgil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate in part where defendant lost his position and reputation); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost public sector job as a result of conviction); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993).

In Mr. Cua's case, the collateral consequences are harsher than in many cases. Given his age, he will suffer these consequences for his entire adult life. Given that he had not completed high school at the time of the offense, he has not established a career, gotten training for necessary job skills, or acquired substantial job experience. A felony will hamper Bruno's employment more than it might an older defendant with an established job or work experience. Bruno is also exploring attending flight school but would be precluded from working for an airline if he is a convicted felon. Aside from employment, a felony would result in numerous other potentially permanent collateral consequences, from social stigma, to loss of voting privileges and other civil rights, to difficulty obtaining housing or obtaining loans, to entry to schools (including ineligibility for federal financial aid), to inability to lawfully possess a firearm.[3] While stated in the context of a life prison sentence, the Supreme Court's words in *Graham v. Florida*, apply equally to the lifetime collateral consequences of a felony conviction for such a young man: "A 16-year-old and a 75- year-old each sentenced to life without parole receive the same punishment in name only." 560 U.S. 48, 71 (2010). The same is true for lifetime collateral consequences.

As discussed above, Mr. Cua has also endured a long period of pretrial home confinement in which his liberty has been substantially curtailed.

### 2.      Need for Deterrence

#### a)      General Deterrence

As an initial matter, the correlation between severity of punishment and general deterrence is suspect at best. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity"). Such findings support the notion that the requested sentence in this case is sufficient deterrence, both generally and with respect to Mr. Cua specifically.

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report examined penalties in the United States as well as several European countries. *Id.* at 1. Specifically, the authors focused on the effects on deterrence of changes to both the certainty and severity of punishment. *Id.* While studies generally showed "significant negative relationships between likelihood of conviction and crime rates," "[t]he negative correlations between sentence severities and crime rates . . . are not sufficient to achieve statistical significance." *Id.* at 45.

In this case, of course, one issue is preventing the events of January 6, 2021, or similar events, from happening again. But just as January 6 was a collective harm caused by numerous individuals engaging in wrongdoing, the deterrence of such an event is also a collective effect

of the prosecution, conviction, and punishment of many individuals who engaged in a variety of wrongdoing under various circumstances. The defendants are of all ages and social backgrounds, they engaged in various levels of planning and coordination with others, they engaged in different degrees of violence, with or without weapons, some forced their way in while others walked in unabated. What the public collectively has learned through this event is that the Department of Justice and the FBI have the resources and capability to track down just about anyone who engages in actions like those that occurred on January 6, 2021. They have also learned that you almost certainly will be convicted, potentially of a serious and life-altering felony, and that you could potentially end up serving years in prison, especially if you engage in coordinated planning and leadership of such actions or engage in serious violence.

> In sentencing Mr. Hodgkins, this Court rightly pondered:
>
> To the extent that you're concerned about the deterrent value here, I suppose one question is whether you look at the bigger picture and you look at each case on its particular facts, but with sort of the confidence that the bigger picture is going to emerge in a way in which a pretty clear message is sent that anyone who would engage in conduct like this in the future, that if you do so you're going to face grave penalties.
>
> …
>
> And … to the extent the Government is concerned about general deterrence and making sure that people who engage in violence, destructive behavior, threatening behavior are really, really deterred, there will be cases likely in which the Government will have the opportunity to make that point and courts will have an opportunity to make that point.

*Hodgkins* Sentencing Tr., at 31:3-10, 32:10-16.

The Court was correct to raise such an issue. Mr. Cua is one of hundreds of January 6 defendants. His sentencing is but one data point in a much larger picture that sends a clear message of deterrence to society. Moreover, Mr. Cua's youth takes him outside the mine run of convictions.

b)      *Specific Deterrence*

The need for specific deterrence of Mr. Cua through further imprisonment is zero. Mr.

Cua's arrest, pretrial detention (including solitary confinement), pretrial release, the

humiliation of being brought before a court for criminal charges, admitting to his culpable

conduct, and now coming before this Court for sentencing have been a life-altering experience

for Mr. Cua, who had never previously had any exposure to the criminal justice system. These

experiences alone will serve as strong deterrents from engaging in even questionable conduct

going forward. Moreover, Mr. Cua has already shown the Court that he can abide by even the

most stringent release conditions over the last two-plus years. Finally, he has been participating

in therapy with both a psychologist and counselor that will further ameliorate any concern that

he will re-offend. Accordingly, there is simply no need to impose a sentence that will further

deter Mr. Cua from future criminal activity.

Kate Boccia, President and CEO of the National Incarceration Association, has

submitted a letter at Exhibit 38. The NIA is a group concerned with "reforming *why* and *how*

we incarcerate for greater public safety so that incarceration gets to the primary mission of

repairing and correcting what went wrong." Ex. 38 at 1 (emphasis in original). She cites a 2021

United Nations report on "System Common Position on Incarceration" that found:

> For various categories of offenses and offenders, non-custodial measures can be
> more effective in reducing the risk of re-offending, as they can support
> rehabilitation in the community…. As they prevent the unnecessary exposure to
> the harmful impact of incarceration, alternatives are also a more proportionate and
> humane criminal justice response, in appropriate cases.

*Id.* This passage identifies the crux of the issue. Because the need to deter Mr. Cua from further

crimes is zero, the Court should consider the affirmatively harmful impact further

imprisonment may have on Mr. Cua.

