**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIM NO. 21–CR–00107-RDM** |
| | ) | |
| **BRUNO JOSEPH CUA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT BRUNO JOSEPH CUA'S RESPONSE TO THE GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND SUPPLMENTAL INFORMATION

The defendant, Mr. Bruno Cua, respectfully submits this response to the government's Memorandum In Aid of Sentencing (ECF No. 328) and the final Presentence Investigation Report (ECF No. 326) ("PSR"), both of which were submitted on May 5, 2023, the same day on which Mr. Cua submitted his sentencing memorandum.

The government's memorandum is largely detached from the reality of this case. In an effort to force this sentencing into a category of J6 cases it does not belong, the government has distorted the underlying facts, exaggerated Mr. Cua's role in the events of that day, and attempted to transform fairly mundane actions that caused no physical damage or harm (e.g., "running," "rushing," "knocking," "sitting"), into violent acts deserving of many life-ruining years in prison that will serve no good purpose. For all of the government's exaggerated and hyperbolic descriptions, the real-world *physical* impact of Mr. Cua's conduct, including property damage (of which he caused none), consists of his brief exchange with Officer G.L. as Mr. Cua attempted to get past him.

Mr. Cua recognizes that his words and his presence in the Capitol that day were, when combined with the actions of many others, extremely harmful to the institutions of our

government. He is profoundly remorseful for that and for what he and the mob of others put Officer G.L. through. He fully recognizes the seriousness of his actions. But the government's extreme request of nearly five years in prison, at the very top of an artificially inflated and inappropriate Guidelines range, and for acts committed by an 18-year-old kid, is wrong. Indeed, such a sentence would undermine, not promote, the fairness and compassion that makes this nation's institutions great in the first place.

Critical to seeing through the government's false narrative of Mr. Cua's conduct is the difference between posts on the internet, on the one hand, and *real-world, concrete* planning and preparation for the events of January 6, on the other. Mr. Cua engaged in the former, which he deeply regrets and understands was wrong. In contrast to many J6 defendants, however, there is no evidence he engaged in the latter. Mr. Cua's father has stated now several times in this case, including in his most recent letter to the Court at Exhibit 25 of Mr. Cua's sentencing memorandum, that he insisted on Bruno carrying pepper spray and a baton for self-defense purposes and that *Bruno did not want to carry them*. To be clear, Mr. Cua did carry them, but he did not acquire them in advance or bring them to D.C. with the intent to use them that day. Mr. Cua should not be punished for the influence and acts of his well-intentioned but misguided father. And Mr. Cua's failure actually to use either of these items against anyone, of course, further supports this view. Indeed, more physical violence was visited upon Mr. Cua while incarcerated in this case at an Oklahoma jail than he visited upon anyone on January 6.

The same cannot be said of any case the government offers in comparison. The government attempts to lump Mr. Cua in with three men in particular—Josiah Colt, Joshua DeGraves, and Ronald Sandlin—who, while in close physical proximity to Mr. Cua during much of his time inside the Capitol, could not be more different in terms of culpability. In

particular, Colt, DeGraves, and Sandlin are much older than Mr. Cua, and they engaged in extensive group planning and preparation with one another for violence on January 6. They brought guns, ammunition, knives, bear spray, batons, body armor, helmets, a taser—a virtual arsenal—to Washington, D.C. In contrast to Mr. Cua, Mr. Colt and Mr. DeGraves were equipped for all-out warfare the morning of January 6.

Mr. Cua has identified a substantial number of cases in his sentencing memorandum that are more appropriate comparisons. But even most of those defendants are much older men who "should have known better" than Mr. Cua. As discussed below, Matthew Wood is the most comparable of those cases simply due to Mr. Wood's age (23 years old at the time of the offense) and the real-world impact of his actions. Mr. Wood was given 12 months of home confinement in a case in which the government also requested 57 months incarceration. That same punishment is appropriate here.

Finally, the government's assertion that youth is the only mitigating factor here—a factor it nevertheless gives short shrift and proposes zero sentencing credit for—is obviously incorrect. The Probation Office takes the same incorrect position. While Mr. Cua's tender age at the time of the offense conduct does make this case importantly different, there are many other mitigating factors the government simply ignores because they defy its shallow narrative. Those include (1) the role of Mr. Cua's parents in his political views and decision-making with respect to January 6; (2) Mr. Cua's 40 days in various jails, where he was subject to isolation (for 32 of them) and then violently assaulted by an older, menacing inmate, as well as infected with COVID-19, when he was admitted to the general population; (3) the symptoms of Post-Traumatic Stress Disorder ("PTSD") from his imprisonment that Mr. Cua continues to suffer from to this day; and (4) Mr. Cua's fulfillment of his solemn promise to this Court to abide by

highly restrictive conditions of pretrial supervision—a promise he has kept 100% for nearly 2.5 years of close supervision.

That the government needs to distort the facts and discount (or outright ignore) the abundant mitigating evidence underscores a fundamental truth about this case: it is much different than the mine run of J6 cases and should be treated differently. The government does none of us any good, including the Court, by pretending otherwise, and only undermines its credibility. Mr. Cua has paid—and will continue for the rest of his life to pay—a severe price for his words surrounding, and his actions on, January 6. That price is more than sufficient punishment.

