UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

BRUNO JOSEPH CUA,

    *Defendant*.

Criminal Action No. 21-107 (RDM)

**MEMORANDUM OPINION AND ORDER**

Defendant Bruno Joseph Cua was convicted of offenses arising from his participation in the riot at the United States Capitol on January 6, 2021. As part of his sentence, the Court ordered Cua to pay special assessments and restitution. While his convictions were on appeal, however, Cua received a pardon from President Trump. Cua, proceeding *pro se*, now moves for a refund of his payments. Dkt. 397. The government does not oppose the motion. Dkt. 399. Nonetheless, for the reasons explained below, the Court will deny Cua's motion.

**I. BACKGROUND**

As Congress convened to certify the vote count for the 2020 Presidential Election on January 6, 2021, Cua, armed with an ASP baton, entered the restricted Capitol grounds. Along with a crowd of rioters, Cua pushed past the police line, entered the Capitol building, and reached the doors of the Senate Gallery. When Cua arrived, several officers were attempting to secure the doors and prevent the mob from entering. Dkt. 281 at 5–8. As Cua and his fellow rioters forced their way in, Cua "pushed" an officer "with the baton in his arm." Dkt. 372 at 26. Cua then "rushed into the Senate Gallery and yelled 'This is our house! This is our country!'" Dkt. 281 at 9. Cua leaped from the Senate Gallery to the Senate Floor, where he unlocked the

doors to the chamber and allowed the other rioters to enter. After spending time on the dais, rifling through Senators' desks, and sitting in the Vice President's chair, Cua left the Senate Floor. *Id.* at 9–10.

Based on this conduct, a grand jury returned an indictment charging Cua with twelve counts.[1] The parties entered into an agreement to hold a stipulated bench trial on two of the counts: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) & 2, and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). Following that stipulated bench trial, the Court found Cua guilty of both counts. Dkt. 326 at 5. At sentencing, the Court concluded that the Guidelines Range was 27 to 33 months, but the Court varied downward significantly, imposing a sentence of one year and one day, to be followed by 36 months of supervised release. Dkt. 373 at 91–92; Dkt. 377 at 1. The Court also ordered Cua to pay a $200 mandatory special assessment and $2,000 in restitution to the Clerk of the Court for disbursement to the Architect of the Capitol. Dkt. 376 at 6–7. Cua did not object to the order of restitution. Dkt. 372 at 59.

---

[1] The twelve counts were: Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Three, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Count Four, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Six, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Count Seven, Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); Count Eight, Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); Count Nine, Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); Count Ten, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Eleven, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and Count Twelve, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Dkt. 90.

Cua timely appealed his convictions, Dkt. 378, but while his appeal was pending, President Trump granted pardons to "to all . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." Proclamation No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 29, 2025). The Department of Justice emailed a "Certificate of Pardon" to Cua. Dkt. 397-1 at 6. The email explained that Cua was "pardoned under President Trump's January 20, 2025 clemency proclamation," and that "[t]he pardon means that you're forgiven, but you still have a criminal conviction." *Id.* at 7. In light of Cua's pardon, however, the government filed a motion in the Court of Appeals to vacate Cua's convictions and for remand to dismiss the case as moot, which that court granted. *See* Dkt. 396. Consistent with that disposition, the Court dismissed the case as moot on remand. Min. Order (Feb. 27, 2025).

Before receiving his pardon, Cua paid the $2,200 he owed in special assessments and restitution. *See* Dkt. 397 at 1. In accordance with its usual protocol, the Finance Office for the District Court collected these funds and deposited them into the Crime Victims Fund within the United States Treasury. Dkt. 397-1 at 2; *see also* 34 U.S.C. § 20101. After the Court dismissed his case, Cua submitted a request to the Finance Office for a refund of his payments, but the Office responded that it was unable to issue a refund. Dkt. 397-1 at 2. Relying on *Knote v. United States*, 95 U.S. 149 (1877), the Finance Office explained that "[c]riminal debt, which includes special penalty assessments, fines, and restitution, paid to the U.S. Government . . . pursuant to a valid Judgment in a Criminal Case Order and prior to a pardon or dismissal is considered to be vested in a third party and therefore not available to be refunded." *Id.* The Finance Office confirmed that Cua's funds were "`no longer in the possession of the Judiciary" because they had been "deposited" into the Treasury. *Id.*

3

This led Cua to file the instant motion for an order requiring a refund of his payments. The government filed a response, stating that it agrees that the Court should order a refund Cua's payments. Dkt. 399.[2] Cua's motion is now ripe for decision.

## II. ANALYSIS

Cua and the government's principal contention is that the Finance Office was wrong to rely on *Knote v. United States*, 95 U.S. 149 (1877), when it denied Cua's request for a refund. In their view, Cua's motion is, instead, governed by *Nelson v. Colorado*, 581 U.S. 128 (2017). They argue that, under *Nelson*, vacatur of a conviction requires the government to refund any exactions collected as part of the sentence. *See* Dkt. 397 at 2; Dkt. 399 at 4. Cua's motion thus raises the question of whether *Knote* or *Nelson* applies.