### 3.    *Need for Incapacitation*

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Cua, this Court should again consider the statistically low risk of recidivism presented by Mr. Cua's history and characteristics. *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on a basis of Defendant's first-offender status); *United States v. Urbina*, No. 06-CR-336, 2009 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by Defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

First offenders like Mr. Cua with zero criminal history points have a rate of recidivism nearly half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*], *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf. Indeed, the Commission has recognized the advisability of revising the guidelines to take first offender status into account. *See First Offender*, at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"). *See also United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time . . . .").

As reviewed above, Dr. Murrie has assessed whether Bruno poses a risk of violence or criminal recidivism and found that across the board all indicators show Bruno is low risk. See Ex. 1 at 20-23. As Dr. Murrie explains, Bruno "no longer espouses attitudes of animus towards

43

the government or any political group, no attitudes that support any type of individual or group insurrection or aggression." *Id.* at 22. Importantly, Dr. Murrie observed that Bruno is "self-critical in describing his prior attitudes." *Id.*

Finally, while undoubtedly serious, the circumstances of the events of January 6th themselves are unique. A sitting president was essentially goading his supporters to attack the Congress. The government and law enforcement agencies were admittedly caught off guard and the situation spiraled out of control. That is not to fault law enforcement, but January 6 represents a unique place in our history and one that is unlikely to occur again. The notion that Bruno Cua must be incapacitated to prevent further actions like he engaged in on January 6 is frankly preposterous. Moreover, Bruno's long record of compliance with the Court's pretrial release conditions and his sincere remorse support a conclusion that there is no risk that he will offend again.

Finally, the Court will be able to craft sufficient conditions of release to prevent any risk that Mr. Cua would reoffend while on supervised release.

### 4.   *Rehabilitation*

As discussed more fully above, Mr. Cua would benefit most from being able to work in the community and further his education. Mr. Cua would not benefit from additional incarceration.

### C.   **Need to Avoid Unwanted Disparities and Unwarranted Similarities**

The Court must also consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). This suggests that the Court should avoid unwarranted *similarities* in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall*, 552 U.S. at 55 ("need to avoid unwarranted *similarities* among other co-conspirators who were

44

not similarly situated"); *Ovid*, 2010 WL 3940724, \*8 (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), *and* unwarranted differences among defendants whose conduct and characteristics are similar. *See Parris*, 573 F. Supp. 2d at 753, 756-62.

The U.S. Sentencing Commission has published data[7] showing that, in fiscal years 2015-2021, there were 612 sentencings under section 2J1.2 with Criminal History Category of I. The median sentence was 7 months, while the average was 12 months. Of the 612 cases, 36 percent received a non-government-requested downward variance. Another 11 percent received a downward variance pursuant to a government motion. Another 6 percent received downward departures. In total, approximately 53 percent of defendants sentenced under section 2J1.2 between 2015 and 2021 received sentences below the Guidelines range.

Based on a sentencing chart for January 6 cases, as of April 18, 2023, this Court has sentenced two defendants for convictions under section 1512(c)(2): Paul Hodgkins and Mr. Miller. Mr. Miller was also convicted of violated section 111(a)(1).

***Paul Hodgkins*, 1:21-cr-00188-RDM.** The Court sentenced Mr. Hodgkins to 8 months' incarceration, 24 months' supervised release, and $2,000 in restitution. Mr. Hodgkins was 38 years old at the time of sentencing. Tr. at 64:3. Hodgkins pled guilty to violating section 1512(c)(2). The government and Mr. Hodgkins agreed on a base offense level of 14, plus three levels for substantial interference with the administration of justice, and a three-level reduction for acceptance of responsibility for a Guidelines range of 15-21 months. Mr. Hodgkins traveled to Washington with a backpack containing protective eye goggles, rope, and white latex

---

[7] https://ida.ussc.gov/analytics/saw.dll?Dashboard.

gloves.[8] He entered the Senate Chamber approximately 10 minutes after entering. "As he walked among the desks in the Senate Chamber, Hodgkins put on and then removed protective eye goggles, took "selfi-style" photographs with his cell phone, and put on and removed white latex gloves." ECF No. 23 at 3-4 (Statement of Offense). He joined in a group on the elevated platform in the well who were shouting, cheering, and saying prayers using a bullhorn. In a symbolic act, he also raised his "Trump" flag and saluted. All in all, he spent about 30 minutes inside the building.[9] As the Court recognized, Mr. Hodgkins was 38 years sold; "[h]e knew better." Tr. at 73:21.