## DISCUSSION

## I.     THE GOVERNMENT DISTORTS THE FACTS.

The government's factual recitation—which goes well beyond the facts Mr. Cua stipulated to—is both inaccurate and inflammatory. As an initial matter, the government falsely equates online activity with actual planning and preparations for the events of January 6. *See, e.g.*, ECF No. 328 at 27 ("Cua planned his actions on January 6 weeks in advance."). This is not unintentional: the government knows what real planning and preparations for the violence of January 6 look like, and that those kinds of planning and preparations are not seen here. Such planning and preparations do not include traveling to the rally with one's parents, for example. Nor do they include preparing and bringing an 800-square-foot flag on a giant flagpole in the back of a pick-up truck, strapped down with tarps, *See* Exhibits GX903A, GX903B & GX903C, which shows convincingly that, despite his bold talk on social media, Mr. Cua's primary motivation here for traveling to D.C. with his parents was to find a place to park his truck and garner social media attention for his flag, a factor the government (like all

other mitigating factors) simply ignores.[1] He would not have gone through the such a hassle if his real plan was to attack the Capitol when he traveled to Washington.

The government argues that a top-of-the-Guidelines sentence is warranted based on Mr. Cua's "encouragement and direction of other rioters." Gov't Mem. at 2. But Mr. Cua was plainly a follower that day, not a leader. The most the government can point to in this regard is Mr. Cua's quaint cheerleading on the stairs to the Rotunda, shouting: "Let's go! Good job guys!" ECF NO. 328 at 10. Meanwhile, hundreds of protesters were already in the Capitol and had filled the Rotunda by the time Mr. Cua entered the building. Mr. Cua's youthful exuberance may have catapulted him up the stairs, but he was following the crowd into the Capitol and, importantly, no one was taking directions from teenage Bruno Cua.

The government likewise distorts how Mr. Cua made it to the Senate floor, a fact that appears to be the main driver of its extreme sentencing request.[2] He *followed* a stream of people to the Upper West Terrace Doors. He *followed* a stream of people up the stairs near the Rotunda doors that eventually led to the Senate Gallery. He *followed* a stream of people down the hallway to the Senate Gallery. There is no evidence that Mr. Cua knew where he was going—none. And he attempted to stop Officer G.L. and others from locking the doors to the

---

[1] Mr. Cua explained this in great detail to the government when he debriefed with the previously-assigned prosecutors and the FBI on June 9, 2021, less than three months after he was released. Furthermore, to the extent there is any doubt about this, the defense urges the Court to watch Exhibits GX903A, GX903B & GX903C. These videos—taken on January 5— are characteristic of Bruno Cua's true (and lifelong) interests of construction and design; not politics.

[2] The government's charging decisions and plea offers in the J6 cases reflect a clear delineation between those people who entered the Senate Chamber and those who did not, with those in the former group being charged with a 20-year felony under section 1512(c)(2), while others who spent more time in the Capitol and were arguably more disruptive to vote certification due to that time spent in the Capitol were either charged with less serious offenses or permitted to plead to less serious offenses, including misdemeanors.

Senate Gallery when Ronald Sandlin yelled for him and others not to let them lock the doors. He then *followed* Josiah Colt down to the floor of the Senate. At every turn, Mr. Cua was following much older people deeper and deeper into the Capitol, and deeper and deeper into trouble. Notwithstanding access to Mr. Cua's electronic communications, there is no evidence Mr. Cua consulted a map or the Capitol of anything else. Instead, it was sheer fortuity that Mr. Cua ended up in the Senate; dumb "luck" that, while the government has used it to seek greater punishment of Mr. Cua, should not be used as a measure of his culpability.

It is notable that the very first thing the government focuses on in its memorandum is a post on social media, not on January 6, 2021, but four days prior on January 2. That is because the words Mr. Cua wrote on social media—as opposed to the actions he took in the real world on January 6—are the worst thing he did. But in reality, this young teenager was caught in the echo chamber of extreme language that was bouncing throughout the internet at that time, sometimes stealing statements from others, sometimes inspired by others to be extreme, including the leaders of our country at that time. Mr. Cua immediately took responsibility for the things he said on social media at the very beginning of this case, in a letter directly to the Court. *See* ECF No. 17-1. He is ashamed of those things. But they are not a reason to send a young man to prison, a drastic step that—and the Court should have no illusions about this— could well ruin the remainder of his life.

## II.    THE GOVERNMENT'S CASE COMPARISONS ARE DEEPLY FLAWED.

The government's case comparisons are an obvious and strained effort to shoehorn this case into a category of J6 cases in which it simply does not belong. The government argues that "Cua's conduct is most closely comparable to that of Ronald Sandlin (21-CR-88 (DLF)), Nathaniel DeGrave (21-CR-88 (DLF)), and Josiah Colt (21-CR-74 (DLF))," ECF No. 328 at 37, essentially because they took the same physical path into and through the Capitol and were

involved in the confrontation of the officers at the Senate Gallery doors. *See id.* ("All three defendants also entered through the Upper West Terrace Doors, confronted the USCP officers who were attempting to lock the Senate Gallery doors, and in Colt's case, jumped from the Senate Gallery to the Senate Floor.").[3] Under the actual facts of those cases, this comparison is truly outlandish.

As an initial matter, these three defendants were much older than Bruno. Josiah Colt was approximately 34 years old at the time of the offense, Nathaniel DeGrave was 31, and Ronald Sandlin was 34.[4] They most definitely were *not* adolescents. Messrs. Colt and Sandlin were nearly twice Mr. Cua's age. They did not travel to D.C. with their parents. They were not coming to fly a gigantic flag at the rally. They certainly did not need permission from their parents to travel to D.C. They planned their trip to D.C. together, met up in Nashville from different points in the United States, paid for flights, rented a car, and stayed in a hotel.

The government states in its memorandum in this case that "Sandlin, DeGrave, and Colt were acquainted with each other via social media before January 6, 2021. They planned to meet in Washington, D.C. for the rally." Govt. Mem. at 37. In fact, they never attended the rally. In contrast to the government's whitewashed description of their conduct in its sentencing memorandum filed here, its description in its sentencing memorandum for Josiah Colt differs greatly in tone and adds significant details that foil any comparability argument:

---

[3] *See also id.* ("Cua entered the Capitol via the Upper West Terrace Doors just minutes before Sandlin, DeGrave, and Colt. They followed the same route through the Capitol – from the Upper West Terrace Doors up to the Rotunda, up the stairs to the third floor, through the hallway outside the Senate Gallery, into the Senate Gallery, and ultimately, Colt and Cua jumped onto the Senate Floor.").