The Court recently confronted this exact issue in *United States v. Vargas Santos*, No. 21-cr-47 ("*Vargas Santos*"). In that case, the defendant's convictions were also on appeal at the time of President Trump's pardons. And, like Cua, his convictions were subsequently vacated by the D.C. Circuit on the government's motion. *Vargas Santos*, Dkt. 111 at 2. This led the defendant to move for a refund of his restitution, fine, and special assessments, arguing that he was entitled to their return under *Nelson v. Colorado*, 581 U.S. 128 (2017). *Id.* at 4. The Court

---

[2] Consistent with its "independent obligation to assure [itself] of [its] jurisdiction," *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1179 (D.C. Cir. 2025), the Court concludes that it has ancillary jurisdiction over Cua's motion, *see United States v. Wilson*, 540 F.2d 1100, 1103–04 (D.C. Cir. 1976) (holding that district court had ancillary jurisdiction over criminal defendant's motion for return of seized property following his sentencing). The Court is also satisfied that, notwithstanding the parties' apparent lack of adversity, the motion presents a justiciable "case or controversy." *United States v. Windsor*, 570 U.S. 744, 758 (2013). A request for an order requiring "the United States to pay money that it would not disburse but for the court's order" presents an Article III "controversy," even where the United States would "welcome" such an order because it agrees with the ruling. *Id.* The United States has indicated that it requires a Court order to effectuate the payment and that it cannot act unilaterally. *See United States v. Vargas Santos*, No. 21-cr-47, Dkt. 111 at 3.

rejected this argument, explaining that *Knote*, rather than *Nelson*, applied to his motion for a refund. *Id.* at 6. *Knote*, the Court explained, similarly arose from the issuance of a presidential pardon. The petitioner in *Knote* was a Confederate supporter, and, following the Civil War, the United States confiscated and sold Knote's property "on the alleged ground of his treason and rebellion." *Knote*, 95 U.S. at 149. The United States did so pursuant to the Confiscation Act of 1862, which authorized the government to "seize" the property of "any person . . . aiding or abetting [the] rebellion." *See* Confiscation Act of July 17, 1862, § 6, 12 Stat. 589. The proceeds of that sale—totaling $11,000 at the time or over $200,000 if adjusted to current purchasing power—were then "paid into the treasury." *Knote*, 95 U.S. at 149. After President Johnson granted a blanket pardon "to all persons who had directly or indirectly participated in the rebellion," Knote filed suit in the Court of Claims seeking the proceeds from the sale, but the court dismissed his case. *Id.* at 149–50, 152. The Supreme Court thus considered "whether the general pardon and amnesty granted by President Johnson" "entitle[d]" pardoned individuals "to the proceeds of [their] property, previously condemned and sold . . . after such proceeds have been paid into the treasury." *Id.* at 152. The Court concluded that it did not.

  The Court began with the "settled" principle that a pardon "releases the offender from all disabilities imposed by the offence, and restores to him all his civil rights," but a pardon does not "affect any rights which have vested in others directly by the execution of the judgment for the offence." *Id.* at 153–54. If, for example, a defendant's property is seized and sold to a third party pursuant to a valid judgment, that third party gains a vested property right and "will hold the property notwithstanding the subsequent pardon." *Id.* at 154. The Court applied this principle to the United States, concluding that "if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to

5

the former owner of the property through an act of Congress." *Id.*  The Appropriations Clause prohibits drawing money from the Treasury except "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  The Court noted, however, that this rule does not apply where proceeds have not yet been deposited into the U.S. Treasury, but "remain under control of the Executive" or "are in the custody of the judicial tribunals." *Knote*, 95 U.S. at 154.  In those circumstances, "the property will be restored or its proceeds delivered to the original owner, upon his full pardon." *Id.*  But because Knote's proceeds *had* been paid into the Treasury, and because no appropriations law authorized their return, the funds could not be "subsequently reached and recovered by the offender"—Knote's pardon notwithstanding. *Id.*  The Court, accordingly, concluded that "[h]owever large . . . may be the power of pardon possessed by the President," it "cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress," in accordance with the Appropriations Clause. *Id.*

*Nelson v. Colorado*, 581 U.S. 128 (2017), in contrast, did not involve the issuance of a pardon.  In *Nelson*, the Court addressed whether the Fourteenth Amendment's Due Process Clause requires states to refund payments exacted from criminal defendants and deposited into state coffers after a court invalidates the underlying conviction. *Id.* at 130.  The petitioners there were each convicted at trial in Colorado state court and ordered to pay fees and restitution, which were deposited into Colorado's "victim compensation fund" and its "victims and witnesses assistance and law enforcement fund," pursuant to state law. *Id.* at 131 nn.1–2.  The petitioners' convictions were subsequently vacated, and the petitioners, accordingly, moved for return of their payments. *Id.* at 131–32.  Colorado law, however, permitted refunds in such circumstances only if defendants could "show, by clear and convincing evidence, [their] actual innocence of the offense of conviction." *Id.* at 132–34.  The U.S. Supreme Court held that Colorado's refund law

6

violated due process, reasoning that Colorado had "no legal right to . . . retain" funds exacted from a defendant whose conviction had been vacated, *id.* at 132, 139, and by requiring defendants to prove their innocence, the law created an unacceptable "risk of erroneous deprivation" of defendants' property, *id.* at 137.