*Matthew Miller*, **1:21-cr-00075-RDM.** The Court sentenced Mr. Miller to 33 months' incarceration, 24 months' supervised release, with $2,000 in restitution, and 100 hours of community service. Mr. Miller was 22 years old at the time of the offense. Tr. 27:16-18. He was affiliated with the Proud Boys and had previously attended Proud Boys rallies in November and December 2020. Tr. 6:3-14. Mr. Miller pled guilty to violating section 1512(c)(2) and the less included offense of 111(a), but was originally charged with the more severe offense under 111(b), including use of a deadly or dangerous weapon or the infliction of bodily injury. In the plea agreement, the government and Mr. Miller agreed on a base offense level of 14, plus three levels for substantial interference with the administration of justice and eight levels for injury/property damage, as well as a three-level reduction for acceptance of responsibility for a Guidelines range of 41-51 months. Mr. Miller came to DC by himself and rented a hotel room. Tr. 27:24-25. Mr. Miller apparently got drunk and high on marijuana

---

[8] Although the Statement of Facts does not mention a rope, counsel for the government stated that Mr. Hodgkins had a rope at sentencing. *See* July 19, 2021 Tr. at 15.
[9] The defense believes that Mr. Hodgkins was not on home detention.

before and during the events of the Capitol, having beer on his person. Mr. Miller participated

and encouraged the brutal assault on officers attempting to secure the doors within the tunnel

on the Lower West Terrace. Prior to participating in that assault, he threw a full can of

approximately 30 yards in the direction of police officers and used Capitol Police barriers to

scale the walls of the Capitol Plaza and assisted others in doing so. Once at the tunnel, he said

multiple times, "Come one" and yelled "one, two, three, push!" while counting with his

fingers. He threw batteries into the tunnel where law enforcement officers were and sprayed a

fire extinguisher directly into the tunnel where officers were defending the entrance, burning

their skin and eyes. Tr. 24:7-13, 39:4-7.

   *Richard Michetti*, **21-cr-00232-CRC.** Mr. Michetti pled guilty to one count of

violating section 1512(c)(2). The Court sentenced Mr. Michetti to 9 months' imprisonment, 24

months' supervised release, and $2,000 in restitution.[10] Mr. Michetti entered the same Upper

West Terrace Door at 2:35 p.m., the same door Mr. Cua entered one minute later at 2:36 p.m.

Mr. Michetti was part of a crowd

> trying to get past a police line of Metropolitan Police Officers in the hallway by
> the Old Senate Chamber. He remained near the front of the crowd, yelling at the
> police 'we feed your family'; 'you are just taking orders'; and 'we pay you.' He
> gesticulated at the officers and at one point briefly pinched the sleeve of one
> officer as the officers were trying to do their lawful duty and keep the mob from
> penetrating further into the building. At one point he made it into the stairwell off
> the Senate hallway by the Old Senate Chamber but was herded out by the police.

Michetti, ECF No. 41, at 4. He also called an officer at "fucking traitor." Tr. at 9:25-10:01. He

and the crowd persisted in that effort until police dispersed them with tear gas or OC spray. *Id.*

at 10:14-18. Once he was turned away from the Senate, Mr. Michetti continued to yell at

---

[10] In sentencing Mr. Michetti to 9 months, Judge Cooper considered that he had been on home
detention pending trial for 18 months, in contrast to Paul Hodgkins. Tr. at 15:16-20, 16:4-5,
16:7-14.

officers in the Rotunda. He then pushed with a mob against a police line at the inner door to the

Rotunda. ECF No. 41. All in all, Mr. Michetti was inside the Capitol at 40 to 45 minutes. He

also remained on the Capitol grounds until about 5:30. Tr. at 12:24-25.

*Anthony Puma*, **21-cr-00454-PLF**. Mr. Puma pled guilty to one count of violating

section 1512(c)(2). The Court sentenced Mr. Puma to 9 months in prison, 24 months'

supervised release, and $2,000 in restitution. The government and Mr. Puma agreed on a base

offense level of 14, plus three levels for substantial interference with the administration of

justice, and a three-level reduction for acceptance of responsibility for a Guidelines range of

15-21 months. In the days before coming to D.C., Mr. Puma posted statements on social media,

including:

- "On the 6th, when we are all there in the capital and he is givin (sic) his second term the people will see. Then you never know we might have to start killing some commie bastards." ECF No. 48, at 4.

- On January 5: "Tomorrow is the big day…. War is coming." *Id.*

- Later that night "We are here. What time do we storm the House of Representatives?" *Id.*

- Then, "Hopefully we are storming the House of Representatives tomorrow at 100pm." *Id.*

- And after: "I was there. They were flash banging us. Tear gassing us. Pepper spraying us. We were outside. Don't believe the NEWS. I have hours of video on my go pro." *Id.* at 5.

- On January 10: "But they [the police] were assholes. The stormtroopers flash banged us and shot rubber bullets into the crowd." *Id.*

Mr. Puma scaled a wall surrounding the Capitol Building and then climbed through a broken

window to enter the Capitol. ECF No. 48, at 3-4. At the time, Mr. Puma was aware that Mayor

Bowser had issued a curfew, but Mr. Puma told people in the crowd that he was going to

ignore the curfew. *Id.* Once inside, Mr. Puma entered various offices, observed individuals

smoking marijuana inside an office, and asked if he could join them. *Id.* at 4. In reference to potential arrests, Mr. Puma told another protester, "They ain't got enough space for everybody." *Id.*

*James Rahm*, **21-CR-150-TFH**. Mr. Rahm was convicted after a stipulated bench trial of violating section 1512(c)(2) and several misdemeanor counts. The Court sentenced him to 12 months in prison, plus 36 months' supervised release and $2,000 in restitution.[11] On January 6, 2021, prior to entering the Capitol, Mr. Rahm posted a picture of the Capitol on Facebook and wrote, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back." ECF No. 57, at 6. He filed a video just before entering in which he stated, "We broke the door down. We're going in. My eyes hurt like shit from that pepper spray, but we're going in." *Id.* at 7. In the Statuary Hall, he filmed a video in which he proclaimed loudly, "We're in. We're taking our fucking house back. We're here. Time to find some brass and kick some friggin' ass." *Id.* at 8. Afterward, he posted: "do not believe the media there were no anarchists no antifa just patriots trying to take our country back. Yes I was there the pepper spray is just wearing off…" *Id.* at 13. He later posted: "I walked right through Pelosi's office I should have shit on her chair."