[4] This information was taken from the database of January 6 defendants published at https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories. The government states that they were "all in their 30s on January 6, 2021." ECF No. 28 at 37.

Colt and his co-conspirators traveled to Washington, D.C. to attend the "Stop the Steal" rally with the expectation that there would be violence—specifically, a 'civil war.' … In the days leading up to January 6, 2021, Colt coordinated with his co-conspirators to bring a car full of weapons and protective gear—including gas masks, bear spray, knives, and Colt's Glock .43 pistol—to D.C.

*United States v. Colt*, 1:21-cr-00074-DLF, ECF No. 41 ("*Colt* Memo"), at 2.[5]

To drive this image home, here is a picture of Colt and DeGrave as they approach the

Capitol:



The government states in Colt's memorandum that the trio planned to interfere with the

transition of power "weeks in advance." *Id.* at 3. "Beginning on December 31, 2020, Colt,

DeGrave, and Sandlin began a private group chat on Facebook in which they discussed

'shipping guns' to Sandlin's residence in Tennessee, where they would all meet before driving

to D.C." *Id.* at 5. Colt, however, said he would "try to fly with his 'G43,' referring to his Glock

.43 caliber pistol." *Id.* "They purchased weapons and paramilitary gear on Amazon.com to take

to the Capitol." The government described Colt's preparations as "a man girding for battle." *Id.*

at 19. This is where the distinction between planning and preparation, on the one hand, and

---

[5] Mr. Colt took his Glock pistol to a rally in D.C. on the evening of January 5, 2021, but left it in his hotel room the next morning. *Id.* at 2.

being a "keyboard warrior" making statements on social media about the certification, on the other, differ and become critical. Bruno did nothing remotely like this.

Below is a screenshot of Mr. Colt's Amazon.com "shopping cart" he shared on social media:



*Colt* Memo, at 6. It includes ballistic "shooting glasses" to protect his eyes while firing a gun, a gun holster, a tactical helmet, and a gas mask.

In his preparations for January 6, DeGrave sought recommendations from his social network on "personalized [firearms] training" from "somebody special forces or ex fbi." *United States v. DeGrave*, 21-cr-00088-DLF, ECF No. 144 ("*DeGrave* Memo"), at 2. On

December 31, 2020, he asked on FaceBook: "Who can shoot and has excellent aim and can teach me today or tomorrow." *Id.* at 5-6.

In its memoranda for Colt and DeGrave, the government listed the following weapons and other items the three brought in a rental car from Tennessee to D.C.:

- Colt's Glock .43 pistol,

- Sandlin's M&P bodyguard pocket pistol,

- two magazines of ammunition,

- two cans of bear mace (one purchased by Colt),

- gas masks,

- a handheld taser/stun gun (brought by Colt),

- a slingshot,

- military-style vests/body armor,

- two helmets,

- an expandable baton (brought by Colt),

- walkie talkies (brought by Colt), and

- several knives.

*Colt* Memo, at 7; *DeGrave* Memo, at 7. Mr. Cua brought no guns, no ammunition, knives, no gas masks, no bear mace, no tasers, no body armor, no helmet. His father insisted that he carry the pepper spray and baton. This is one of many places where the difference between "talk" and "action" is apparent.

Colt, DeGrave, and Sandlin also rented a hotel room. Mr. Sandlin posted a picture of Mr. Colt sleeping in the room while holding his pistol, stating that he was "ready for the boogaloo Jan 6," while Mr. Colt responded that he was "ready for any battle":[6]



*Colt* Memo at 7.

On the morning of January 6, as the three prepared to leave the hotel, Colt recorded a video discussing "a debate we've been having for days now: should we carry our guns or not?" *Id.* at 7-8. Complaining that carrying a gun in D.C. is a felony that could get you "five years potentially in prison," they decided to leave the guns at the hotel room. *Id.* at 8. But Colt and Sandlin carried knives and DeGrave carried bear spray to the rally.

---

[6] The Anti-Defamation League describes the term "boogaloo" as "a slang reference to a future civil war." *See* https://www.adl.org/resources/backgrounder/boogaloo-movement

The three watched President Trump's speech from a restaurant in Alexandria. *Id.* There, after the speech ended, Sandlin said in a live-streamed video, "no less than four times, 'freedom is paid for with blood.'" *Id.* Sandlin also predicted there was "going to be violence" at the rally and "urge[d] other patriots" to "take the Capitol." *Id.* He added that he was "willing to go and fight for this country … even if that means I have to sacrifice in some capacity." *Id.* Ominously, Sandlin stated on camera: "one o'clock is when it is all going to go down. So we are going to be there back by one o'clock when it is action time it is game time." *Id.* at 9. In contrast, Mr. Cua was having breakfast with his parents, who never had the slightest intentions for themselves or their young son to enter the Capitol that day.

As the three men approached the Capitol building itself—which presumably was at about the same time Mr. Cua was walking over with his mother and father—DeGrave recorded a video in which he stated:

> They just breached the Capitol building. That's it, bro. It's game time. We all armored up, we got a gas mask. This is what separates us true patriots from everyone else who is all talk—you know, fuck this, fuck that, setting at home, we out here taking action. It's Dr. Death in the building [referring to himself in his all-black full body armor] and it's about to go down.

DeGrave Memo, at 2. There is no evidence Mr. Cua said anything like this.