The Court remains unpersuaded that *Nelson* applies in the present context. *Nelson* had nothing to do with the scope of the pardon power or the Appropriations Clause. Rather, it held that vacatur of a conviction presumptively entitles a defendant to a refund of her payments into the state's coffers, and so "a State may not impose anything more than minimal procedures" on obtaining that refund. *Nelson*, 581 U.S. at 139. The vacatur of a conviction for reasons other than a pardon generally renders the conviction void *ab initio*. The parties insist that *Nelson* governs here because, like the petitioners in that case, Cua's conviction was also subsequently vacated. It is true that Cua's conviction was vacated, but that alone does not trigger *Nelson*'s rule. The Court's power to order a refund does not turn on whether a defendant's conviction was vacated or not; it turns on whether the defendant is *entitled* to funds that were deposited into the U.S. Treasury before the pardon was granted. As *Knote* made clear, a pardoned individual is not "entitle[d]" to payments that have already been deposited into the United States Treasury, absent congressional authorization to withdraw the funds. *Knote*, 95 U.S. at 152; *see also In re North*, 62 F.3d 1434, 1435 (D.C. Cir. 1994) ("[The Appropriations Clause] is a restriction on the power of the President to grant pardons.").[3] The parties do not point to any appropriations law that would authorize the disbursal Cua seeks, and the Court is aware of none. *See Vargas Santos*, Dkt. 111 at 8–9.

---

[3] Cua also suggests that, under *Nelson*, he is entitled to a refund based on the "Constitutional Right[]" of "Redress of Grievance (1st Amendment)." Dkt. 397 at 3. But *Nelson* makes no mention of the First Amendment, nor does Cua's motion implicate First Amendment concerns.

Notably, the statute at issue in *Knote* did not require a criminal conviction at all, and there is no indication that Knote himself was ever convicted of treason. *See Knote*, 95 U.S. at 149–52; *see also Knote v. United States*, 10 Ct. Cl. 397, 398 (1874); Confiscation Act of July 17, 1862, § 6, 12 Stat. 589. If individuals who were never convicted of a crime are not entitled to a return of their property following a pardon, then it stands to reason that the same rule applies to individuals whose convictions were vacated, not because their convictions were invalid, but because they received presidential pardons. And, like the petitioner in *Knote*, Cua's payments have left the custody of the executive and judicial branches and have been deposited into the U.S. Treasury. Dkt. 397-1 at 2. Thus, at least for purposes of evaluating the Court's authority to order their return—that is, for purposes of deciding whether the Court has the power to order the United States to withdraw funds from the Treasury to make a payment to Cua—they are treated as "vested in the United States," *Knote*, 95 U.S. at 154 ("[I]f the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress[.]"); *accord United States v. Sullivan*, 2025 WL 1444392, at *3–5 (D.D.C. May 20, 2025). The Court, accordingly, concludes that because Cua's conviction was set aside by virtue of the presidential pardon, and because the funds "have been paid into the treasury," *Knote* applies, rather than *Nelson*. And under *Knote*, the Court must deny Cua's motion.

Cua attempts to distinguish *Knote* on two additional grounds, but neither is persuasive. First, Cua suggests that *Knote* applies to cases where the pardoned individual is seeking the return of "real estate," but it does not apply where the individual seeks to "recover money." Dkt. 397 at 1–2. But, to the contrary, Knote *was* seeking to recover money, "amounting to the sum of $11,000." *Knote*, 95 U.S. at 149. *Knote*'s rule, moreover, applies to all money that has been

8

deposited into the Treasury, regardless of whether it comes from the sale of seized real estate or "personal property," or whether it is collected as a monetary exaction. *Id.* Cua next argues that the Supreme Court denied relief in *Knote* because the petitioner filed suit "after the two-year statute of limitations had run out for recovering monies under Common[ ]law Tort process." Dkt. 397 at 2. The Court makes no mention of any statute of limitations in its opinion, however, and Cua otherwise provides no reason to believe that *Knote* was decided on this basis.

The government, for its part, insists that even if *Knote* applies, the Court may nonetheless order a refund because the Architect of the Capitol is the intended recipient of Cua's restitution payments. Dkt. 399 at 4 n.1. The government reasons that because the Architect is a "governmental entity," not a "third-party victim," the United States does not have a vested right to the funds. *Id.* The Court previously rejected this argument in *Vargas Santos*. No. 21-cr-47, Dkt. 111 at 8. As the Court explained in that case, under *Knote*, the question is not whether the intended recipient is a "governmental entity." The only question is whether the funds remain in the custody of an executive agency or the court system, or whether they have been deposited into the U.S. Treasury. As explained above, Cua's funds have now been deposited into the Treasury, and so the Court is unable to order their return.

## CONCLUSION

For the reasons explained above, Cua's motion for refund of fees and restitution, Dkt. 397, is **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: June 30, 2025

9