*John Andries*, **21-cr-00093-RC**. Mr. Andries pled guilty to violating section 1512(c)(2). The Court sentenced him to twelve months and a day in prison, 36 months' supervised release, and $2,000 in restitution. The government and Mr. Andries agreed on a base offense level of 14, plus three levels for substantial interference with the administration of justice, and a three-level reduction for acceptance of responsibility for a Guidelines range of

---

[11] Mr. Rahm's Sentencing Guidelines calculation is not publicly available.

15-21 months.[12] Mr. Andries entered the Capitol through a broken window near the Senate

Wing Door at 2:15, just two minutes after the initial breach of the Capitol at that location. ECF

No. 61, at 3. He was among a crowd that tried to push past U.S. Capitol police officers in the

Crypt—he walked up to officers "several times and got within inches of them"—and was

eventually able to surge forward past the police. *Id.* He made his way to the House of

Representatives Chamber and to the area near the Speaker's Lobby. *Id.* at 3-4. Inside, he filmed

himself saying: "We're in the U.S. Capitol." "Hey y'all think they hear us now?" "Stop the

steal." "Knock-knock motherfuckers." "Think they're scared yet." "I think the police have

gotten the message, we ain't back'n down." *Id.* at 4. He appears to have left that area only after

Ashley Babbit was shot. *Id.* As he was about to exit, he saw another protester scuffling with an

officer. Once outside, Mr. Andries filmed a video in which he confessed to pulling a fire alarm.

*Id.* The defendant briefly pushed past a police officer to the protester and then exited at

approximately 2:56 p.m, more than 40 minutes after entering. Mr. Andries continued to remain

close to the Capitol, sat on a ledge, and refused to move when ordered to by officers at 4:25,

more than 2 hours after he entered the building. He then pushed against the officers and were

forced to "physically drag the defendant away from the Capitol building." *Id.*

    ***Matthew Wood*, 21-cr-00223-APM**. Mr. Wood pled guilty to the indictment, including

for violating section 1512(c)(2) and several misdemeanors. The Court sentenced him to 12

months' home detention. Days before coming to D.C., Mr. Wood texted another individual: "If

they want to raid Congress, sign me up, I'll be brave heart in that bitch!" ECF No. 46, at 3.

Woods was the 10th person to enter through the broken window near the Senate Wing Door, at

---

[12] Although Mr. Andries' plea agreement stated the parties' understanding that Mr. Andries
had zero criminal history points, they did agree that he had prior convictions for resisting arrest
and driving while intoxicated.

approximately 2:13 p.m. Mr. Wood then moved throughout the Capitol, including to the second floor, just outside the Senate chamber, the Capitol Crypt, where he was a part of a large group confronting police officers and eventually pushing past them, the Rotunda, back toward the Senate Door (before apparently being repelled by chemical irritant), back toward the House chamber, through Statuary Hall (removing velvet rope from stanchions along the way), back to the Rotunda, back through Statuary Hall toward the House chamber. At one point, Mr. Wood entered the House Speaker's office suite and entered her conference room. Mr. Wood did not leave the Capitol until approximately 3:31 p.m., an hour and 15 minutes after entering, when he was forced out of the East Rotunda door by a line of police officers.

Within this universe of cases, Mr. Cua's case is unique. His case presents far more powerful mitigating circumstances than other January 6 cases. In particular his age, but also the facts of his offense, differentiate his case from others and demonstrate that a sentence within— or even near—the Guidelines range would fail to reflect the unique circumstances of his case.

### D.    Kinds of Sentences Available

There is no statutory minimum sentence of imprisonment in this case. The Court may impose a term of supervised release of up to three years. 18 U.S.C. § 3583(b)(2). *See also* PSR at 19 ¶ 105. Under Section 5D1.3(e)(2) of the Guidelines, the Court may impose home detention as a condition of supervised release. *See also* U.S.S.G. § 5F1.2 (home detention). Under Section 5F1.2, the Guidelines specifically state that such a condition of home detention may only be imposed "as a substitute for imprisonment." In other words, the Guidelines specifically contemplate that a Court may impose supervised release with home confinement instead of a term of imprisonment called for by the Guidelines.

In addition to the other reasons stated thus far, a variance to home confinement as part of supervised release is justified in view of Mr. Cua's vulnerability. Even now he is just

turning 21 years old. He was assaulted during pretrial detention after being targeted by another inmate, picked out from among numerous other inmates, likely due to his age, size, stature, and apparent vulnerability. In addition, combined with these characteristics, his involvement with January 6 makes him a candidate for either abuse or radicalization. *See* Ex. 37.

### E.   The Sentencing Guidelines

Among the factors listed in Section 3553(a), the Guidelines range in this case is perhaps the least useful in fashioning a sentence that is sufficient, but no more than necessary to serve the purposes of sentencing. At issue On top of that, the Court should depart downward, or at least vary downward significantly, due to Mr. Cua's you age and mental and emotional conditions at the time of the offense.