In the government's *Colt* memorandum, the government described that Colt "rallied his co-conspirators and others to find 'the Senate room … where they're meeting.'" *Id.* at 2. The trio "scaled a dismantled bike barricade to get over a stone barrier and move closer to the Capitol." *DeGrave* Memo, at 10. "As he ascended the stairs next to the scaffolding, Colt told Sandlin and DeGrave: "we're making it to the main room. The Senate room." *Colt* Memo, at 10. As they were about to go in, Colt added: "we're gonna get tear gassed but we're fucking ready. Let's do this shit." *Id.* at 10-11. In contrast, there is no evidence that Mr. Cua intended

to go to the Senate before he entered the Capitol, or even knew he was going there when he was on his way.

Once inside, the three moved to the East Rotunda doors inside where "twenty to thirty other individuals were encircling" three USCP officers standing guard to keep people on the outside from beaching them. "DeGrave and Sandlin [] began shoving the officers to force the door behind them open," with DeGrave shouting "get the fuck through" and "kick it the fuck open," while Sandlin tried to rip the helmet off an officer. *DeGrave* Memo, at 11. One officer in the assault was "pinned and crushed" while another was pepper sprayed by rioters, a much more violent interaction than the one outside the Senate Gallery doors. *Id.* As Colt ascended the stairs near the East Rotunda doors, Colt shouted, "follow me upstairs!" Colt then set off in his pre-planned search for the "Senate … where they're meeting." *Id.* at 11. So, not only did DeGrave and Sandlin assault officers outside the Senate Gallery doors; they did so much more violently near the Rotunda doors as well and continued undeterred.

Once the trio made their way to the hallway outside the Senate Gallery doors and saw officers attempting to lock the doors, Sandlin shouted, "don't you lock another door," urging others to "grab the door." *DeGrave* Memo, at 12. Both Sandlin and DeGrave then fought with the officers. DeGrave "directly assaulted at least two U.S. Capitol Police … officers—notably after pulling down his face mask to shield his identity—and abetted the assaults of four others." *Id.*, at 3. Sandlin, whom the government characterized as leading the charge and "instigat[ing] the assault" on the officers, "engaged in a shoving match with the officers …, striking Officer N.T.'s head in the process." *United States v. Sandlin*, 1:21-cr-00088-DLF, ECF No. 92, at 15. Later, DeGrave bragged to Colt about punching the officers: "I punched this guy, like, five times," adding, "he didn't see my face, though." *DeGrave* Memo, at 3.

The government states in its *Colt* memorandum that, once Colt was inside the Senate, his "next goal was to breach the Senate floor itself." While discussing how to get down to the floor, "Colt and DeGrave then made their way around the balcony looking for a spot to jump down." *Id.* Shortly thereafter, Colt lowered himself down and jumped to the floor as shown in the now-viral photo that was splashed across newspapers the next day:



After Colt jumped down, DeGrave yelled, "sit in Pelosi's seat, that's your fucking seat now." *DeGrave* Memo, at 13. DeGrave also shouted down to open the doors and to "take laptops, paperwork, take everything, all that shit."[7] DeGrave Memo, at 3.

---

[7] Later, after two separate assaults on officers, Mr. Sandlin put an exclamation point on his conduct by smoking a marijuana joint in the Rotunda while celebrating making "history," stealing a book from an office, and even starting to steal an oil painting before other rioters stopped him. *Sandlin* Memo, at 16.

The government also repeatedly accuses Bruno of opening the doors to the Senate chamber to allow other rioters to enter, but in its sentencing memorandum in Mr. Colt's case, it accuses Mr. Colt of doing so:

> On January 6, 2021, with knives and bear mace in tow, Colt single-mindedly sought out 'the Senate … where they're meeting' as part of a mob bent on obstructing the Electoral College vote certification and was the first to breach the Senate floor, opening the doors so other rioters could as well.

*Id.* at 3. *See also id.* at 2-3 ("He … ran to the seat occupied only moments before by the Vice President and gave a political statement before opening a door and allowing dozens more rioters to breach the Senate floor.").

After the riot, "DeGrave attempted to capitalize on his crime by selling his co-conspirators' footage to media outlets." *DeGrave* Memo, at 3. He also raised over $120,000 on a crowd-funding website by claiming he is a "political prisoner" of a "corrupt Biden regime" in "America's Gitmo." *DeGrave* Memo, at 3, 15. After he was arrested, DeGrave "proceeded to lie to the FBI." *Id.*, at 14-15. He told them, "I was not inside the Capitol" the day of the riot." *Id.* at 15. He even "denied being captured on security camera footage alongside Sandlin and Colt inside the Capitol, stating that 'that's completely shocking to me. I though (sic) the only reason I was here is because I was letting Ronny stay with me.'" *Id.*

In October 2021, the press published an interview with DeGrave in which he stated: "[w]e're not violent people" and that "there is no evidence of him pushing any law enforcement officer and that rather than taking part in the insurrection, he said his actions show he was shooting a documentary."[8] He also claimed in the interview that he was wearing a

---

[8] *See* David Charns, "Man Jailed in US Capitol riot may run for mayor of Las Vegas," *available at* https://www.abc27.com/national/man-jailed-in-us-capitol-riot-may-run-for-mayor-of-las-vegas/. The same interview is discussed by the government in its sentencing memorandum for DeGrave. *See* DeGrave Memo, at 20-21.

"motorcycle jacket," not tactical gear. *Id.* He also claimed: "I was unarmed inside the Capitol," *id.*, even though the evidence showed he was carrying bear spray. Finally, this CEO of a "celebrity planner and adult model management company" stated he was considering cashing in his fame and running for mayor of Las Vegas.[9]

The Probation Office calculated Josiah Colt's total offense level as a 27 based on his conviction for violating section 1512(c)(2), which included the 8- and 3-level enhancements the Probation Office suggests for Mr. Cua, along with a two-level enhancement for extensive scope, planning, and preparation. *United States v. Colt*, 1:21-cr-00074-DLF, ECF No. 41, at 16. After deducting three levels for acceptance of responsibility, Mr. Colt's Guidelines range was 51 to 63 months. The moved for a 9-level downward departure for Mr. Colt's cooperation, lowering his range to 18-24 months. *See Colt* Memo, at 17. The government argued for a sentence at the lower end of that Guidelines range, 18 months. *Id.* On May 10, the Court sentenced Colt to 15 months, below the government's requested sentence.