### 1.   *Count Two: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2)*

The PSR has proposed adding 11 levels for Mr. Cua's conviction under section 1512(c)(2), based on two proposed specific offense characteristics under subsections 2J1.2(b)(1)(B) and 2J1.2(b)(2), nearly doubling the base offense level of 14 and increasing the Guidelines range before acceptance of responsibility from 15-21 months to 57-71 months, nearly quadrupling the low end of the range. Neither of the enhancements applies in this case.

> *a)   Neither enhancement applies because the term "administration of justice" in the enhancements does not apply to the certification of electoral votes.*

Neither subsection 2J1.2(b)(1)(B) not 2J1.2(b)(2) applies because the certification of electoral votes by Congress on January 6, 2021, does not constitute "the administration of justice." "Text, context, and precedent show that the 'administration of justice' most naturally refers to a judicial or related proceeding that determines rights or obligations. The electoral

certification was not such a proceeding." *United States v. Seefried*, --- F. Supp. 3d ---, 2022 WL 16528415, No. 21-cr-287 (TNM), at *1 (Oct. 29, 2022).

"In interpreting the Sentencing Guidelines, the Court applies ordinary tools of statutory interpretation and looks to the plain meaning of its terms," including by reference to dictionary definitions. *Seefried*, 2022 WL 16528415, at *2 (citing case law from numerous circuits). Black's Law Dictionary defines "administration of justice" to mean "[t]he maintenance of right within a political community by means of physical force of the state" and "the state's application of the sanction of force to the rule of right." *Administration of Justice*, Black's Law Dictionary (11th ed. 2019). "Due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Id.* Finally, Black's Law Dictionary defines "obstructing the administration of justice" and "interfering with the administration of justice" as "[t]he skewing of the disposition of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge." *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019) (cross-referencing phrases). *See also Seefried*, 2022 WL 16528415, at *2-3 (quoting same).

As *Seefried* concluded, "[t]he certification [proceedings in Congress] do[] not share the characteristics of these definitions." 2022 WL 16528415, at *2. "The certification is … largely a ceremonial proceeding where Members and staff open, read, list, and announce the electoral votes." *Id.* (citing 3 U.S.C. § 15). While the dictionary definitions above "evoke traditional judicial or quasi-judicial bodies that decide or maintain the legal rights of the parties before them[,] the certification confirms, announces, and officially records whom the people have chosen to be President and Vice President." *Id.* While obstructing the administration of justice

involves "fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge," the certification involved none of these. *See id.* at *3.

In contrast to section 1512(c), section 1503 of title 18 defines "obstruction of justice" to mean an act that "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503. In view of the fact that the government has not charged any January 6 defendants with violating section 1503, the "clear relationship to the enhancements in § 2J1.2," in contrast to section 1512, "is curious." *Seefried*, 2022 WL 16528415, at *3.[13]

Mr. Cua recognizes that this Court previously ruled that the certification proceedings on January 6 qualify as the "administration of justice" under the section 2J1.2 enhancements. *See United States v. Miller*, No. 21-cr-00075, ECF No. 75 (Sentencing Transcript), at 16:6-18:2. Looking to Webster's Third New International Dictionary, the Court noted that "administration in this sense means to mete out, and justice means fair treatment." *Id.* at 16:16-17. The Court reasoned that the congressional proceedings on January 6 fall within that definition because Congress was "adjudicating in some … limited sense, subject to very substantial constraints,

---

[13] Judge McFadden in *Seefried* also assessed the customary usage of the phrase "administration of justice" through corpus linguistics analysis by searching relevant databases of written content. 2022 WL 16528415, at *5. Using a database compiling the text of federal and state court decisions, Judge McFadden found that around 65% of a random sample corresponds with "a judicial proceeding deciding legal rights." *Id.* at *6. About 25% of the sample involved "disciplining judges or lawyers for conduct that interfered with judicial proceedings." *Id.* Another 4% involved "law enforcement activities." Querying a more general database not specific to the legal profession, Judge McFadden only found a few hits, but "[t]he phrase most often appeared in the context of judicial decision-making, courts generally, bar associations, or law enforcement." *Id.* at *7. He concluded: "In short, there is essentially no evidence that either judges, lawyers, or speakers more generally used the term 'administration of justice' to refer to legislative proceedings like the certification of the electoral count.'" *Id.*

the results of the election." *Id.* at 16:21-23. The ordinary meaning of "administration of justice" as a phrase, however, may be different than the meaning of its constituent words. *See Seefried*, 2022 WL 16528415, at *3 (citing, e.g., William Eskridge, *Interpreting Law* 62 (2016) (judges should follow ordinary meaning "when two words combine to produce a meaning that is not the mechanical composition of the two words separately")).

In reference to Black's Law Dictionary, and apparently to the definition therein of "due administration of justice" in Black's Law Dictionary, *supra*—"the proper functioning and integrity of a court or other tribunal in proceedings before it in accordance with the rights of the parties"—this Court admitted that "it's not entirely clear how that fits in this context" but thought that "a portion of [its] analysis in [*United States v. Montgomery*, No. 21-cr-00046, ECF No. 87 (Dec. 28, 2021)] supports the view that what was occurring before Congress and that was obstructed [sic] falls within that definition." *Miller* Sentencing Tr., at 17:10-13.