The government credited Colt with securing the guilty pleas of his two co-conspirators. It is difficult to imagine, however, how Colt's cooperation could have been particularly valuable to securing guilty pleas of his co-conspirators, much less worth a 9-level departure, given that both Sandlin and Colt filmed their own movements and conduct throughout the Capitol—i.e., it was all on tape. These are the same videos that the government has used against Bruno. *Id.* at 23. The government also attempts to justify its 18-month sentencing recommendation for Colt by recognizing that he was "among the first defendants to plead guilty to violating 18 U.S.C. § 1512(c)(2) and was the very first cooperator to plead guilty in

---

[9] DeGrave also had two GPS monitoring violations while on pretrial release, taking time to go to a pool twice and to a gym with a female companion while his device had connectivity issues. DeGrave Memo, at 19.

the January 6 investigation." Of course, Mr. Colt's picture was splashed across the front page of nearly every newspaper in the country. He was aware he was wanted and probably knew his capture was inevitable.

For DeGrave, the government requested 37 months' imprisonment, arguing that he "provided helpful, actionable information," and "help[ed] secure the guilty plea of his co-defendant Ronald Sandlin." *DeGrave* Memo, at 3. The government submitted that DeGrave's Guidelines range was 63-78 months, which included a two-level enhancement for extensive planning or preparation and two levels for obstruction under section 3C1.1. The government sought a five-level departure for his cooperation. Again, it is unclear how Mr. DeGrave's cooperation made any meaningful difference to its case against Mr. Sandlin, especially considering that Mr. Colt was already cooperating. The Court sentenced Mr. DeGrave to 37 months, as the government requested.

Mr. Cua too sat for a debrief session on June 9, 2021, four months after he was arrested and less than three months after he was released. He answered all of the government's questions truthfully and completely. The government has never alleged otherwise. Unfortunately for Mr. Cua, he did not have two co-conspirators with whom he had engaged in long-term planning and preparations to assault the Capitol and drove with in a car full of weapons and against whom he could offer to testify. Nevertheless, despite this full cooperation, Mr. Cua was never offered a plea deal to anything other than the most serious charges for violating section 1512(c)(2) and 111(a). And he certainly was never offered a 9-level departure like Mr. Colt. Indeed, the government has given zero credit for his proffer, denying him even the third point for acceptance of responsibility.

Moreover, the government faults Mr. Cua for not entering into an agreement to avoid trial soon enough. *See, e.g.*, ECF No. 328., at 23 n.5. Again, Mr. Cua admitted to his actions in a government proffer truthfully and completely as early as possible after his arrest—on June 9, 2021. There has been no allegation from the government that Mr. Cua did anything but tell the truth that day. Moreover, this case, and particularly the charges for violating section 1512(c)(2) and 111(a), present novel legal issues. Mr. Cua offered to plead guilty to another felony many months prior to his conviction. In the case of section 1512(c)(2), charging defendants who obstructed a congressional proceeding was a novel application of the statute that had never been done in this situation. The result has been a split among judges on this Court and a fractured Circuit Court opinion. *See United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023). With respect to section 111(a), the parties and the Court wrestled through thorny legal issues for hours over several hearings that involved a circuit split concerning the elements of section 111(a) and the definition of assault, for which there were at least three different options on the table, all to be applied to what could be characterized, at worst, as an extremely minor assault as compared to many other J6 defendants. Mr. Cua should not be penalized for exercising his legal rights when facing such a novel legal landscape.

## III.   THE GOVERNMENT'S DELIBERATE INDIFFERENCE TO THE MITIGATING FACTORS IS BOTH UNHELPFUL AND TELLING.

The government simply ignores (or else complete discounts) the abundant mitigating evidence in this case.

### A.   Mr. Cua's youth is a strong mitigating factor and sound basis for a substantial variance or departure.

Both the government and the Probation Office have argued that a downward variance or a downward departure under section 5H1.1 is not justified.

     **1.**     ***The Probation Office's Incorrect Position on Mr. Cua's Youth as a Mitigating Factor***

The Probation Office suggests that "a downward departure under section §5H1.1 (sic) is not warranted" because Bruno "was 19 years old when he committed the instant offense, and not an adolescent." PSR, at 30. First, the PSR is incorrect—Bruno was 18 at the time of the offense. His date of birth is on page 3 of the PSR. Second, the PSR is incorrect that Bruno is not an adolescent. Even a 19-year-old is an adolescent. Dr. Murrie describes adolescence as "the period of rapid growth and maturation that spans from puberty through the early twenties…." *See* Def.'s Sentencing Mem., Ex. 1 (Dr. Murrie's Report) at 18, 19 & 20.[10] The American Psychological Association defines "adolescence" as extending to at least age 20:

> the period of human development that starts with puberty (approximately 10 to 12 years of age) and ends with physiological and neurobiological maturity, shown in neuroscientific research *to extend to at least age 20, with significant brain development in the late adolescent stage of 18 to 20 yrs*. …

Adolescence, APA Dictionary of Psychology (emphasis added).[11] Dr. Murrie also repeatedly refers to Bruno as an adolescent. *See* Dr. Murrie's Report, at 10, 11, 13, 18, 19 & 20.