Mr. Cua respectfully disagrees with the Court's comments in *Miller*. First, Congress was not sitting as a court or tribunal. Black's Law Dictionary defines "tribunal" as "[a] court of justice or other adjudicatory body." Congress was not sitting as an adjudicatory body. Moreover, there were no "parties" to the proceedings before Congress, as mentioned in the definition of the "due administration of justice."

Finally, this Court in *Miller* reasoned that, because the entirety of part J of the Sentencing Guidelines "is offenses involving the administration of justice" "[a]nd given the fact that the Sentencing Commission concluded that [section 1512(c)] appropriately fell within part J, I think it's fair to read the phrase administration of justice for purposes of the enhancement broadly enough to cover the statutory provision that the sentencing commission decided to include in part J." *Id.* at 17:16-18:1. "But that does not mean that the three- and

eight-point enhancements apply to every situation in which the government charges §

1512(c)—only that they could apply at times." *Seefried*, 2022 WL 16528415, at *9.

There is also an application note following section 2J1.2, which defines "substantial

interference with the administration of justice," a phrase used in subsection 2J1.2(b)(2), as

including "a premature or improper termination of a felony investigation; an indictment,

verdict, or any judicial determination based upon perjury, false testimony, or other false

evidence; or the unnecessary expenditure of substantial government or court resources."[14]

U.S.S.C. § 2J1 n. 1. Mr. Cua expects the government to argue, as it has in other cases, that the

last part of the definition—"unnecessary expenditure of substantial government or court

resources"—encompasses the disruption of the certification proceedings. But "[i]f courts may

enhance an obstruction-related sentence by eleven levels any time the Government can show

that the offense caused unnecessary expenditure of its resources, 'substantial interference with

the administration of justice' could encompass just about anything. Indeed, the Government

could theoretically trigger the enhancements at will." *Seefried*, 2022 WL 16528415, at *8.

Read in context, this phrase most likely refers to prosecutorial resources.[15] *See id.* at *8-9.

In fact, the congressional proceedings occurring on January 6, 2021, had nothing to do

with the "administration of justice." Although admittedly in the context of the statute and not

---

[14] As *Seefried* explains, there is substantial debate regarding the level of deference, if any, a court should give to the Sentencing Commission's commentary. 2022 WL 16528415, at *7-8. As noted by Judge McFadden, "the D.C. Circuit has suggested that courts should eschew deference to the Commission where the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at *8.

[15] The "Background" comment to section 2J1.2 also supports a narrower definition of "administration of justice," listing offenses such as "using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations … [and] using intimidation or force to influence testimony [or] alter evidence[.]" *See Seefried*, 2022 WL 16528415, at *9.

the Guidelines, this Court—in rejecting the argument that section 1512 is limited to proceedings involving the administration of justice—has stated that the "administration of justice" "is not what Congress does." *United States v. Montgomery, et al.*, No. 21-cr-46 (RDM), ECF No. 87, at 14. The Court further explained: "Congress does not engage in adjudicative proceedings (or even quasi-adjudicative proceedings) or in the 'administration of justice.'"[16] *Id. See also id.* at 47 ("Because Congress's constitutionally assigned duties do not include the 'administration of justice,' it makes little sense to read into the word 'corruptly' a requirement that obstruction of a congressional proceeding involve a purpose wrongfully to impede the administration of justice."). Although the Court was addressing the meaning of the statute, the plain meaning is the plain meaning, whether in the statute or the Guidelines. To whipsaw a defendant with two such different definitions of "administration of justice" would be fundamentally unfair.

> b)    *An 8-point enhancement for the section 1512 offense under section 2J1.2(b)(1)(B) does not apply.*

The Guidelines calculation in the PSR adds an 8-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B), which applies where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." PSR, at 13. The PSR reasons that this enhancement applies because Bruno allegedly "shoved Officer G.L. at least once." The government argued in its letter to Probation that the alleged shove constitutes at the very least 'threatening to cause physical injury' to Officer G.L." Mar. 31, 2023 Letter, at 5. This enhancement should not be applied for at least three reasons.

---

[16] The Court identified two narrow exceptions to this statement: (1) "when it investigates and tries cases of impeachment"; and (2) "when it acts as a 'Judge of Elections, Returns and Qualifications of its own Members." *Id.* at 15.

Subsection 2J1.2(b)(1)(B) does not apply because Bruno did not threaten to cause physical injury to Officer G.L. As an initial matter, Bruno did not *threaten* Officer G.L. at all. Presumably what the Probation Office means to allege is that Bruno *attempted* to cause physical injury to Officer G.L.—which is also false, *see infra*—but the plain language of the enhancement does not apply to attempts to cause physical injury or even actions taken with an intent to cause physical injury. It applies only to actions actually inflicting physical injury or threats to inflict physical injury. Bruno did not injure Officer G.L. and did not threaten to cause physical injury to Officer G.L. There is nothing in the stipulation of facts (or in any other evidence provided to the defense or the Court) to support these allegations.