The Probation Office also declined to recommend a departure based on age because Bruno "made the choice on January 6th to enter the Capitol, have a baton in his possession, as well as engaged in violence against law enforcement, all while having the option of removing himself from the situation at any time, after witnessing and being a part of the mayhem that day." But that simply begs the question—is Bruno's adolescence a mitigating factor as to that

---

[10] The defense provided a copy of Dr. Murrie's report to the Probation Office on March 27, 2023.

[11] Available at https://dictionary.apa.org/adolescence. The World Health Organization defines adolescence as the phase of life between childhood and adulthood, from ages 10 to 19…. Adolescents experience rapid physical, cognitive and psychosocial growth. This affects how they feel, think, make decisions, and interact with the world around them." *See* https://www.who.int/health-topics/adolescent-health#tab=tab_1.

"choice." The Supreme Court itself has repeatedly recognized it is.  *See, e.g., Miller v. Alabama,* 567 U.S. 460 (2012) (finding mandatory sentence of life without parole unconstitutional for juvenile offenders).

Finally, the Probation Office cites a portion of section 5H1.1 stating that "age may be a reason to depart downward in a case in which the defendant is elderly and infirm" and observes that Bruno "is in decent physical health" and that, "although he may be subject to outside influences, he was in decent health to travel to the Capitol, engage in illegal conduct, and has been able to withstand incarceration." That provision of section 5H1.1 does not exclude a downward departure for youth. Indeed, the very first sentence of section 5H1.1 states: "Age (*including youth*) may be relevant in determining whether a departure is warranted…." U.S.S.G. § 5H1.1 (emphasis added).

One illustration of this principle of youth as a sound basis for variance or departure is Matthew Wood at 23 years old—which the defense discusses on pages 50-51 of its memorandum. Judge Mehta sentenced Mr. Wood to 12 months of home detention, despite the fact that the government asked for 57 months, just as the government requests here. *See* Exhibit A (Tr. of Matthew Wood sentencing hearing). As Judge Mehta observed about January 6: "People were influenced in ways that people who were doing the influencing should have known better. And it's people like Mr. Wood who are then left to suffer the consequences." *Id.* at 64:4-7. "And in Mr. Wood's case, I think we have somebody who's somewhat unique in that he is young. He's not that—he's an adult, obviously, but he's young." *Id.* at 66:11-13. He then posed the question: "And the question for somebody in my position is: Well, what do you want with someone like that? Do you send them to a facility? If the answer is 'maybe,' what you have to ask yourself is: For what purpose? To what end? And if the end is just simple

punishment, then you need to ask yourself whether there are other ways to do it because imposing an incarceration sentence is the most punitive thing we can do as judges." *Id.* That exact same analysis applies equally to Mr. Cua.

Judge Contreras summarized this principle well in the case of another young Georgia man facing charges in relation to events at the Capitol on January 6, 2021. Although 24-year-old Benjamin Torre was sentenced for a misdemeanor offense—he entered the Capitol through a broken window and spent 14 minutes inside—Judge Contreras's statement at sentencing is similarly applicable here:

> Let's chalk this up to a youthful indiscretion. Certainly, someone living with their parents and working at the Gap doesn't reflect someone who has a lot of life experiences. This ordeal I hope has provided you with life experiences that have matured you and will set you on the right path for what I otherwise expect will be a promising life.[12]

Although the defense recognizes that Mr. Cua's offenses of conviction and his conduct are more serious than Mr. Torre's, it was the same "youthful indiscretion"—although of an 18-year-old, not a 24-year-old such as Mr. Torre—that led Mr. Cua down the path he finds himself on.

In addition to the cases the defense previously highlighted, Mr. Cua draws the Court's attention to the case of Grayson Sherrill, was 21 years old on January 6, 2021. *See United States v. Grayson Sherrill*, No. 21-cr-00282 (TSC). Judge Chutkan sentenced Mr. Sherrill to 7 months incarceration on May 5, 2023, after Mr. Sherrill pled guilty to violating section 111(a)(1). Mr. Sherill had a Guidelines range of 37-46 months, and the government had requested 41 months. *See* ECF No. 124, at 1. As the government recited in its memorandum, Mr. Sherrill became violent outside the Capitol as a unit of officers tried to make their way

---

[12] https://www.11alive.com/article/news/special-reports/capitol-insurrection/benjamin-torre-georgia-dc-capitol-riots/85-69d4698e-bd29-4205-972c-9a4e35d0f9e7.

through the crowd: "As one rioter charged at an officer, Sherrill took advantage of that officer's vulnerability. Sherrill violently swung and struck the officer with a metal pole." *Id.* at 2. Sherill entered the Capitol "less than ten minutes after the initial breach of the building when chaos was at an all-time high." *Id.*

> Sherrill roamed the Capitol building for 34 minutes, banged on a door with his metal pole, joined a mob of rioters that overtook a police line in the Crypt, chanted "NANCY! NANCY!" as he approached the House Speaker Nancy Pelosi's office, climbed on statues in the Rotunda, watched as rioters forced open doors and fought with officers, and took videos of the chaos around him.

*Id.* Mr. Sherill was in the Capitol for twice as long as Mr. Cua (17 minutes). After leaving the building, Sherril "climbed on a government vehicle and watched the chaos as officers tried to reclaim the Capitol building," remaining on the grounds until evening. *Id.*

The violence Mr. Sherrill engaged in was much worse than anything that Mr. Cua did. Mr. Sherrill assaulted an officer with a dangerous weapon. He remained in the Capitol much longer than Mr. Cua. And while he did not find his way to the Senate floor, he engaged in conduct at least as disruptive as Mr. Cua by overtaking a police line and getting near Speaker Pelosi's office. And Mr. Sherrill was three years older than Mr. Cua. Yet, undoubtedly, Mr. Sherrill's youth relative to other defendants undoubtedly played a role in his poor decision-making that day, just as it did in Mr. Cua's case.