Even if section 2J1.2(b)(1)(B) could be interpreted to include attempts or intentions to inflict physical injury, Mr. Cua's actions do not reflect either an attempt or an intent to cause physical injury to Officer G.L. The Guidelines define the similar term "bodily injury" to mean "any significant injury; e.g., an injury that is painful and obvious or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1 n. 1(B). No reasonable interpretation of Mr. Cua's actions includes an attempt by him to physically injure Officer G.L. Even if it is assumed that Mr. Cua—who weighs only 150 pounds—committed a single shove of Officer G.L. Indeed, it was plainly just an attempt to get to the door. And indeed, despite holding a baton, Mr. Cua never used it (or threatened to use it) against Officer G.L.

        c)      *A 3-level enhancement for the Section 1512 offense under section 2J1.2(b)(2) does not apply.*

The PSR also proposes a 3-level enhancement under U.S.S.G. § 2J1.2(b)(2), which applies where "the offense resulted in substantial interference with the administration of justice." Even if the congressional proceedings on January 6 could somehow be interpreted as involving the administration of justice, Bruno's actions by themselves—apart from the actions

of others—could not be seen as resulting in *substantial* interference. Mr. Cua entered the Capitol long after the proceedings had been interrupted and stayed in the Capitol for only 17 minutes, from approximately 2:36 p.m. until 2:53 p.m., when numerous others were in the Capitol. His sentence should not be enhanced based on the actions of others.

> **2.    The offense level for Count Two should be reduced by three levels under section 2X1.1 because Mr. Cua's conduct constitutes an attempt.**

The evacuation of the House began at approximately 2:13 p.m. with Nancy Pelosi being escorted from the dais. It was at that point that the congressional proceedings were disrupted. Mr. Cua did not enter the Capitol until approximately 2:36 p.m. Thus, even if he intended to disrupt the proceedings, he was too late to do so. His conduct is accordingly an attempt, and not a completed offense.

> **3.    The Court Should Grant Downward Departures Pursuant to Sections 5H1.1 and 5H1.3 of the Sentencing Guidelines.**

> **a)    Departure Under Section 5H1.1**

In addition, even if the Court were to vary downward to account for … , it should depart further downward from that lower range in Mr. Cua's case by granting a departure pursuant to USSG §§ 5H1.1 (Age) due to Mr. Cua's extreme youth (age 18) at the time of the offense. "Congress . . . has allowed district courts to depart from the Guidelines to reflect 'mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines.'" *United States v. Leandre*, 132 F.3d 796, 800 (D.C. Cir. 1998).

As noted, Bruno was eighteen years old on January 6, 2021. He appears to be the youngest defendant charged in connection with the January 6 riot. He is the oldest of three

children who all live at home with their parents. He has never lived independently from his parents. Bruno was still a high school student when he committed his offenses.

The government has recognized in its policies that factors such as Bruno's youth should be considered as part of its prosecutorial decision-making:

> In some cases, the personal circumstances of an accused may be relevant in determining whether to prosecute or take other action. Some circumstances particular to the accused, such as extreme youth, advanced age, or mental or physical impairment, may suggest that prosecution is not the most appropriate response to his/her offense.

Department of Justice Manual, 9-27.230.5 That factor weighs heavily here.

It is now well accepted that the prefrontal cortex of the brain, the part that controls judgment and impulsivity, does not fully develop until a person's twenties. A. Ortiz, *Cruel and Unusual Punishment: The Juvenile Death Penalty, Adolescence, Brain Development and Legal Culpability*, 1-2 (2004) (published by the American Bar Association).[17] One scientific report in 2013 states that development of the prefrontal cortex is not complete until age twenty-five. M. Arain, et al., "Maturation of the Adolescent Brain," *Neuropsychiatric Disease and Treatment*, 459 (2013).[18] As a result, "[a]dolescents often rely on emotional parts of the brain, rather than the frontal lobe." Ortiz, at 2. "Mass media, community, and adult role models can [also] influence adolescent risk-taking behaviors." In addition, male adolescent bodies are flooded with testosterone, which further increases emotional volatility and impulsivity. Arain, at 455. As a result, Mr. Cua is less morally culpable than an older adult who commits the same offenses or engages in type of rhetoric in the direct messages presented by the government.

---

[17] Available at https://www.publiccounsel.net/ya/wp-content/uploads/sites/6/2014/08/ABAArticle.pdf.

[18] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/pdf/ndt-9-449.pdf.

Given his ongoing development, he is also more capable of change and rehabilitation, including as a result of experiences like his arrest and incarceration to date.

In the *Miller* case, this Court recognized the relevance of a defendant's youth:

> But just the truth of the matter, though, is that somebody who is 22 is more capable of doing something that is just – I'm trying to choose my words carefully here, but dumb and highly regrettable; and just really doing something that they, one would hope, will look back on later in life and say that was one of the stupidest things I've ever done. Whereas it's harder to say that of somebody who is 40.

> … I'm dealing with somebody here who is younger than most of the defendants in these cases; was perhaps more impressionable; was more prone to getting carried away by rhetoric, false statements, the emotions of a crowd who was around him, and too many cans of beer beforehand.

Tr. at 29:14-30:6.

The Court followed up saying:

> [I]t does strike me that his relatively young age compared to the others involved in this is one factor that I need to take into consideration that may suggest to me that there may be reasons why the guidelines – or why a variance would be appropriate in his case because of his age and perhaps because of the drinking.

Tr. at 33:16-21.

Mr. Cua meets the criteria for a departure under U.S.S.G. § 5H1.1, which would specifically allow for the type of sentence that Mr. Cua is requesting. Section 5H1.1 provides: "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1 ¶ 1.