### 2. The government is flatly incorrect as a matter of law regarding youth as a basis for downward variance.

The government asserts that "a defendant's age is not a justification for a downward variance." ECF No. 328 at 31. The government has it backwards. The governments cites four out-of-circuit decisions from the 1990s. What the government fails to explain is that the policy statement in section 5H1.1 in the 1990s *has changed*. In the 1997 Guidelines, section 5H1.1 stated: "Age (including youth) is *not* ordinarily relevant in determining whether a sentence

should be outside the applicable guideline range." U.S.S.G. § 5H1.1 (1997) (emphasis added).

The 2018 Guidelines applicable to this case state the opposite: "Age (including youth) *may be* relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1 (2018).[13]

Indeed, the 1991 decision in *United States v. White*, one of the cases the government relies upon, specifically quotes and relies upon the language in the *older* version of section 5H1.1. 945 F.2d 100, 121-22 (5th Cir. 1991) ("The guidelines have adequately taken into consideration the defendant's age in § 5H1.1…."). And another Fifth Circuit case from 1993 that the government cites, *United States v. Madison*, relies on *White* in considering the same provision. 990 F.2d 178, 183 (5th Cir. 1993). Similarly, *United States v. Shoupe*, 929 F.2d 116, 120 (3d Cir. 1991), relies on the same outdated provision under section 5H1.1. Finally, United *States v. Sally*, another Third Circuit case the government cites, cites *Shoupe* as precedent for interpreting the same provision. Thus, none of the cases the government cites are applicable.[14] *Accord United States v. Varela*, No. CIV 11-908 RB/LFG, 2012 WL 13076597, at *7 & n.10 (D.N.M. Mar. 7, 2012) (observing that the pertinent 2005 version of the Sentencing Commission Manual provided that "[a]ge … is not ordinarily relevant in determining whether a departure is warranted," but recognizing that "[l]ater versions of the U.S. Sentencing Guidelines Manual contained amended language allowing consideration of age … in deciding whether to allow a downward departure (citing U.S.S.G. § 5H1.1 (2011))).

---

[13] This revised section 5H1.1 was first included in the 2010 Guidelines.
[14] It is also relevant that all four of the cases cited by the government preceded *United States v. Booker*, 543 U.S. 220 (2005), and thus the Guidelines were mandatory at the time.

The Sentencing Commission explained that it made the change to section 5H1.1 and other policy statements in 2010 "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public commentary and testimony, and feedback in various forms from federal judges." U.S.S.G. § 5H1.1 Commentary. *See also United States v. Eccleston*, 543 F. Supp. 3d 1092, 1153-54 (D.N.M. 2021) (quoting same).

The relevance of youth as a mitigating factor and basis for a downward departure or variance is especially pronounced where the defendant is subject to the influence of others. For example, in *United States v. Felton*, 587 F. Supp. 3d 366, 374 (W.D. Va. 2022), the court observed: "While certainly not a minor, Felton was surrounded by co-conspirators much older than he." In another case, the court observed regarding another young defendant "Keyes was 18 years old at the time of the offense…. The Court finds it especially significant that Keyes was much younger than other members of the conspiracy, which the Court considers to be a mitigating factor in assessing his culpability." *United States v. Keyes*, 2022 WL 757958, at *3 (W.D. Va. Mar. 11, 2022).

Moreover, in this case, the significance of youth is especially pronounced. The January 6 cases all involve conduct motivated by collective belief in a lie—that the 2020 election had been stolen from Donald Trump and that the problem could be fixed by "stopping the steal," *i.e.*, by disrupting the vote certification on January 6. Adolescents such as Bruno Cua are especially susceptible to such lies. That is especially true when he was surrounded by older adults—including his parents—who not only did not correct his false belief but fostered it. This false belief was incubated on the internet. Then, on January 6, Bruno was overcome by his emotions and joined in a crowd, just as Dr. Murrie explains that adolescents are prone to do. Bruno's case is in fact a case study in the relevance of youth as a mitigating factor.

24

**B.    Mr. Cua's harrowing time in jail is relevant to determining the extent to which further punishment is necessary.**

After aggressively advocating for his detention—on dangerousness grounds that Mr. Cua has since demonstrated *for nearly 2.5 years* were entirely unfounded—the government takes absolutely no ownership for what happened to Bruno while incarcerated. Indeed, they do not acknowledge it at all. As the Court knows, Bruno is both young and physically slight, and was even more so in early 2021. During his detention, Bruno was (1) subjected to long-term solitary confinement; (2) assaulted by an older inmate; and (3) infected with COVID-19. As the letters and Dr. Murrie's report document amply, Bruno continues to suffer from serious PTSD from that harrowing experience, as do those who love him. *See, e.g.*, ECF No. 329, Ex. 6 (Murrie) at 6, 16; Ex. 13 (Alise Cua) at 6; Ex. 25 (Joseph Cua) at 2. One need only listen to the jail call at Exhibit 26 to Mr. Cua's sentencing memorandum to understand the trauma he experienced by being jailed. This is a significant mitigating factor and itself worthy of a downward variance to a sentence that does not involve further imprisonment.

**C.    Mr. Cua's flawless compliance with his home detention.**

Nor does the government acknowledge (or even mention) that Mr. Cua has already proven to this Court that he does not present any continuing danger. His remarkable record of pretrial compliance includes no violations or even alleged violations over a nearly 2.5-year period of supervision. Moreover, in marked contrast to other J6 defendants, Bruno's period in pretrial release includes no statements to the media (or anyone else) attempting to justify or minimize his conduct or criticize the government for its efforts. The government's assertion that Mr. Cua needs to be specifically deterred underscores its lack of credibility with respect to almost every sentencing factor in this case.