As reviewed, Mr. Cua has submitted to a psychological evaluation in this case by Dr. Murrie. Relevant to the Court's determination as to whether a departure under Section 5H1.1 is

appropriate, Dr. Murrie explains the science-based reasoning for considering age as a factor in

its charging decisions and sentencing:

> Developmental immaturity is a hallmark feature of adolescence, the period of
> rapid growth and maturation that spans from puberty through the early twenties,
> which is when neuroscientific research suggests that brain development—
> particularly the frontal regions responsible for planning and impulse control—
> tends to reach maturation. In short, a robust body of research demonstrates that,
> compared to adults, adolescents demonstrate much greater impulsivity, the
> tendency toward quick, unplanned reactions to events without considering
> negative consequences.

Ex. 1 at 18. Dr. Murrie's description reflects precisely what happened to Bruno on January 6,

2021.

> Many of Mr. Cua's actions on January 6 were impulsive, shortsighted, and
> occurred in the context of others (indeed, a large crowd… ). This is also consistent
> with hallmark qualities of adolescent judgment. Adolescent's (sic) reduced
> independent functioning is reflected in vulnerability to peer influence. Not
> surprisingly, research shows that a great deal of adolescent risk-taking occurs in
> the presence of peers….
>
> Developmental immaturity is one of the features that helps explain the poor risk-
> versus-reward calculus underlying Mr. Cua's (and many adolescent's) impulsive
> and provocative social media posts. Indeed, neuroscientific documents the ways
> in which online communication—particularly social media—elicits impulsive
> communications from users pursuing the "reward" of rapid feedback.
> Developmental immaturity also helps explain Mr. Cua's quick transition from
> attending a political rally with parents to impulsively—and with little
> appreciation of consequences—joining a crowd that illegally entered the Capitol.

Ex. 1 at 19.

As former FBI agent Greg Rice writes in support of Bruno: "I am not nor ever have

been easily fooled by any defendant in a criminal case." Ex. 21 at 2. Nevertheless, Mr. Rice

concludes that Bruno "got caught up in the crowd mentality" and his "true moral identity

disappeared in such a large crowd full of adults." *Id.* "His choices and the influences of others

resulted in his running into the Capitol, following adults twice his age." *Id.* Mr. Rice continues:

"Given the circumstances, the highly emotional surroundings at the Capitol, his age at the time

(18), and his lack of maturity, I am not sure he could have fully understood the significance of what he was doing at the time." *Id.* Speaking of raising a teenage boy himself, Mr. Rice relates: "Put another way, these are the things that sometimes beguile[] 18-year-old boys whose hearts are sometimes bigger than their brains." *Id.*

> b) *Departure under 5H1.3*

The Court may also depart downward based on section 5H1.3, which provides: "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Dr. Murrie has provided a basis for such a departure. Specifically, he explains the impact of crowd dynamics, which is essentially a type of altered thinking when in the company of large groups like the one present at the Capitol on January 6. As Dr. Murrie explained in his report:

> [A]dolescent risk-taking is heightened in the presence of others, but it is not only adolescents who are influenced by large groups. Social science research has long documented the ways in which crowds—whether in sporting events, riots, mobs, or other large group contexts—tend to foster poorer behavior than individuals would demonstrate independently. In short, scholars have identified several features of crowds that contribute to shared negative or risky behaviors. These include:
>
> - Contagion, the tendency for people to repeat the behavior of others around them.
>
> - Anonymity, the tendency to feel "lost in a crowd," or so similar as to be an unidentifiable unit of the broader group.
>
> - Universality, a sense of shared beliefs and values, particularly a sense that "everyone else is doing it."
>
> - Convergence, the sense that the large group is driven by the same broad goal (even if actual goals or reasons for the shared behavior differ substantially).

Ex. 1 at 20. Dr. Murrie observes that these "dynamics of large crowds were evident in many of the events at the Capitol on January 6; they were not unique to Mr. Cua, of course. But these dynamics were also evident in Mr. Cua's descriptions of his own behavior." Indeed, Dr. Murrie opined that "these dynamics may have been more powerful in the context of [Bruno's] developmental immaturity and adolescent judgment." *Id.*

### F.  The Need to Provide Restitution

Mr. Cua did not personally damage any property or cause any losses. In other cases, the Court has been requiring restitution of $2,000. Mr. Cua has no objection to restitution in that amount, although he reserves the ability to object to an amount higher than $2,000 if the government requests it.

## III.  FINANCIAL ABILITY TO PAY A FINE

Mr. Cua submits that she has demonstrated an inability to pay a fine. Although the Probation Office stated that Mr. Cua has the ability to pay a fine, that appears to have been based on that Mr. Cua's parents raised on GiveSendGo to help pay for the cost of Bruno's legal defense. *See* PSR, at 18 ¶ 99. As defense counsel informed the Probation Office, that money was paid to counsel.

## IV.  CONCLUSION

At the time of Mr. Cua's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101. This bedrock principle of sentencing law cannot be fulfilled in Mr. Cua's case if he is sentenced within or near the proposed by the Guidelines sentence range. Rather, as demonstrated above, a sentence of supervised release with community service and a significant period of home detention is more appropriate in this case.

Respectfully submitted,

DATED:  May 5, 2023

*/s/ William E. Zapf*
William E. Zapf (D.C. Bar No. 987213)
Jonathan Jeffress (D.C. Bar No. 479074)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
wzapf@kaiserdillon.com

*Attorneys for Bruno Joseph Cua*

65