## IV.      OBJECTIONS TO PRESENCE INVESTIGATION REPORT

The final PSR was filed on May 5, 2023, the same day as sentencing memoranda were due to the Court. In addition to the Probation Office's position with respect to a downward departure for age, Mr. Cua responds to the final PSR as follows:

### A.      Descriptions of the Offense Conduct

The Probation Office adopted wholesale a proposed narrative of the offense conduct submitted by the government even prior to the draft PSR, which included many additional alleged facts beyond those from the stipulated statement of facts that the government had not proven or offered evidence regarding but which it said it "intends to prove at sentencing." Although the Probation Office accepted the government's allegations in its proposed narrative of offense conduct at face value, it declined to incorporate into the PSR's description of the offense any descriptions Mr. Cua proposed. *See* PSR at 25-16. Mr. Cua maintains his objections.

### B.      Enhancements Related to Administration of Justice

The Probation Office disagreed with Mr. Cua's argument that the 8-level and 3-level enhancements to the base offense level under sections 2J1.1(b)(1)(B) and (b)(2). Mr. Cua maintains his objections to these enhancements.

With respect to the 8-level enhancement under section 2J1.2(b)(1)(B) and its requirement that the offense involved causing or threatening to cause physical injury to a person in order to obstruct the administration of justice, the Probation Office asserts: "Pursuant to USSG § 1B1.3, Mr. Cua's 'relevant conduct' for purposes of addressing the Guidelines includes his own acts as well as the acts of others, including harm that resulted from the jointly undertaken activity." ECF No. 326 (Final PSR), at 28. This is incorrect as a matter of law.

Section 1B1.3(a)(1)(B) states that relevant conduct for purposes of determining the

applicable Guidelines includes:

> In the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i)      within the scope of the joint undertaken criminal activity,
>
> (ii)     in furtherance of that criminal activity, and
>
> (iii)    reasonably foreseeable in connection with that criminal activity.

The comments explain:

> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

U.S.S.G. § 1B1.3, commentary n. 3(B).

In Mr. Cua's case, there was no agreement with anyone to jointly undertake any

criminal activity. As the comment notes, the Court may not consider acts not within the scope

of such an agreement, "even if those acts were known or reasonably foreseeable to the

defendant." This was a riot, plain and simple. It is ludicrous to suggest that Mr. Cua's "relevant

conduct" for calculating the Guidelines is *all of the actions by all of the defendants* on January

6, which is what the necessary implication of the Probation Office's position.

### C.      Attempt

The Probation Office declined to reduce Mr. Cua's offense level by three points on the

basis that his conduct constituted an attempt. Mr. Cua maintains his objection; his brief time in

the Capitol came after the Chamber had been evacuated, and he did not remain there long enough to prevent the resumption of the proceedings. His actions do not reflect a completed obstruction offense.

## V.   THE GOVERNMENT'S PROPOSED GUIDELINES CALCULATIONS FOR SECTION 111(A)

If the Court agrees not to include the enhancements proposed by the government and the Probation Office for the Guidelines calculation for the 1512(c)(2) conviction, it may become necessary to calculate the Guidelines for Mr. Cua's conviction under section 111(a). The Probation Office did not calculate the Guidelines for section 111(a), concluding that Mr. Cua's convictions are grouped and that his section 111(a) conviction "is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable" to his section 1512(c)(2) conviction. PSR, at 13 ¶ 53.

The government has proposed a calculation for section 111(a) starting with a base offense level of 14 with two enhancements: (1) plus two levels under section 2A2.2(b)(1) "[i]f the assault involved more than minimal planning" and (2) plus six levels under section 3A1.2(a) which applies, in relevant part, if "the victim was a government officer or employee [and] the offense of conviction was motivated by such status." ECF No. 328, at 25. Under the Court's findings at trial that Mr. Cua assaulted Officer G.L. with the intent to commit another felony, Mr. Cua has no grounds to object to the base offense level under section 2A2.2(a). However, neither of the government's proposed enhancements applies in Mr. Cua's case.

First, there is no evidence that the assault on Officer G.L. involved any planning, much less more than minimal planning. "More than minimal planning" means "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 2A2.2, note 2. The videos make clear that Mr. Cua made no move toward Officer G.L. before Ronald Sandlin yelled for

others not to let the officers close the doors to the Senate Gallery. To the extent that the government is relying on Mr. Cua's statements on social media, such generalized statements are not sufficiently connected to Mr. Cua's actions to be considered. Moreover, while such statements in advance might be considered evidence of intent (although in Mr. Cua's case, they are too remote and generalized to be considered such), they are not evidence of "planning" under the Guidelines. Finally, as discussed above, Mr. Cua's father insisted that he carry the baton and pepper spray that day. Mr. Cua did not carry those items as part of a plan to assault anyone, much less a law enforcement officer (nor did he use them against Officer G.L.).

Second, there is no evidence that Mr. Cua was motivated by Officer G.L.'s status as a government officer or employee. As an initial matter, unlike many of the assaults of law enforcement officers at the Capitol that day, Officer G.L. was not in uniform and so his status as a law enforcement officer did not play into Mr. Cua's actions. Moreover, Mr. Cua's motivation was that Ronald Sandlin shouted not to let them close the doors. It was a split second reaction. Mr. Cua's only goal was to get to the door and get past. Even to the extent Mr. Cua may have committed a minor assault of Officer G.L., it was not motivated by the officer's status.

## CONCLUSION

For the reasons stated above, as well as the reasons stated in Mr. Cua's sentencing memorandum, and all of the evidence presented in this case, Mr. Cua respectfully requested a sentence of time served, plus an appropriate amount of supervised release, with no fine because he does not have the means to pay one.

Respectfully submitted,

DATED:  July 21, 2023

*/s/ William E. Zapf*
William E. Zapf (D.C. Bar No. 987213)
Jonathan Jeffress (D.C. Bar No. 479074)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
wzapf@kaiserdillon.com

*Attorneys for Bruno Joseph Cua*